# EXHIBIT F

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT ENGLEHART, JORGE RODRIGUEZ and THE JUDITH KANE-RODRIGUEZ 2012 FAMILY TRUST, On Behalf of Themselves and All Others Similarly Situated, | ) ) ) ) ) ) | No. _____ <br><br> <u>CLASS ACTION</u> |
| Plaintiffs, | ) ) ) | <u>DEMAND FOR JURY TRIAL</u> |
| vs. | ) ) ) | |
| TELLABS, INC., MARLIN EQUITY PARTNERS, BLACKHAWK HOLDING VEHICLE LLC, BLACKHAWK MERGER SUB INC.,VINCENT H. TOBKIN, BO HEDFORS, FRANK IANNA, VINCENT D. KELLY, MICHAEL E. LAVIN, STEPHANIE PACE MARSHALL, ALEX MASHINSKY, GREGORY J. ROSSMANN, DENNIS F. STRIGL, JAN H. SUWINSKI and MIKEL H. WILLIAMS, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) ) | |

CLASS ACTION COMPLAINT FOR VIOLATIONS OF §§14(e) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND FOR BREACHES OF FIDUCIARY DUTY

Plaintiffs Robert Englehart, Jorge Rodriguez and The Judith Kane-Rodriguez 2012 Family Trust ("Plaintiffs"), by and through their undersigned counsel, individually and on behalf of all others similarly situated, submit this Complaint for violations of §§14(e) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78n(e) and 78t(a), and for breach of fiduciary duty against the herein-named defendants, and upon information and belief, except as to the allegations specifically pertaining to Plaintiffs, which are based on personal knowledge, allege as follows. Plaintiffs' allegations are based upon the investigation of Plaintiffs' counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Tellabs, Inc. ("Tellabs" or the "Company") and the defendants, press releases and other public statements issued by the Company and the defendants, media reports about the Company and the defendants, and other publicly available information concerning the Company and the defendants.

## SUMMARY OF THE ACTION

1. This is a direct shareholder class action brought by Plaintiffs individually and on behalf of the holders of Tellabs common stock against Tellabs, the Company's Board of Directors (the "Board" or the "Individual Defendants"), and Marlin Equity Partners, Blackhawk Holding Vehicle LLC, and Blackhawk Merger Sub Inc. (collectively "Marlin"), arising out of the acquisition of Tellabs by Marlin (the "Acquisition"). In pursuing the Acquisition, the Individual Defendants and Tellabs violated §§14(e) and 20(a) of the Exchange Act by issuing a 14D-9 (defined below) recommendation statement that contained untrue statements of material fact, or omitted any material fact necessary in order to make the statements made not misleading, or by engaging in fraudulent, deceptive, or manipulative acts or practices in connection with the Tender Offer (defined below). Also, in pursuing the Acquisition, each of the defendants violated applicable state law by directly breaching and/or aiding and abetting breaches of fiduciary duties of loyalty and due care owed to Plaintiffs and the proposed Class (defined below).

2.      Headquartered in Naperville, Illinois, Tellabs designs, develops, and supports telecommunications networking products.  On October 21, 2013, Tellabs and Marlin announced that that they had entered into a definitive agreement (the "Merger Agreement") pursuant to which Marlin would acquire all of the outstanding shares of Tellabs via a tender offer (the "Tender Offer"), which was commenced on November 1, 2013 for a mere $2.45 per share in cash (the "Acquisition Price").  The Tender Offer closed at 11:59 p.m., New York City time on December 2, 2013 and was followed by a short-form merger, which paid those shareholders who had not previously tendered the Acquisition Price.  The Acquisition Price of $2.45 per share undervalued Tellabs' intrinsic value and stand-alone alternatives going forward.  The Acquisition was the product of a flawed process that was designed to ensure the sale of Tellabs to Marlin on terms preferential to defendants and also certain Tellabs insiders and to subvert the interests of Plaintiffs and the other public stockholders of the Company.

3.      Throughout the sale process, the Tellabs Board supinely deferred to conflicted management and a conflicted financial advisor, which without the Board's knowledge steered negotiations towards their preferred acquirer, Marlin, and away from other potential acquirers. Unlike other potential acquirers, Marlin led Tellabs management to believe that Marlin would retain them after the Acquisition.  Indeed, on December 5, 2013, just two days after the Acquisition closed, CEO Daniel P. Kelly wrote that "***I continue to serve as Tellabs CEO and Tellabs headquarters continues to be in Naperville, Ill***."  In addition, large shareholders, including Dialectic Capital Management ("Dialectic"), were agitating for a sale or change of management, and Tellabs management realized that they would personally benefit from a sale to Marlin rather than continue as a public company.

4.      Despite these conflicts, the Board continued to allow management to tilt the process improperly towards Marlin.  One potential acquirer, "Party A," requested that it be permitted to work

with another potential acquirer in order to partner and submit a higher bid for the entire Company. Party A was forced to make that request because its confidentiality agreement with the Company prohibited it from discussing a potential transaction with any other parties. Throughout the sale process, Party A consistently indicated that it was interested in acquiring the Company's data business, but if allowed to partner with another potential acquirer, the mini-consortium could have been able to offer a higher overall value for Tellabs' shareholders. Egregiously, and without any valid justification, the Board refused to allow Party A to partner with the other entity and submit a higher bid.

5.     Collectively, Dialectic, the Board, Michael J. Birck ("Birck"), and senior management controlled approximately 13% of Tellabs' outstanding shares of common stock and sought liquidity for their illiquid Tellabs holdings. The Acquisition provided that liquidity, and as a result, Dialectic, Birck, the Board, and senior management received over **$110 million** from the deal. In addition, from the Acquisition, Tellabs' officers and directors received millions of dollars in special payments –not being made to ordinary shareholders –for unvested stock options, performance units, and restricted shares, all of which became fully vested and exercisable upon closing the Acquisition. The Company's senior management was also entitled to receive from the Acquisition millions of dollars in change-of-control payments. Thus, Board members were conflicted and served their own financial interests rather than those of Tellabs' other shareholders.

6.     The Board's bad faith decision to remain uninvolved in the sale process was exacerbated by the fact that it hired a highly conflicted financial advisor, Goldman, Sachs & Co. ("Goldman Sachs"). Not only was Goldman Sachs conflicted by a $10 million transaction fee that was wholly contingent upon the closing of the Acquisition, but it also stood on both sides of the transaction. ***Funds managed by an affiliate of Goldman Sachs owned 11% of Marlin Equity III, L.P., which provided $13 million in equity financing to Marlin for the Acquisition***. The Board did

nothing to oversee Goldman Sachs or attempt to protect shareholders from this significant conflict of interest.

7.     The Acquisition Price, which provided Tellabs shareholders with a paltry 4.5% premium, drastically undervalued the Company's prospects and was the result of an entirely unfair sales process that sought to take advantage of the vacuum created by the untimely death in 2012 of the Company's then-Chief Executive Officer ("CEO") Rob Pullen ("Pullen"), and then-Chairman Birck's announcement that he would step down from the Board after being diagnosed with leukemia. Pullen's death and Birck's retirement, when combined with Dialectic's 2012 seizure of three Board seats, left the Company ripe for a fire sale to a bidder like Marlin, who likely, based on its prior practice, promised to give Company management employment with the post-Acquisition entity. Significantly, the Company's book value, as of the end of its most recently reported fiscal quarter (ended September 27, 2013) was $2.80 per share, almost 15% higher than the Acquisition Price. Given that on September 27, 2013, Tellabs' cash, cash equivalents and marketable securities amounted to $1.55 per share, Marlin paid just 90¢ per Tellabs share for all of Tellabs' business, which per book value, was worth at least $1.25 per share. Moreover, the Acquisition Price was less than at least one analyst's high target of $2.50 per Tellabs share, and undervalued what Tellabs will contribute to Marlin, as the Acquisition will permit Marlin, and not Tellabs' current shareholders, to capitalize – for just 90¢ a share of their own money – on the growth in the telecom network equipment sector.

8.     Birck, Dialectic, the Board, and senior management signaled their support for the deal and tendered their shares to Marlin.  Moreover, prior to the close of the Tender Offer, Tellabs and Marlin announced their intent to effect the merger, once one share more than 50% of Tellabs' outstanding shares was tendered pursuant to recently enacted §251(h) of the Delaware General Corporation Law, as a short-form merger — to cash out any shareholders who do not tender —

without so much as a shareholder vote. Given that Birck, Dialectic, the Board, and senior management controlled approximately 13% of Tellabs' outstanding shares, only 37% of the shares outstanding needed be tendered for the Acquisition to close.

9. In order to lock up the Acquisition, and the material benefits for Dialectic, themselves and Company management, the Board also agreed to numerous preclusive "deal protection" devices that guaranteed the success of the Acquisition for Marlin and effectively prevented other potential suitors from making a topping bid. These provisions included: (i) a no-shop clause that prevented Tellabs from providing confidential Company information to, or even communicating with, potential competing bidders except under extremely limited circumstances; (ii) information rights that required Tellabs to share highly sensitive information about potential competing proposals with Marlin; (iii) matching rights that allowed Marlin to match any superior proposal; (iv) a termination fee provision that required Tellabs to pay Marlin $26.7 million if Tellabs terminated the Acquisition in favor of a competing proposal; and (v) a tender offer structure for the Acquisition that unduly limited the time competing bidders had to put together a proposal. Especially in light of the tainted and circumscribed process leading up to the execution of the Merger Agreement, these deal protection provisions unduly bound the Board to the Acquisition and substantially hindered, if not eliminated, the Board's ability to fulfill its fiduciary duties.

10. To make matters worse, and in further breach of their fiduciary duties, on November 1, 2013, defendants filed a Schedule 14D-9 Solicitation/Recommendation Statement (collectively with its amendments, the "14D-9") with the SEC that recommended shareholders tender their shares in response to the Tender Offer. The 14D-9 contained untrue statements of material fact, or omitted material information concerning the Acquisition necessary to make the statements made in the 14D-9 not misleading, in violation of §14(e) of the Exchange Act and the Individual Defendants' fiduciary duties to the Plaintiffs and the Class. These failures of disclosure deprived Tellabs'

shareholders of the basic information they required to make an intelligent, informed, and rational decision to tender their shares or to seek "fair value" for their shares pursuant to the appraisal process. As detailed below, the 14D-9 omitted or misrepresented material information concerning, among other things: (a) the sales process for the Company; (b) the conflicts of interests in the process leading to the Acquisition; and (c) the data and inputs underlying the financial valuation analyses that purported to support the so-called fairness opinion provided by the Company's financial advisor, Goldman Sachs.

11. In pursuing and completing the unlawful plan to sell the Company for less than fair value and pursuant to an unfair process, defendants breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and/or aided and abetted such breaches.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over the claims for violations of §§14(e) and 20(a) of the Exchange Act pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa. Federal courts have "exclusive jurisdiction . . . of all suits in equity and actions at law brought to enforce any liability or duty created by" the Exchange Act. In addition, this Court has jurisdiction over the claims for violations of §§14(e) and 20(a) of the Exchange Act, pursuant to 28 U.S.C. §1331, because the claims arise under the laws of the United States.

13. This Court has supplemental jurisdiction over Plaintiffs' claims for violations of state law pursuant to 28 U.S.C. §1367 because the state law claims are so related to the claims for violations of §§14(e) and 20(a) of the Exchange Act that they form part of the same case or controversy.

14. This Court has personal jurisdiction over defendants because they conduct business in Illinois, and Tellabs has at all relevant times been located at One Tellabs Center, 1415 W. Diehl

Road, Naperville, Illinois.  Further, §27 of the Exchange Act permits process to "be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found."

15.     Venue is proper in this Court pursuant §27 of the Exchange Act because acts or transactions constituting the violations of the Exchange Act took place in this District and defendants transacted business in this District.  Venue in this Court is also proper pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to the claims in this Complaint took place in this District.  Further, defendants have purposely availed themselves of the benefits of this Court and this District by appearing and litigating in a related action.

## PARTIES

16.     Robert Englehart, Jorge Rodriquez and The Judith Kane-Rodriguez 2012 Family Trust were, at all material times, owners of Tellabs common stock.

17.     Tellabs, was, prior to the Acquisition, a Delaware Corporation with its principal place of business located at One Tellabs Center, 1415 W. Diehl Road, Naperville, Illinois.  Tellabs common stock traded on the NASDAQ Stock Market under the ticker symbol "TLAB."  After the Acquisition, Tellabs is privately owned by Marlin.

18.     Defendant Marlin Equity Partners is a global investment firm with headquarters in Los Angeles, California.  Marlin Equity Partners is sued herein as an aider and abettor.

19.     Defendant Blackhawk Holding Vehicle LLC ("Parent") is a Delaware limited liability company and an affiliate of Marlin Equity Partners.  Parent is sued herein as an aider and abettor.

20.     Defendant Blackhawk Merger Sub Inc. ("Merger Sub") is a Delaware corporation, a wholly-owned subsidiary of Parent, and an affiliate of Marlin Equity Partners.  Merger Sub is sued herein as an aider and abettor.

21.     Defendant Vincent H. Tobkin was at all material times Chairman and a director of Tellabs.

22.     Defendant Bo Hedfors was at all material times a director of Tellabs.

23.     Defendant Frank Ianna was at all material times a director of Tellabs.

24.     Defendant Vincent D. Kelly ("Kelly") was at all material times a director of Tellabs. Kelly was one of Dialectic's designees on the Board.

25.     Defendant Michael E. Lavin was at all material times a director of Tellabs.

26.     Defendant Stephanie Pace Marshall was at all material times a director of Tellabs.

27.     Defendant Alex Mashinsky was at all material times a director of Tellabs.

28.     Defendant Gregory J. Rossmann ("Rossmann") was at all material times a director of Tellabs.  Rossmann was one of Dialectic's designees on the Board.

29.     Defendant Dennis F. Strigl was at all material times a director of Tellabs.

30.     Defendant Jan H. Suwinski was at all material times a director of Tellabs.

31.     Defendant Mikel H. Williams ("Williams") was at all material times a director of Tellabs.  Williams was one of Dialectic's designees on the Board.

32.     The defendants identified in ¶¶21-31 above are sometimes collectively referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

33.     Plaintiffs bring this action individually and as a class action on behalf of: (a) all holders of Tellabs common stock whose common stock was converted to the Acquisition Price through the short-form merger and who were harmed by defendants' breaches of fiduciary duties as described herein; and (b) all holders of Tellabs common stock who tendered their common stock through the Tender Offer or whose common stock was converted to the Acquisition Price through the short-form merger and were harmed by defendants' violations of the Exchange Act as described herein (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the defendants.

34.    This action is properly maintainable as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3).

35.    The Class is so numerous that joinder of all members is impracticable. According to the Company's latest annual report filed with the SEC, there were over 355 million shares of Tellabs common stock outstanding. These shares were held by hundreds, if not thousands, of beneficial holders.

36.    There are questions of law and fact which are common to the Class and which predominate over questions affecting solely individual Class members. The common questions include, inter alia, the following:

(a)    whether the Individual Defendants and Tellabs violated §14(e) of the Exchange Act by making untrue statements of material fact, or omitting to state any material fact necessary in order to make the statements made not misleading, or by engaging in fraudulent, deceptive, or manipulative acts or practices in connection with the Tender Offer;

(b)    whether any or all the Individual Defendants were controlling persons under Section 20(a) of the Exchange Act, and whether the Individual Defendants violated §20(a) of the Exchange Act by controlling any person liable under the Exchange Act, including Tellabs;

(c)    whether the Individual Defendants breached their state law fiduciary duties of undivided loyalty, independence, due care, or candor with respect to Plaintiffs and the other members of the Class in connection with the Acquisition;

(d)    whether the defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives, including offers from interested parties for the Company or its assets;

(e)    whether Parent, Merger Sub, and Marlin aided and abetted the wrongful acts of the Individual Defendants;

(f)     whether Plaintiffs and the other members of the Class were harmed by the transactions complained of herein;

(g)     whether to rescind the Acquisition; and

(h)     whether Plaintiffs and the other members of the Class are entitled to damages, including rescissory damages.

37.     Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs do not have any interests adverse to the Class.

38.     Plaintiffs are adequate representatives of the Class, have retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

39.     Questions of fact and law common to the Class members predominate over any questions affecting only individual members of the Class.

40.     Plaintiffs anticipate that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## SECTIONS 14(E) AND 20(A) OF THE EXCHANGE ACT

41.     Section 14(e) of the Exchange Act makes it unlawful for:

any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

42.     Section 20(a) of the Exchange Act imposes liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of" the Exchange Act or any of the rules promulgated thereunder.  Such "controlling persons" are "liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . .

- 10 -

unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

43.     Under applicable Delaware state law (Tellabs was a Delaware corporation), in any situation where the directors of a publicly traded corporation undertake a transaction that will result in either (i) a change in corporate control, or (ii) a breakup of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium.  To diligently comply with these duties, the directors and/or officers may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     contractually prohibits them from complying with their fiduciary duties;

(d)     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; or

(e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

44.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Tellabs, were obligated under applicable law to refrain from:

(a)     participating in any transaction where the directors' or officers' loyalties were divided;

       (b)     participating in any transaction where the directors or officers received, or were entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and

       (c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

45.    Defendants were also obliged to honor their duty of candor to Tellabs' shareholders by, inter alia, providing all material information to the shareholders regarding a scenario in which they are asked to tender their shares. This duty of candor ensures that shareholders have all the information that would enable them to make informed, rational and intelligent decisions about whether to tender their shares or seek appraisal.

46.    Because the Individual Defendants knowingly or recklessly breached their duties of loyalty, good faith and independence in connection with the Acquisition, the burden of proving the inherent or entire fairness of the Acquisition, including all aspects of its negotiation, structure, price and terms, is placed upon defendants as a matter of law.

## FACTUAL ALLEGATIONS

## I.    BACKGROUND ON TELLABS

47.    Headquartered in Naperville, Illinois, Tellabs designs, develops and supports telecommunications networking products. The Company generates revenue principally through the sale of these products to communications service providers worldwide as both stand-alone network elements and as elements of solutions integrated under a common network management system. Tellabs also generates revenue by providing services to its customers.

48.    The Company operates in four segments: Optical, Data, Access and Services. Optical segment products are primarily used to manage large volumes of telecommunication traffic in metro areas. The Optical segment includes the Tellabs® 5000 Series of Digital Cross-Connect systems,

the Tellabs® 6300 Managed Transport System, the Tellabs® 7100 OTS and the Tellabs® 7300 Metro Ethernet Switching Series. Data segment products are primarily used in mobile backhaul applications, and for business services and various edge routing applications. The Data segment includes the Tellabs® 8100 Managed Access Systems and the Tellabs 8600 and 8800 Smart Routers. Access segment products are primarily used to enable service providers to bundle Internet, video, and voice over high-speed fiber-based networks and in Optical LAN applications. The Access segment includes the Tellabs® 1000 and 1100 Multi-service Access systems, and the Tellabs® 1600 Optical Network Terminals. The Services segment delivers deployment, training, support and professional services to Tellabs' customers. Through these offerings, Tellabs serves its customers through the phases of planning, deploying and operating a network.

## II.     THE ACQUISITION

49.     On October 21, 2013, Tellabs and Marlin each issued press releases announcing that that they had entered into the Merger Agreement pursuant to which Marlin would acquire all of the outstanding shares of Tellabs via the Tender Offer and follow-up short-form merger.

50.     Tellabs press release was attached as an exhibit to a Form 8-K filed with the SEC on October 21, 2013, and stated in relevant part:

### Tellabs to be Acquired by Marlin Equity Partners for $891 Million in Cash

. . . Tellabs today announced that it has entered into a definitive merger agreement with entities affiliated with Marlin Equity Partners ("Marlin"), which provides that Marlin entities will acquire all of the outstanding shares of Tellabs for $2.45 per share in cash.

The price per share represents a premium of 4.3% over the closing share price on October 18, 2013, and 13.3% over the 180-day volume-weighted average closing share price as of the same day. In addition, the offer represents a premium of 28.9% over the current 52-week-low closing share price, which occurred on April 17, 2013. The transaction value represents a total equity value of approximately $891 million on a fully diluted basis.

Under the terms of the merger agreement, an affiliate of Marlin is required to commence a tender offer to acquire all outstanding shares of Tellabs' outstanding

common stock for $2.45 per share in cash no later than November 1, 2013. The merger agreement provides that, promptly after the closing of the tender offer, any shares not tendered in the tender offer (other than shares for which appraisal is properly sought under applicable law) will be acquired in a second-step merger at the same cash price as paid in the tender offer.

Closing of the tender offer and closing of the merger are subject to certain conditions, including the tender of at least a majority of the outstanding shares of Tellabs common stock (on a fully-diluted basis) and the expiration or termination of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act. The transaction is expected to close in the fourth quarter of 2013. The transaction is not subject to a financing condition.

The Tellabs Board of Directors has unanimously approved the transaction. In addition, Michael J. Birck, Tellabs's co-founder and second-largest stockholder, has communicated to Tellabs that he supports the transaction.

"This transaction will deliver to Tellabs stockholders certainty of value and liquidity, immediately upon closing," said Vince Tobkin, Tellabs chairman. "Tellabs' Board of Directors arrived at the decision to enter into a transaction with Marlin after a thorough review of Tellabs' strategic alternatives and after more than 30 potential buyers, both strategic parties and financial sponsors, were contacted as part of a competitive bidding process.

"This move begins an exciting new chapter for Tellabs, our customers, partners and employees. We believe the transaction will enable us to invest in key technologies for future products, and become even more competitive as we help our customers succeed," Tobkin added.

Lead activist Dialectic Capital Management said, "We are pleased that the Board has evaluated all alternatives and are choosing what they feel is the best option for all stakeholders."

"We are excited to back the Tellabs team and we view Tellabs' business as an ideal opportunity to capitalize on the growth in the telecom network equipment sector," said Nick Kaiser, partner at Marlin. "We are committed to extending Tellabs' market leadership by continuing to make significant investments in research and development, and in providing a superior customer experience."

Goldman, Sachs & Co. is acting as financial advisor, and Sidley Austin LLP is acting as legal counsel, to Tellabs. Credit Suisse and Evercore are acting as financial advisors and Schulte Roth & Zabel LLP is acting as legal counsel to Marlin.

51. On November 1, 2013, Marlin filed a Schedule TO-T (collectively, with its amendments, the "TO-T") with the SEC, which commenced the Tender Offer for a mere $2.45 per

share in cash. The Schedule TO-T expected the Tender Offer to expire/close at 11:59 p.m., New York City time on December 2, 2013. Marlin filed three amendments to the TO-T.

52. Also on November 1, 2013, Tellabs filed the 14D-9 with the SEC, recommending that Tellabs shareholders tender their shares. Before the close of the Tender Offer, Tellabs filed two amendments to the 14D-9.

53. On December 3, 2013, both Tellabs and Marlin announced that the Tender Offer had closed with all conditions to the Tender Offer satisfied, and that the Acquisition had been consummated pursuant to the short-form merger provisions of Delaware law. Tellabs Amendment No. 3 to the 14D-9 stated, in relevant part:

> *Final Results of the Offer and Completion of the Merger*.
>
> The Offer and withdrawal rights expired as scheduled at 11:59 p.m., New York City time, on December 2, 2013. Computershare Trust Company, N.A., the depositary, has advised that, as of that time, 284,506,571 Shares had been validly tendered into the Offer and not properly withdrawn, representing approximately 76.0375% of the Shares outstanding on a fully diluted basis. The number of Shares validly tendered into the Offer and not properly withdrawn satisfied the Minimum Tender Condition. All conditions to the Offer having been satisfied, Purchaser has accepted for payment all Shares that were validly tendered into the Offer and not properly withdrawn.
>
> On December 3, 2013, the Merger was consummated pursuant to the terms of the Merger Agreement and in accordance with Section 251(h) of the DGCL. As a result of the Merger, each Share issued and outstanding immediately prior to the Effective Time (other than (i) Shares that are held in the treasury of the Company, owned of record by any wholly-owned subsidiary of the Company or owned of record by Parent or any of its wholly-owned subsidiaries and (ii) Shares held by stockholders, if any, who are entitled to appraisal rights under Section 262 of the DGCL and who have complied with all of the provisions of the DGCL concerning the right of holders of Shares to require appraisal of such Shares) was automatically converted into the right to receive the Merger Consideration, less any applicable withholding taxes, and all such Shares were canceled and ceased to exist.
>
> Parent intends to cause all Shares to be delisted from the Nasdaq Stock Market and deregistered under the Exchange Act.

## III.    THE FLAWED PROCESS AND CONFLICTS OF THE BOARD AND GOLDMAN SACHS

54.    The Acquisition was the product of a hopelessly flawed process that was designed to ensure the sale of Tellabs to Marlin on terms preferential to defendants and other Tellabs insiders and to subvert the interests of Plaintiffs and the other public stockholders of the Company. Collectively, Birck, Dialectic, the Board, and senior management controlled approximately 13% of Tellabs' outstanding shares and sought liquidity for their illiquid Tellabs holdings. The Acquisition offered that liquidity and upon closing, Birck, Dialectic, the Board and senior management received over *$110 million* from the deal.

55.    Dialectic, which Tellabs described in the announcement of the Acquisition as its "lead activist," has for some time pressured the Board to sell the Company. As part of that pressure, Dialectic demanded, and in 2012 the Board capitulated and gave Dialectic, three Board seats.

56.    From the Acquisition, Tellabs' officers and directors received millions of dollars in special payments – not being made to ordinary shareholders – for unvested stock options, performance units, and restricted shares, all of *which, upon the Acquisition's closing, became fully vested and exercisable*.

57.    For example, the members of the Board all had a substantial financial interest in the Acquisition, owning substantial amounts of Tellabs common stock and unvested restricted stock units (RSUs) that would vest and become payable immediately upon the consummation of the Acquisition. Accordingly, the Board members collectively stood to gain millions of dollars from otherwise locked-up and unvested stock options, $124,274 each from the unvested RSUs alone, benefits which other Tellabs shareholders did not receive. This constituted an impermissible conflict of interest. The following table illustrates how much the Board members received:

| | Shares Owned | Cash for Shares | Unvested RSUs | Cash for RSUs | Total Cash |
|---|---|---|---|---|---|

|  |  |  |  |  | **Payment** |
|---|---|---|---|---|---|
| Bo Hedfors | 78,276 | $191,776 | 50,724 | $124,274 | $316,050 |
| Frank Ianna | 69,276 | $169,726 | 50,724 | $124,274 | $294,000 |
| Vincent D. Kelly | 39,685 | $97,228 | 50,724 | $124,274 | $221,502 |
| Michael E. Lavin | 78,776 | $193,001 | 50,724 | $124,274 | $317,275 |
| Stephanie Pace Marshall | 51,826 | $126,974 | 50,724 | $124,274 | $251,248 |
| Alex Mashinsky | 44,000 | $107,800 | 50,724 | $124,274 | $232,074 |
| Gregory J. Rossmann | 27,685 | $67,828 | 50,724 | $124,274 | $192,102 |
| Dennis F. Strigl | 0 | $0 | 50,724 | $124,274 | $124,274 |
| Jan H. Suwinski | 88,276 | $216,276 | 50,724 | $124,274 | $340,550 |
| Vincent H. Tobkin | 46,826 | $114,724 | 50,724 | $124,274 | $238,998 |
| Mikel H. Williams | 0 | $0 | 50,724 | $124,274 | $124,274 |

58.     The Company's senior management also received from the Acquisition millions of dollars in change-of-control payments.  For example, Daniel P. Kelly, the Company's CEO, earned roughly $20 million from the completion of the Acquisition from his stock being cashed out, acceleration and vesting of RSUs, payment of otherwise unvested performances shares, change-in-control payments, and other benefits not shared by the Company's other stockholders.

59.     Tellabs management drove the process towards Marlin because they expected to obtain lucrative post-Acquisition employment roles in addition to an immediate realization of liquidity benefits.  At the time of the Acquisition-related negotiations, Marlin led management to believe they would indeed be retained going forward.  Indeed, just two days after the close of the Acquisition, Daniel Kelly posted on his "Tellabs Blog" that he would be leading the post-close entity.  On December 5, 2013, Kelly wrote:

> I have some exciting news to share about Tellabs' future.  On Tuesday, Marlin Equity Partners completed its acquisition of Tellabs. . . .  Going forward, Tellabs will operate as a legally independent entity under the Marlin portfolio.  Marlin has made a

number of substantial investments in the telecom sector, including Coriant, Openwave Messaging, Openwave Communications and now Tellabs. . . . Many things about Tellabs will remain the same. ***I continue to serve as Tellabs CEO and Tellabs headquarters continues to be in Naperville, Ill***. Our products and services are backed up by Tellabs people, many of whom have supported you for years or even for decades.

60.     Again, on December 13, 2013, Tellabs published a factsheet (the "Factsheet") listing its Executive Management Team: ***President and CEO Daniel P. Kelly***; Executive Vice President ("EVP") Global Operations John M. Brots; EVP Global Sales & Services Roger J. Heinz; EVP Product Development Kenneth G. Craft; EVP Access Business Unit Mike Dagenais; EVP and General Counsel James M. Sheehan; Acting CFO Lawrence A. Rieger; and Vice President Human Resources Kyle Matthews.  According to Tellabs' 2012 10-K, filed with the SEC on February 22, 2013, Mr. Craft held the position of EVP Product Development at Tellabs in 2013.  In addition, as part of the Merger Agreement, Marlin agreed to provide, for one year from the effective time of the Acquisition, substantially similar salary and benefits to each Tellabs employee who was an employee immediately prior to the effective time of the Acquisition.

61.     During negotiations for the Acquisition, Marlin requested on more than one occasion that six key Tellabs employees and executives (identified by Marlin) enter into employment agreements relating to the Acquisition prior to execution of the Merger Agreement or at the time the Merger Agreement was signed.  The "Working Group," comprised of Individual Defendants Tobkin, Kelly, Rossmann, and Lavin, and authorized by the Board to determine the time when Marlin could begin such discussions with the Tellabs employees and executives,  problematically authorized negotiations for these agreements to commence September 18, 2013, a month before the Merger Agreement was executed on October 18, 2013.  The rest of the Board never properly monitored such discussions and allowed management to tailor the terms of the Acquisition for their own personal benefit.

62. In sum, throughout all relevant time periods herein, Tellabs management, including CEO Daniel Kelly, were vying for continued employment and at the time of the close, were operating under the belief that their efforts had succeeded.

63. In addition to handing negotiations over to conflicted management, the Board supinely allowed Goldman Sachs to work hand-in-hand with management to direct the Tellabs sale process towards Marlin to the exclusion of other potential acquirers. Not only was Goldman Sachs conflicted by a $10 million transaction fee that was wholly contingent upon the closing of the Acquisition, but it also stood on both sides of the transaction. ***Funds managed by an affiliate of Goldman Sachs own 11% of Marlin Equity III, L.P., which provided $13 million in equity financing to Marlin for the Acquisition***. Despite that significant conflict of interest, the Board inexplicably failed to hire a different advisor to replace or supplement Goldman Sachs but, instead, allowed Company management and Goldman Sachs to direct the process with little oversight or direction.

64. These unresolved conflicts infected the process that led to the Acquisition. The Board's decision to enter into the Merger Agreement was the product of a flawed process wherein the putatively disinterested members of the Board frequently deferred to the members of Tellabs' management, who have interests that are different from, and conflict with, the interests of the Class. The Board initially restricted the parties that it contacted about a potential transaction to an unreasonably small group of companies and, in fact, excluded financial acquirers.

65. Moreover, with respect to Party A (as disclosed in the 14D-9), with whom the Company had been engaging in discussions for an extensive period of time, the Board wholly deferred to Tellabs President and CEO Daniel P. Kelly, who was given unfettered ability to steer negotiations away from Party A and towards Marlin. During the process, Party A requested that it be allowed to contact another potential acquirer in order to partner and submit a higher bid for the

entire Company. Party A was forced to make that request because its confidentiality agreement with the Company prohibited it from discussing a potential transaction with any other parties. Party A had consistently indicated that it was interested in acquiring the Company's data business, but if allowed to partner with another potential acquirer, the mini-consortium could have been able to offer a higher overall value for Tellabs shareholders. Egregiously, the Board never permitted Party A to partner with the other entity and submit a higher bid. This further titled the process in favor of management and Goldman Sachs' preferred acquirer, Marlin.

66.     Furthermore, the Board failed to reengage various parties – and sporadically reengaged others – as developments unfolded though the course of the process. For example, on or prior to June 6, 2013, the Board (through Goldman Sachs) received four non-binding indications of interest with per share values of $2.10 (Party G), $2.20 (Party F), $2.35 (Marlin), and $2.47 (Party A). After the parties submitting the lowest two offers were excluded from the process because of the value of their bids, Party A determined that it was no longer interested in acquiring the Company, and Marlin reduced its offer to $2.26 per share.

67.     Despite this change in circumstances, the Board failed to contact either Party G or Party F to inquire whether they would be interested in increasing their indication of interest. This was especially unreasonable in light of the fact that the Company had not entered into an exclusive negotiating agreement with Marlin or Party A, and given that the sales process continued for several more months.

68.     Furthermore, the Board agreed, as part of the process, with Marlin exclusively, that the consideration payable to the Company's stockholders pursuant to the Tender Offer and the merger would be funded by a combination of funds provided by Marlin and the contribution of cash by the Company. In particular, Tellabs contributed $450,000,000 – more than half of the value of the Acquisition – for Marlin to purchase the Company's outstanding shares. This provision – the

Company funding more than half of its own purchase price – was not made available to any other potential acquirer, and added to the barrier to other potential bidders imposed by the deal protection devices discussed below.

69. Birck, Dialectic, the Board and senior management signaled their support for the deal and tendered their shares to Marlin. Moreover, Tellabs and Marlin announced their intent to effect the merger, once one share more than 50% of Tellabs' outstanding shares were tendered pursuant to recently enacted §251(h) of the Delaware General Corporation Law, as a short-form merger — to cash out any shareholders who did not tender — without so much as a shareholder vote. Given that Birck, Dialectic, the Board, and senior management controlled approximately 13% of Tellabs' outstanding shares, only 37% of the shares outstanding needed to have been tendered for the Acquisition to close.

70. In order to lock up the Acquisition, and the material benefits for Dialectic, themselves and Company management, the Board also agreed to numerous preclusive deal protection devices that guaranteed the success of the Acquisition for Marlin. These provisions included: (i) a no-shop clause that prevented Tellabs from providing confidential Company information to, or even communicating with, potential competing bidders except under extremely limited circumstances; (ii) information rights that required Tellabs to share highly sensitive information about potential competing proposals with Marlin; (iii) matching rights that allowed Marlin to match any superior proposal; (iv) a termination fee provision that required Tellabs to pay Marlin $26.7 million if Tellabs terminated the Acquisition in favor of a competing proposal; and (v) a tender offer structure for the Acquisition that would unduly limit the time competing bidders had to put together a proposal. These provisions unduly bound the Board to the Acquisition and made it highly unlikely that the Board would fulfill its fiduciary duties.

## IV.    THE ACQUISITION PRICE OF $2.45 PER SHARE WAS INADEQUATE

71.    The Acquisition Price of $2.45 per share undervalued Tellabs' intrinsic value and stand-alone alternatives going forward.

72.    The Acquisition Price, which provided Tellabs shareholders with a paltry 4.5% premium, drastically undervalued the Company's prospects and was the result of an entirely unfair sales process that sought to take advantage of the vacuum created by the untimely death in 2012 of the Company's then-CEO Pullen, and then-Chairman Birck's announcement he would step down from the Board after being diagnosed with leukemia. Pullen's death and Birck's retirement, when combined with Dialectic's 2012 seizure of three Board seats, left the Company ripe for a fire sale to a bidder like Marlin, who had likely, based on past practice, promised to give Company management employment with the post-Acquisition entity. This 4.5% premium paled in comparison to the average premium paid to acquire public companies in recent years. Indeed, according to deal tracker Dealogic, acquirers of publicly traded companies have paid premiums that average 25%.

73.    Significantly, the Company's book value, as of the end of its most recently reported fiscal quarter, was $2.80 per share, almost 15% higher than the Acquisition Price. Tellabs filed its most recent Form 10-Q with the SEC on October 31, 2013 (ten days after the Acquisition was announced) for the third quarter 2013 ended September 27, 2013. Given that on September 27, 2013, Tellabs' cash, cash equivalents, and marketable securities amounted to $1.55 per share, Marlin paid just 90¢ per Tellabs share for all of Tellabs' business, which per book value, was worth at least $1.25 per share. Moreover, the Acquisition Price was less than at least one analyst's high target of $2.50 per Tellabs share, and it undervalued what Tellabs will contribute to Marlin, as the Acquisition will permit Marlin, and not Tellabs' current shareholders, to capitalize – for just 90¢ per share of their own money – on the growth in the telecom network equipment sector.

74.     Tellabs provides services that help wireless and optical network providers, such as Vodafone Plc, MegaFon, MTS, and Telecom Italia, to manage traffic and improve data service on their networks.  As Marlin co-founder and partner Nick Kaiser said in a statement about the deal: "'[W]e view Tellabs' business as an ideal opportunity to capitalize on the growth in the telecom network equipment sector . . . .'"  Marlin, which bought Nokia Siemens Networks' optical business in December 2012, has said it intends to act as a consolidator in the fragmented optical networking sector.

75.     Furthermore, the Company had reshaped its business plan and cut costs to be more competitive and profitable.  It undertook a major restructuring in early 2012 and maintained this renewed strategic focus.  As explained during an earnings release on January 31, 2013, "Over the last quarter, Tellabs initiated a review of its strategy, product portfolio and cost structure," said Dan Kelly, Tellabs CEO and president.  As Kelly continued:

>       Based upon our analysis of ROI, customer needs and market conditions, we are discontinuing development of the Tellabs 9200.  We will reduce our expenses, which will affect about 300 people during 2013.  Going forward, we will enhance Tellabs' solutions with innovations to help our customers succeed.  We will demonstrate new software-defined networking (SDN) and self-optimizing networks (SON) capabilities at Mobile World Congress in February.

76.     As stated in the Company's most recent Form 10-Q, filed with the SEC on October 31, 2013, "[e]stimated cash payments under [Tellabs' current restructuring plan] are expected to be $22.1 million, of which $16.0 million has been paid through the third quarter of 2013. Other than the cash payments, actions under this plan are expected to be substantially completed by the end of the fourth quarter of 2013."  Accordingly, although the Company incurred various temporary charges, the result is that Tellabs' operations were more streamlined, and expenses would be aligned with revenue.  To the detriment of its public shareholders, Tellabs was acquired as a more efficient company and was primed for substantial growth.

77.     On April 24, 2013, the Company reported its first quarter results.  "We're working to revitalize Tellabs' performance with a focus on customers, strategy and results," said Tellabs CEO and president Dan Kelly.  Kelly continued: "Going forward, we're working on what customers need to succeed with our optical and mobile solutions."  On August 1, 2013, Tellabs reported its second quarter results. "We made good progress in the second quarter, compared with the first quarter, as revenue and gross profit margins improved," said Dan Kelly.  "We're encouraged by this progress as we work to revitalize Tellabs with a focus on customers, strategy and results."

78.     As a result of this restructuring, various Wall Street analysts forecasted Tellabs' business to grow in the coming years.  For example, analysts estimated, on average, that Tellabs would lose $0.01 per share in 2013, whereas they forecasted a $0.05 per share *profit* in 2014.  Thus Tellabs was poised for future growth.  But again, though, it is Marlin, and not Tellabs' shareholders, that will capitalize – for just 90¢ per share – on Tellabs' prospects and the growth in the telecom network equipment sector.

## V.     THE 14D-9 FAILED TO DISCLOSE MATERIAL INFORMATION ABOUT THE ACQUISITION, IN VIOLATION OF THE EXCHANGE ACT AND IN BREACH OF THE DEFENDANTS' FIDUCIARY DUTIES

79.     To make matters worse, defendants issued and published a 14D-9 that that contained untrue statements of material fact concerning the Acquisition, or omitted material facts concerning the Acquisition necessary in order to make the statements made not misleading, in violation of §14(e) of the Exchange Act and in breach of the defendants' fiduciary duties to Plaintiffs and the Class.  The result was that material information relevant to the Tender Offer and the Acquisition was withheld from Tellabs' public shareholders.  This information was necessary for shareholders to make an informed decision about whether to tender their shares or seek appraisal.

**False and Misleading Disclosure Concerning the Sales Process**

80.     The 14D-9 misrepresented or omitted material information concerning the process leading up to the execution of the Merger Agreement, which information should have been fully disclosed in order for Tellabs stockholders to evaluate whether the Individual Defendants satisfied their fiduciary obligations to secure a deal at the highest price reasonably attainable or, instead, failed to maximize shareholder value.

_The Value Attributed to the Company's Data Business_

81.     The 14D-9 failed to disclose the value attributed to Tellabs' data business by Goldman Sachs and management. This is material because the 14D-9 indicates that the Board or its advisors considered or pursued a sale of the data business throughout the process, and the Company even received various indications of interest in acquiring the data business.

82.     The 14D-9 copiously discusses a potential sale of the Company's data business, making specific reference to the phrase "data business" at least 40 times, summarized as follows:

(a)     On numerous occasions and with numerous potential acquirors, the Board or its advisors actively pursued a sale of just the Company's data business;

(b)     At least one party, Party A, submitted a non-binding indication of interest to acquire Tellabs' data business for between $80 million and $110 million in cash, that Party A conducted due diligence on the data business over an extended period of time;

(c)     At a Board meeting held on June 28, 2013, Goldman Sachs "discussed a preliminary financial analysis with respect to the Company assuming a sale . . . of the data business";

(d)     On July 24, 2013 the Board discussed Party A's expressed continued interest in acquiring Tellabs' data business, but that same day the Board authorized Tellabs' management to execute an exclusivity agreement with Marlin barring the Company from negotiating with any other potential suitors, including Party A;

(e)      Party A maintained its interest in acquiring Tellabs' data business up to the very day the Board agreed to the Acquisition by Marlin;

(f)      The Board, in agreeing to the Acquisition, considered "a sale or divesture of the Company's data business as a separate transaction or in connection with the sale of the Company"; and

(g)      Tellabs' financial projections also make specific reference to revenue expected to be generated by the Company's data business, as isolated from the rest of the Company's operations.

83.      The 14D-9's incessant mention of Tellabs' data business indicates that it was an important part of the Company, that the Board or its advisors were capable of attributing a value to the data business, specifically, and that the Board was considering a sale of the data business as an alternative to the Acquisition, a sale of the Company to another party, or continuing to function as a standalone company.  (Notably, a sale of the data business alone would not have constituted a "change in control" and, as such, would not have yielded the huge payday that came with the Acquisition.)  Accordingly, the Board considered value of the data business, as compared with the Company's other strategic alternatives.

84.      The 14D-9 fails, however, to disclose what value the Board, the Company, or Goldman Sachs attributed to the data business. Accordingly, Tellabs' stockholders were unable to make an informed decision whether the Acquisition represented the best course of action for Tellabs and its stockholders.  The defendants' failure to disclose this information thus constitutes a violation of §14(e) as well as the Board's fiduciary duty of candor.

*The Specific Value Conclusions from Goldman Sachs' Scenarios Presented to the Board*

85.      The 14D-9 also failed to disclose the specific value conclusions from each of the three scenarios reviewed by Goldman Sachs in its June 28, 2013 presentation to the Board, which are

necessary for shareholders to understand both why the Board decided to pursue the Acquisition (as opposed to other strategic alternatives) and the value of other strategic alternatives as compared to the Acquisition Price.

86.     As of the June 28, 2013 Board meeting, Tellabs had already held extensive discussions with Marlin concerning the Acquisition and had even received a draft of the Merger Agreement.

87.     At the Board meeting, Goldman Sachs discussed, among other things, "continuing [Tellabs' data business] on the current basis, selling it to a third party or shutting it down."

88.     The 14D-9 also states, "[r]epresentatives of Goldman Sachs also discussed a preliminary financial analysis with respect to the Company assuming a sale or a shutdown of the data business."

89.     The 14D-9 also states that Goldman Sachs discussed certain restructuring charges associated with selling the data business, the impact such a sale might have on Tellabs' remaining business, and the cash that might be received from a sale of the data business.

90.     At the conclusion of this meeting the Board decided to pursue a sale of the Company, as opposed to any of the other alternatives, in reliance upon Goldman Sachs' valuation conclusions with respect to the three aforementioned alternatives regarding Tellabs' data business. This underscores the significance of Goldman Sachs' value conclusions.

91.     The 14D-9 fails, however, to disclose any of the value conclusions presented by Goldman Sachs to the Board on the June 28, 2013 meeting, thereby preventing Tellabs stockholders from being informed with respect to the comparative value of Tellabs' various strategic alternatives as well as the Board's decision-making process. The defendants' failure to disclose this information thus constitutes a violation of §14(e) as well as the Board's fiduciary duty of candor.

*False and Misleading Disclosure of Potential Conflicts of Interest*

92.    The 14D-9 also made numerous material misstatements, and otherwise failed to disclose material information necessary in order to make the statements made not misleading, about conflicts of interests that burdened the Board, Company management and their advisors, including:

(a)    the reasons the Board permitted management to run portions of the process;

(b)    the basis for the Board's selection of, and the process by which the Board selected and retained Goldman Sachs as its financial advisor;

(c)    the Board's versus management's role in retaining Goldman Sachs;

(d)    the nature of the "long-standing" relationship between Goldman Sachs and the Company;

(e)    the information Goldman Sachs received at any time through its significant investment in Marlin Equity III, L.P., about Marlin's interest in acquiring Tellabs; and

(f)    the specific services Goldman Sachs has provided to any of the parties involved in the transaction, or their affiliates, in the last two years and how much compensation was received for services rendered.

93.    In order for shareholders to have been able to decide whether to tender their shares or seek appraisal on an informed basis, defendants were required to disclose even potential conflicts of interest.  Here the conflicts were more than potential, as Tellabs' Board, financial advisor, and management were all conflicted.  Shareholders were entitled to know if their fiduciaries had interests in the transaction that are even potentially in conflict with the shareholders' interest in a maximized value for their Tellabs shares.  This information is material because shareholders must be told of all potential and actual conflicts of interests that bear on a director's ability to objectively assess a tender offer.

94.     The 14D-9 also made numerous material misstatements, and otherwise failed to disclose material information necessary in order to make the statements made not misleading, about the Company's intrinsic value and prospects going forward, including:

(a)     the basis for revising the forecasted "unlevered free cash flow" downward from the initial base case projections to the revised base case projections, which negatively impacted the valuation of Tellabs' shares;

(b)     the creation of the Company's financial forecasts and whether they resulted from any business plan developed for Tellabs;

(c)     the specific calculations used to derive "unlevered free cash flow," including tax (or tax rate), and whether stock-based compensation was treated as a cash or non-cash expense; and

(d)     the financial projections provided by Tellabs management and relied upon by Goldman Sachs for purposes of its analyses, for each of the base, downside, upside, and refined base cases, for fiscal years 2013-2017, for the following items:

(i)     taxes (or tax rate);

(ii)     changes in net working capital;

(iii)     net income;

(iv)     earnings per share;

(v)     cash adjusted earnings per share;

(vi)     stock-based compensation; and

(vii)     NOL utilization.

95.     In order for Tellabs' shareholders to have determined whether to tender their shares or seek appraisal, it was critical that the shareholders received the material information underlying or

supporting the Company's inherent value. Without this information, shareholders could not evaluate whether to tender or seek appraisal on an informed basis.

96. The 14D-9 also made numerous material misstatements, and otherwise failed to disclose material information necessary in order to make the statements made not misleading, about critical data and inputs underlying the financial analyses supporting the fairness opinion of the Board's financial advisor, Goldman Sachs, including:

(a) With respect to Goldman Sachs' Illustrative Present Value of Future Share Price Analysis:

(i) the specific numerical inputs and assumptions that Goldman Sachs used for the selection of a discount rate of 12.7%;

(ii) the size of the premium that Goldman Sachs used for calculating its discount rate;

(iii) the bases for Goldman Sachs applying illustrative implied enterprise value to one-year forward EBITDA multiples of 3.0x to 7.0x to EBITDA estimates;

(iv) the bases for Goldman Sachs applying illustrative implied enterprise value to one-year forward revenue multiples of 0.2x to 0.5x; and

(v) whether Goldman Sachs employed a mid-year or end-year discounting method;

(b) With respect to Goldman Sachs' Illustrative Discounted Cash Flow Analysis,

(i) the definition of Unlevered Free Cash Flow as used by Goldman Sachs in its analysis;

(ii) how stock-based compensation was treated in this analysis (i.e. cash or non-cash expense);

(iii)     the specific numerical inputs and assumptions that Goldman Sachs used for the selection of discount rates of 16.6%-20.6%;

(iv)     why the discount rates used by Goldman Sachs in its discounted cash flow analysis are significantly higher than the discount rate used by Goldman Sachs in its illustrative Present Value of Future Share Price Analysis;

(v)     the implied terminal value multiples observed in this analysis; and

(vi)     whether Goldman Sachs employed a mid-year or end-year discounting method; and

(c)     With respect to Goldman Sachs' **Selected Companies Analysis**, any implied per share values derived as a result of this analysis.

97.     There is no more material information to shareholders in a change of control transaction, such as a tender offer, than the information underlying or supporting the purported "fair value" of their shares. Shareholders are entitled to the information necessary to inform a decision as to the adequacy of the tender offer price, which includes the **underlying data** (including management's projections) the investment bankers relied upon, the **key assumptions** that the financial advisors used in performing valuation analyses, and the range of values that resulted from those analyses. Here the analyses of Goldman Sachs incorporated certain critical assumptions that significantly affect the output (valuation) of their analyses.

98.     Plaintiffs relied upon the 14D-9 in determining whether to tender their shares and whether to exercise their appraisal rights under Delaware statutory law. That the 14D-9 misrepresented and omitted material information prevented Plaintiffs from making an adequately informed decision whether to whether to tender their shares and whether to exercise their appraisal rights. As a result of the materially inadequate and misleading 14D-9, the defendants consummated the Acquisition to the detriment of Tellabs stockholders.

99.     Without full and fair disclosure of the material information set forth above, shareholders should not have been asked to tender their shares.

## COUNT I

### Claim for Violations of §14(e) of the Exchange Act
### On Behalf of Plaintiffs and the Class Against the Individual Defendants and Tellabs

100.    Plaintiffs repeat and reallege each allegation set forth above herein.

101.    Tellabs and the Individual Defendants caused the 14D-9 to be issued with the intention of soliciting stockholder support for the Acquisition.

102.    Section 14(e) of the Exchange Act requires full and fair disclosure of material information in connection with tender offers.  Section 14(e) makes it unlawful for:

> any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

103.    By virtue of the foregoing, including allegations in ¶¶79-99, Tellabs and the Individual Defendants violated §14(e) of the Exchange Act.  Tellabs and the Individual Defendants issued and published a 14D-9 that contained untrue statements of material fact concerning the Tender Offer and the Acquisition, and omitted material facts concerning the Tender Offer and the Acquisition necessary in order to make the statements in the 14D-9 not misleading, or engaged in fraudulent, deceptive, or manipulative acts or practices in connection with the Tender Offer.Moreover, in the exercise of reasonable care, Tellabs and the Individual Defendants should have known that the 14D-9 was materially misleading and omitted material facts necessary to make it not misleading.

104.    Plaintiffs and the Class relied on the 14D-9 to their detriment.    The misrepresentations and omissions in the 14D-9 are, and were, material to the Plaintiffs and the Class,

and due to those material misrepresentations and omissions Plaintiffs and the Class were deprived of their entitlement to make a fully informed decision concerning the Tender Offer or whether to seek appraisal rights.

105.    As a result of the Individual Defendants' and Tellabs' violations of §14(e) of the Exchange Act, Plaintiffs and the other members of the Class were harmed in that they did not receive the fair value of their equity ownership of the Company.

106.    As a result of the Individual Defendants' and Tellabs' violations of §14(e) of the Exchange Act, Plaintiffs and the Class are entitled to damages.

## COUNT II

### Claim for Violations of §20(a) of the Exchange Act
### On Behalf of Plaintiffs and the Class Against the Individual Defendants

107.    Plaintiffs repeat and reallege each allegation set forth above herein.

108.    Section 20(a) of the Exchange Act imposes liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of" the Exchange Act or any of the rules promulgated thereunder.  Such "controlling persons" are "liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

109.    By reason of the allegations herein, Tellabs violated §14(e) of the Exchange Act by issuing and publishing the 14D-9, which contained untrue statements of material fact concerning the Tender Offer and the Acquisition, and omitted material facts concerning the Tender Offer and the Acquisition necessary in order to make the statements in the 14D-9 not misleading, or by engaging in fraudulent, deceptive, or manipulative acts or practices in connection with the Tender Offer.

110.    The Individual Defendants were controlling persons of Tellabs within the meaning of §20(a) of the Exchange Act.

111.    The Individual Defendants, by virtue of their positions as officers and/or directors of Tellabs, participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs, and therefore exercised general control over the operations of Tellabs.

112.    The Individual Defendants, by virtue of their positions as officers and/or directors of Tellabs, had the power or ability to control the issuance, publication, and contents of the 14D-9.  The Individual Defendants were each involved in negotiating, reviewing, and approving the Acquisition. The 14D-9 purports to describe the various issues and information that the Individual Defendants reviewed and considered concerning the Acquisition.

113.    The Individual Defendants, by virtue of their positions as officers and/or directors of Tellabs, had the ability to prevent the issuance of the materially misleading 14D-9 or to cause the 14D-9 to be corrected so that it was not in violation of §14(e) of the Exchange Act.

114.    Defendant Kelly signed the 14D-9, stating "[a]fter due inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct."

115.    By virtue of the foregoing, the Individual Defendants violated §20(a) of the Exchange Act.

116.    As a result of the Individual Defendants' violations of §20(a) of the Exchange Act, Plaintiffs and the other members of the Class were harmed in that they did not receive the fair value of their equity ownership of the Company.

117.    As a result of the Individual Defendants' violations of §20(a) of the Exchange Act, Plaintiffs and the Class are entitled to damages.

## COUNT III

### Claim for Breach of Fiduciary Duties
### On Behalf of Plaintiffs and the Class Against the Individual Defendants

118.     Plaintiffs repeat and reallege each allegation set forth above herein.

119.     In pursuing the unlawful plan to sell the Company for less than fair value and pursuant to an unfair process, defendants breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and/or aided and abetted such breaches.  The deal protection devices operated, as intended, to block any other potential acquirers.

120.     Defendants knowingly and recklessly and in bad faith violated fiduciary duties of care, loyalty, good faith, and independence owed to the public shareholders of Tellabs and acted to put the interests of Marlin and themselves ahead of the interests of Tellabs' shareholders.

121.     By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, knowingly or recklessly and in bad faith unfairly deprived Plaintiffs and other members of the Class of the true value of their investment in Tellabs.

122.     As demonstrated by the allegations above, defendants knowingly or recklessly failed to exercise the care required, and breached their duties of loyalty, good faith and independence owed to the shareholders of Tellabs because, among other reasons, they failed to:

(a)     fully inform themselves of the market value of Tellabs before entering into the agreement for the Acquisition;

(b)     act in the best interests of the public shareholders of Tellabs common stock;

(c)     maximize shareholder value;

(d)     obtain the best financial and other terms when the Company's independent existence would be materially altered by the Acquisition; and

(e)     act in accordance with their fundamental duties of good faith, due care and loyalty.

123.    By reason of the foregoing acts, practices and course of conduct, defendants knowingly or recklessly and in bad faith failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiffs and the other members of the Class.

124.    As a result of defendants' unlawful actions, Plaintiffs and the other members of the Class were harmed in that they did not receive the fair value of their equity ownership of the Company.

125.    As a result of the defendants' unlawful actions, Plaintiffs and the Class are entitled to damages.

### COUNT IV

### Claim for Breach of Fiduciary Duties
### On Behalf of Plaintiffs and the Class Against the Individual Defendants

126.    Plaintiffs repeat and reallege each allegation set forth above herein.

127.    The Board members' fiduciary duties required them to disclose to Plaintiffs and the Class all information material to the decisions confronting Tellabs stockholders, including whether to tender their shares and whether to exercise their appraisal rights under Delaware law.

128.    As set forth above, the Individual Defendants breached their fiduciary duties by issuing and disseminating materially misleading and inadequate disclosures vis-à-vis the 14D-9.

129.    As a result, Plaintiffs and the Class have suffered irreparable harm.

130.    As a result of the defendants' unlawful actions, Plaintiffs and the Class are entitled to damages.

### COUNT V

### Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty
### On Behalf of Plaintiffs and the Class Against Defendants Tellabs, Marlin Equity
### Partners, Parent and Merger Sub

131.    Plaintiffs repeat and reallege each allegation set forth above herein.

132.     Defendants Tellabs, Marlin Equity Partners, Parent and Merger Sub are sued herein as aiders and abettors of the breaches of fiduciary duties outlined above by the Individual Defendants as members of the Board of Tellabs.

133.     The Individual Defendants breached their fiduciary duties of good faith, loyalty and due care to Tellabs' shareholders by failing to:

      (a)     fully inform themselves of the market value of Tellabs before entering into the Acquisition;

      (b)     act in the best interests of the public shareholders of Tellabs common stock;

      (c)     maximize shareholder value;

      (d)     obtain the best financial and other terms when the Company's independent existence will be materially altered by the Acquisition; and

      (e)     act in accordance with their fundamental duties of good faith, due care and loyalty.

134.     Such breaches of fiduciary duties could not, and would not, have occurred but for the conduct of defendants Tellabs, Marlin Equity Partners, Parent and Merger Sub, who aided and abetted such breaches via entering into the Merger Agreement and/or conducting and completing the Tender Offer.

135.     Defendants Tellabs, Marlin Equity Partners, Parent and Merger Sub had knowledge that they were aiding and abetting the Individual Defendants' breaches of their fiduciary duties to Tellabs' shareholders.

136.     Defendants Tellabs, Marlin Equity Partners, Parent and Merger Sub rendered substantial assistance to the Individual Defendants in their breaches of fiduciary duties to Tellabs' shareholders.

137.     As a result of the conduct of defendants Tellabs, Marlin Equity Partners, Parent and Merger Sub of aiding and abetting the Individual Defendants' breaches of fiduciary duties, Plaintiffs and the other members of the Class were damaged in that they were prevented from obtaining a fair price for their shares.

138.     As a result of the unlawful actions of defendants Tellabs, Marlin Equity Partners, Parent and Merger Sub, Plaintiffs and the other members of the Class were harmed in that they did not receive fair value for Tellabs' assets and business, and were prevented from obtaining the real value of their equity ownership in the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand relief against defendants as follows:

A.     Declaring that this action is properly maintainable as a class action;

B.     Declaring and decreeing that the Individual Defendants and Tellabs violated §14(e) of the Exchange Act;

C.     Declaring and decreeing that the Individual Defendants violated §20(a) of the Exchange Act;

D.     Declaring and decreeing that the Merger Agreement was entered into in breach of the fiduciary duties of the Individual Defendants and was therefore unlawful and unenforceable;

E.     Declaring and decreeing that the defendants breached their fiduciary duties and/or aided and abetted in the breach of fiduciary duties, as described herein;

F.     Rescinding the Acquisition, or, in the alternative, if rescission is not feasible, awarding rescissory damages;

G.     Awarding Plaintiffs and the Class damages;

H.     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

I.      Granting such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand trial by jury of all issues so triable.

Dated: March 20, 2014                      LASKY & RIFKIND, LTD.
                                           NORMAN RIFKIND
                                           AMELIA S. NEWTON


                                                    /s/ Norman Rifkind
                                           NORMAN RIFKIND

                                           351 West Hubbard Street, Suite 401
                                           Chicago, IL  60654
                                           Tel:  (312) 634-0057
                                           Fax:  (312) 634-0059

                                           *Local Counsel for Plaintiffs*

                                           GREENE AND LETTS
                                           ATTORNEYS AT LAW
                                           MARTIN P. GREENE
                                           ZACHARY BUDDEN
                                           55 Monroe Street
                                           Suite 600
                                           Chicago, IL 60603
                                           Tel: (312) 346-1100
                                           Fax: (312) 346-4571


                                           ROBBINS GELLER RUDMAN
                                                  & DOWD LLP
                                           RANDALL J. BARON
                                           A. RICK ATWOOD, JR.
                                           DAVID T. WISSBROECKER
                                           DAVID KNOTTS
                                           EDWARD M. GERGOSIAN
                                           655 West Broadway, Suite 1900
                                           San Diego, CA  92101
                                           Tel:  (619) 231-1058
                                           Fax:  (619) 231-7423

ROBBINS GELLER RUDMAN
    & DOWD LLP
JAMES E. BARZ
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Tel: (312) 674-4674
Fax: (312) 674-4676

WOLF POPPER LLP
ROBERT M. KORNREICH
CHET B. WALDMAN
JOSHUA W. RUTHIZER
NATALIE M. MACKIEL
845 Third Avenue
New York, NY 10022
Tel: (212) 759-4600
Fax: (212) 486-2093

JOHNSON & WEAVER, LLP
W. SCOTT HOLLEMAN
99 Madison Avenue, 5th Floor
New York, NY 10016
Tel: (212) 802-1486
Fax: (212) 602-1592

*Attorneys for Plaintiffs Robert Englehart, Jorge Rodriguez and The Judith Kane-Rodriguez 2012 Family Trust*