**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KERRY LAMBERT, On Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> TELLABS, INC., VINCENT H. TOBKIN, BO HEDFORS, FRANK IANNA, VINCENT D. KELLY, MICHAEL E. LAVIN, STEPHANIE PACE MARSHALL, ALEX MASHINSKY, GREGORY J. ROSSMANN, DENNIS F. STRIGL, JAN H. SUWINSKI, MIKEL H. WILLIAMS, MARLIN EQUITY PARTNERS, BLACKHAWK HOLDING VEHICLE, LLC, and BLACKHAWK MERGER SUB INC., <br><br> Defendants. | Case No. 1:13-cv-07945 <br><br> <u>CLASS ACTION</u> <br><br> Hon. Ronald A. Guzman |

**LEAD PLAINTIFF**
**KERRY LAMBERT'S MEMORANDUM OF LAW IN SUPPORT OF**
**HIS MOTION FOR FINAL APPROVAL OF PROPOSED SETTLEMENT AND**
<u>**AN AWARD OF ATTORNEYS' FEES**</u>

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS AND PROCEDURAL HISTORY......................................... 2

        A.      THE TRANSACTION.......................................................................... 2

        B.      THE LITIGATION ............................................................................. 3

        C.      SETTLEMENT OF THE LITIGATION ................................................. 5

        D.      THE *ENGLEHART ACTION* AND AMENDMENT OF THE SETTLEMENT.... 6

        E.      PRELIMINARY APPROVAL OF THE SETTLEMENT AND
                CERTIFICATION OF THE CLASS ...................................................... 8

        F.      THE SETTLEMENT ......................................................................... 11

III.    ARGUMENT ................................................................................................... 17

        A.      THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE UNDER
                THE APPLICABLE LEGAL STANDARDS AND SHOULD BE
                APPROVED ..................................................................................... 17

                1.      The Strength of Lead Plaintiff's Case Compared to the Terms of the
                        Proposed Settlement Supports Final Approval ......................................... 19

                        a)      The Settlement Provides a Substantial Benefit to the Class ......... 19

                        b)      There is Great Uncertainty as to Lead Plaintiff's Ability to
                                Prove the Remaining Part of His Case......................................... 24

                2.      Continued Litigation of this Complex Action Would Consume
                        Considerable Time and Expense.............................................................. 27

                3.      Class Members Have Responded Positively to the Settlement,
                        Supporting Final Approval ..................................................................... 27

                4.      The Experience and Views of Lead Counsel Favor Final Approval ........ 29

                5.      The Stage of the Proceedings and Confirmatory Discovery
                        Completed .......................................................................................... 30

        B.      THE COURT SHOULD APPROVE LEAD PLAINTIFF'S REASONABLE
                REQUEST FOR ATTORNEYS' FEES AND EXPENSES................................. 30

                1.      The Value of Services Provided on an Hourly Basis................................ 33

i

2.      The Novelty and Difficulty of the Questions Involved, and the Skill Requisite to Perform the Legal Service Properly ..................................... 34

3.      The Fee Customarily Charged in the Locality for Similar Legal Services ..................................................................................................... 35

4.      The Results Obtained for the Class.......................................................... 36

5.      The Experience, Reputation and Ability of the Lawyers Performing the Services ............................................................................................. 38

6.      The Contingent Nature of the Fee............................................................ 39

IV.     CONCLUSION.............................................................................................. 40

## TABLE OF AUTHORITIES

**Cases**        **Page(s)**

*Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*,
   616 F.2d 305 (7th Cir. 1980) ...........................................................................................19

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
   270 F.R.D. 330 (N.D. Ill. 2010)...............................................................................19, 25

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
   789 F. Supp. 2d 935 (N.D. Ill. 2011) ...............................................................................18

*Atchley v. Qonaar Corp.*,
   704 F.2d 355 (7th Cir. 1983) ...........................................................................................20

*Bailey v. AK Steel Corp.*,
   No. 1:06-CV-468, 2008 U.S. Dist. LEXIS 16704 (S.D. Ohio Feb. 21, 2008) .......................29

*Behrens v. Wometco Enters., Inc.*,
   118 F.R.D. 534 (S.D. Fla. 1988).......................................................................................33

*In re Beverly Hills Fire Litig.*,
   639 F. Supp. 915 (E.D. Ky. 1986) ....................................................................................33

*Blum v. Stenson*,
   465 U.S. 886 (1984).........................................................................................................35

*In re Boston & Maine Corp. v. Sheehan, Phinney, Bass & Green, PA.*,
   778 F.2d 890 (1st Cir. 1985).............................................................................................33

*Butler v. Am. Cable & Tel., LLC*,
   No. 09 CV 5336, slip op. (N.D. Ill. Jan. 23, 2012) (Final Approval Order)...........................31

*In re Chips & Techs., Inc. S'holders Litig.*,
   No. 15832, 1998 Del. Ch. LEXIS 109 (Del. Ch. June 24, 1998) ..........................................23

*Chrysler Corp. v. Dann*,
   223 A.2d 384 (Del. 1966) ................................................................................................39

*City of Greenville v. Syngenta Crop Prot., Inc.*,
   No. 3:10-cv-00188-JPG-PMF, 2012 U.S. Dist. LEXIS 151819 (S.D. Ill. Oct. 23, 2012).......32

*Cnty. of N.Y. Emps. Ret. Plan v. Merrill Lynch*,
   C.A. No. 4066-VCN, slip op. (Del. Ch. Aug. 31, 2009) (Order and Final J.) ........................37

*Conley v. Sears, Roebuck & Co.*,
   222 B.R. 181 (D. Mass. 1998) ..........................................................................................33

*Cook v. Niedert,*
    142 F.3d 1004 (7th Cir. 1998) .........................................................................................31

*In re Countrywide Corp. S'holders Litig.,*
    No. 3464-VCN, 2009 Del. Ch. LEXIS 44 (Del. Ch. Mar. 31, 2009) ................................22, 23

*In re Delphi Corp. Sec., Derivative & "ERISA" Litig.,*
    248 F.R.D. 483 (E.D. Mich. 2008) ...................................................................................39

*Evans v. Jeff D.,*
    475 U.S. 717 (1986).........................................................................................................18

*In re Fine Host Corp. Sec. Litig.,*
    No. MDL 1241, 2000 U.S. Dist. LEXIS 19367 (D. Conn. Nov. 8, 2000).............................34

*Florin v. Nationsbank of Ga., N.A.,*
    34 F.3d 560 (7th Cir. 1994) .............................................................................................39

*Florin v. Nationsbank of Ga., N.A.,*
    60 F.3d 1245 (7th Cir. 1995) ...........................................................................................31

*Fournier v. PFS Invs., Inc.,*
    997 F. Supp. 828 (E.D. Mich. 1997).................................................................................33

*Franklin Balance Sheet Inv. Fund v. Crowley,*
    C.A. No. 888-VCP, 2007 Del. Ch. LEXIS 133 (Del. Ch. Aug. 30, 2007) ............................39

*Gaskill v. Gordon,*
    160 F.3d 361 (7th Cir. 1998) ...........................................................................................39

*In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.,*
    55 F.3d 768 (3d Cir. 1995)...............................................................................................31

*Globis Capital Partners v. Safenet,*
    No. 2772-VCS (Del. Ch. Dec. 20, 2007) (Tr. of Settlement Hr'g)........................................40

*Harman v. Lyphomed, Inc.,*
    945 F.2d 969 (7th Cir. 1991) .......................................................................................32, 33

*Henkel v. Battista,*
    C.A. No. 3419-VCN, 2008 Del. Ch. LEXIS 292 (Del. Ch. Dec. 16, 2008) ...........................37

*Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    855 F. Supp. 825 (E.D.N.C. 1994)....................................................................................18

*IBEW Local 164 Pension Fund v. Hewitt Assocs., Inc.,*
    No. 10 CH 31612, slip op. (Cook Cnty. Ill. Cir. Ct. Feb. 15, 2011)
    (Final J. and Order of Dismissal with Prejudice).................................................................37

*In re ICX Techs., Inc. S'holder Class Action*,
    Consol. C.A. No. 1:10-cv-941, slip op. (E.D. Va. Jul. 8, 2011) (Order and Final J.)..............37

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
    194 F.R.D. 166 (E.D. Pa. 2000) ..........................................................................................33

*Isby v. Bayh*,
    75 F.3d 1191 (7th Cir. 1996) ...............................................................................17, 18, 29

*Jacob M. Scheiner IRA v. Midas, Inc.*,
    No. 12 C 02653, 2013 U.S. Dist. LEXIS 11520 (N.D. Ill. Jan. 29, 2013).............................26

*Johnson v. Ga. Highway Express, Inc.*,
    488 F.2d 714 (5th Cir. 1974) ..............................................................................................40

*Langendorf v. Conseco Senior Health Ins. Co.*,
    No. 08-cv-3914, 2009 U.S. Dist. LEXIS 131289 (N.D. Ill. Nov. 18, 2009) ..........................31

*Major v. Treen*,
    700 F. Supp. 1422 (E.D. La. 1988)......................................................................................35

*McMullin v. Beran*,
    765 A.2d 910 (Del. 2000) ....................................................................................................20

*In re Mexico Money Transfer Litig.*,
    164 F. Supp. 2d 1002 (N.D. Ill. 2000) ................................................................................30

*In re MicroStrategy, Inc. Securities Litigation*,
    148 F. Supp. 2d 654 (E.D. Va. 2001) ..................................................................................18

*Missouri v. Jenkins*,
    491 U.S. 274 (1989)............................................................................................................32

*In re Netsmart Techs., Inc. S'holders Litig.*,
    924 A.2d 171 (Del. Ch. 2007)..............................................................................................23

*Neuman v. Elec. Specialty Co.*,
    No. 68 C 1817, 1969 U.S. Dist. LEXIS 13005 (N.D. Ill. Dec. 31, 1969) ..............................26

*Nichting v. DPL, Inc.*,
    No. 3:11-cv-141, slip op. (S.D. Ohio Feb. 24, 2012) (Order and Final J.) ............................37

*Panter v. Marshall Field & Co.*,
    646 F.2d 271 (7th Cir. 1981) ........................................................................................25, 26

*Peregrine Options, Inc. v. Farley, Inc.*,
    No. 90 C 285, 1993 U.S. Dist. LEXIS 16479 (N.D. Ill. Nov. 17, 1993)................................25

*In re Plains Res. Inc. S'holders Litig.*,
  No. 071-N, 2005 Del. Ch. LEXIS 12 (Del. Ch. Feb. 4, 2005)..................................................40

*Plumbers Local #65 Pension Fund v. Nicor Inc.*,
  No. 10-CH-52627, slip op. (Cook Cnty. Ill. Cir. Ct. Dec. 7, 2011)
  (Final J. and Order of Dismissal with Prejudice)....................................................36

*Powell v. Comm'r of Internal Revenue*,
  891 F.2d 1167 (5th Cir. 1990) ...........................................................................35

*In re Prudential-Bache Energy Income Partnerships Sec. Litig.*,
  MDL No. 888, 1994 U.S. Dist. LEXIS 6621 (E.D. La. May 18, 1994) ................................39

*In re Pub. Serv. Co. Sec. Litig. of Ind. Sec. Litig.*,
  125 F.R.D. 480 (S.D. Ind. 1988).......................................................................33

*Rawlings v. Prudential-Bache Props., Inc.*,
  9 F.3d 513 (6th Cir. 1993) ..............................................................................33

*Reade-Alvarez v. Eltman, Eltman, & Cooper, P.C.*,
  237 F.R.D. 26 (E.D.N.Y. 2006).........................................................................30

*Rome v. Archer*,
  197 A.2d 49 (Del. 1964) ...................................................................................29

*Santa Fe Indus., Inc. v. Green*,
  430 U.S. 462 (1977).........................................................................................20

*In re Schering-Plough/Merck Merger Litig.*,
  No. 09-CV-1099 (DMC), 2010 U.S. Dist. LEXIS 29121 (D.N.J. Mar. 25, 2010).................37

*Schulte v. Fifth Third Bank*,
  805 F. Supp. 2d 560 (N.D. Ill. 2011) ..................................................................27

*Seinfeld v. Coker*,
  847 A.2d 330 (Del. Ch. 2000)............................................................................39

*Skeen v. Jo-Ann Stores, Inc.*,
  750 A.2d 1170 (Del. 2000) ...............................................................................20

*Stein v. Pactiv Corp.*,
  No. 10-CH-35455, slip op. (Cook Cnty. Ill. Cir. Ct. Apr. 26, 2011)
  (Final J. and Order of Dismissal with Prejudice)....................................................36

*In re Sw. Airlines Voucher Litig.*,
  No. 11 C 8176, 2013 U.S. Dist. LEXIS 120735 (N.D. Ill. Aug. 26, 2013) ..........................29

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
    463 F.3d 646 (7th Cir. 2006) ..............................................19

*In re Synthroid Mktg. Litig.*,
    264 F.3d 712 (7th Cir. 2001) ..............................................31

*In re Talley Indus., Inc. S'holders Litig.*,
    No. 15961, 1998 Del. Ch. LEXIS 53 (Del. Ch. Apr. 13, 1998)...............................................20

*In re Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig.*,
    137 F. Supp. 2d 985 (S.D. Ohio 2001) ..............................................29

*In re The Trizetto Grp., Inc. S'holders Litig.*,
    C.A. No. 3694-VCN, slip op. (Del. Ch. Dec. 4, 2008) (Final Order and J.) ..........................37

*In re Vitalink Commc'ns Corp. S'holders Litig.*,
    No. 12085, 1991 Del. Ch. LEXIS 195 (Del. Ch. Nov. 8, 1991)...............................................40

*Weiss v. Mercedes-Benz of N. Am., Inc.*,
    899 F. Supp. 1297 (D.N.J. 1995) ..............................................33

*Wilfong v. Rent-A-Center, Inc.*,
    No. 00-680-DRH, 2002 U.S. Dist. LEXIS 28016 (S.D. Ill. Oc. 4, 2002) .............................35

*In re Wm. Wrigley Jr. Co. S'holders Litig.*,
    No. 3750-VCL, 2009 Del. Ch. LEXIS 12 (Del. Ch. Jan. 22, 2009) .......................................24

## Other Authorities

6A Charles Alan Wright & Arthur R. Miller,
    Federal Practice and Procedure: Civil 2d § 1522....................................................17

Fed. R. Civ. P. 23 ..............................................17, 31

## I.     __INTRODUCTION__

Lead Plaintiff Kerry Lambert ("Lead Plaintiff" or "Lambert"), by and through his counsel Lite DePalma Greenberg, LLC and Lead Counsel Faruqi & Faruqi, LLP ("Lead Counsel"), respectfully requests this Court enter a judgment pursuant to Federal Rule of Civil Procedure 23(e):   (i) granting final approval of the proposed settlement submitted to the Court on November 20, 2014 (the "Settlement"),[1] pursuant to which the Defendants disclosed material information to the Class prior to the close of the Tender Offer that enabled the members of the Class to make an informed decision about whether to tender their shares as part of the Tender Offer and/or exercise their appraisal rights while preserving their right to opt-out from the Settlement, and (ii) granting an award of attorneys' fees and reimbursement of expenses, which will be paid by the Defendants at no cost to the Class.

On May 5, 2015, the Court issued an Order (ECF No. 124), *inter alia*, preliminarily approving the Settlement, certifying the Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) for purposes of settlement, and approving the form and method of notice to the Class.  The Settlement should now be finally approved.  The Settlement provided a substantial benefit to the Class through the disclosure of additional important and meaningful information concerning the valuation of Tellabs, Inc. ("Tellabs" or the "Company") and the transaction announced on October 21, 2013, whereby Tellabs was to be acquired by Blackhawk Holding Vehicle, LLC, and Blackhawk Merger Sub Inc., affiliates of Marlin Equity Partners ("Marlin" and collectively the "Marlin Defendants") through a tender offer that expired on December 2, 2013 (the "Tender Offer"), followed by a short-form merger between Tellabs and Blackhawk Merger Sub Inc. (the "Merger," collectively with the Tender Offer, the "Transaction").  As set

---

[1]     Capitalized terms are defined herein.

forth herein, at the time the Settlement was reached, Lead Plaintiff and Lead Counsel had a thorough understanding of the strengths and weaknesses of the claims asserted in this litigation (the "Action"), and was achieved only after extensive arm's-length negotiations. Further, Lead Plaintiff and Lead Counsel have confirmed, after thorough confirmatory discovery and with the assistance of a highly respected financial expert, that the per share price offered to Tellabs stockholders in the Tender Offer was within the range of fairness, and consequently Lead Plaintiff was faced with great uncertainty as to his ability to prove the rest of his case and obtain damages for the Class.

Lead Plaintiff and Lead Counsel's request of an award of attorneys' fees in the amount of $700,000 and out-of-pocket expenses in the amount of $50,000 should also be approved. The award is reasonable under the standards applied in this Circuit, as compared to other similar litigations and based on the lodestar method cross-check.

## II.   STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.   THE TRANSACTION

On or about April 30, 2013, the Tellabs Board of Directors (the "Board" or the "Individual Defendants")[2] authorized a formal process to explore Tellabs' strategic alternatives. As part of this process, Goldman Sachs & Co. ("Goldman Sachs"), was hired by Tellabs to serve as its financial advisor, was authorized to contact specified third parties to determine whether they were interested in pursuing a possible transaction with Tellabs.

On October 18, 2013, the Board entered into an Agreement and Plan of Merger (as amended or modified from time to time, the "Merger Agreement"), by and among Tellabs,

---

[2]      The Individual Defendants are Vincent H. Tobkin, Bo Hedfors, Frank Ianna, Vincent D. Kelly, Michael E. Lavin, Stephanie Pace Marshall, Alex Mashinsky, Gregory J. Rossmann, Dennis F. Strigl, Jan H. Suwinski, and Mikel H. Williams.

Blackhawk Merger Sub Inc., and Blackhawk Holding Vehicle LLC. The Merger Agreement contemplated, *inter alia*, that Blackhawk Merger Sub Inc. would make a cash Tender Offer of $2.45 for each share of Tellabs common stock outstanding. Following the consummation of the Tender Offer and subject to the satisfaction or, if permissible, waiver of the other conditions set forth in the Merger Agreement, Blackhawk Merger Sub Inc. would merge with, and into, Tellabs, with Tellabs surviving the Transaction as a wholly owned subsidiary of Blackhawk Holding Vehicle LLC, which is controlled by Marlin.

On October 21, 2013, Tellabs issued a press release announcing the Merger Agreement, and also filed a Form 8-K with the U.S. Securities and Exchange Commission (the "SEC"), which attached the Merger Agreement and the press release.

On November 1, 2013, Tellabs filed a Schedule 14D-9 (the "14D-9") with the SEC related to the Tender Offer. *See* Decl. of Juan E. Monteverde in Supp. of Mot. for Final Approval of Proposed Settlement and an Award of Attorneys' Fees and Expenses ("Monteverde Decl."), Ex. A. The 14D-9 recommended that Tellabs stockholders tender their shares in the Tender Offer.

### B.    THE LITIGATION

On November 5, 2013, Lead Plaintiff filed this Action against Tellabs, the Individual Defendants, and the Marlin Defendants (collectively, the "Defendants"). ECF No. 1. The complaint filed in the Action, a putative class action on behalf of Lambert and all other public stockholders of Tellabs, alleged the Individual Defendants breached their fiduciary duties to Tellabs stockholders by entering into and approving the Transaction and by failing to disclose material information relevant to the Transaction. The Action further alleged the Marlin Defendants aided and abetted such breaches. The Action also alleged the 14D-9 omitted certain material information in further breach of the Board's fiduciary duties and also in violation of

3

Sections 14(e) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(e) and 78t(a). Parallel litigation also was brought by other Tellabs stockholders in Illinois State Court[3] and Delaware State Court.[4]

Also on November 5, 2013, Lambert filed a motion seeking expedited discovery in the Action. Subsequently, Lead Counsel and counsel for Defendants ("Defendants' Counsel") met and conferred regarding expedited discovery and reached an agreement regarding the production of certain documents. ECF No. 4. After discussions with Defendants' Counsel concerning production of documents, on November 12, 2013, Lead Plaintiff withdrew his motion for expedited discovery. ECF No. 10.

On November 14, 2013, the Parties executed an Agreed Confidentiality Order to govern the exchange of confidential discovery. Following the execution of the Agreed Confidentiality Order, Defendants provided to Lead Plaintiff certain requested non-public documents relating to his claims, including minutes of meetings of the Board and extensive presentations to the Board by Goldman Sachs and Tellabs management, which Lead Counsel reviewed.

On November 20, 2013, Tellabs and the Individual Defendants filed a Motion to Dismiss the Complaint for failure to state a claim. ECF No. 37. On November 21, 2013, the Marlin Defendants filed a Motion to Join Tellabs and the Individual Defendants' Motion to Dismiss. ECF No. 47.

---

[3]    Specifically, eleven cases were filed in Cook County and DuPage County, Illinois. These cases were ultimately consolidated in each county bearing the case captions *Englehart v. Hedfors, et al.*, Case No. 13 CH 23886 (Cook Cnty. Ct. Oct. 22, 2013); *Jackson v. Tellabs, Inc.*, Case No. 13 CH 2988 (DuPage Cnty. Ct. Aug. 28, 2014).

[4]    Three cases were filed in Delaware Chancery Court. These cases were consolidated into one action bearing the case caption *In re Tellabs, Inc. Stockholders Litigation*, C.A. No. 9028-VCL (Del. Ch. Oct. 23, 2013).

## C.     SETTLEMENT OF THE LITIGATION

Also on November 20, 2013, Lead Counsel sent a formal demand letter to Defendants' Counsel in an effort to resolve the Action (the "Demand Letter").  Subsequent to receipt of the Demand Letter, Lead Plaintiff and Defendants, through their respective counsel, commenced arm's-length discussions and negotiations regarding the Demand Letter and a potential resolution of the claims asserted in the Action.

On November 24, 2013, the Parties, by and through their counsel, completed their negotiations and executed a Memorandum of Understanding ("MOU") containing the terms of the Parties' agreement-in-principle to resolve the Action.  Among other things, the MOU set forth the Parties' agreement-in-principle that in consideration for the full and final settlement and dismissal with prejudice of the Action, and the release of any and all Released Claims (as defined in the MOU), Tellabs would make additional disclosures concerning the Tender Offer and the Transaction (the "Supplemental Disclosures").  The MOU further provided that any settlement and release of claims would be contingent upon satisfactory completion of confirmatory discovery by Lambert and Lead Counsel.

On November 25, 2013, Lead Plaintiff and the Defendants (the "Parties") informed the Court of their agreement-in-principle to resolve the Action, and Tellabs and the Individual Defendants withdrew their Motion to Dismiss without prejudice (the Marlin Defendants' Motion to Join having already been granted).  Also on November 25, 2013, Tellabs filed Amendment Number 2 to the 14D-9 with the SEC (the "Amendment"), which included the Supplemental Disclosures agreed to in the MOU.  The Supplemental Disclosures included in the Amendment are more fully discussed below.  *See* Monteverde Decl., Ex. B.

On December 2, 2013, the Tender Offer closed. All conditions necessary for the Transaction to close were satisfied, and on that same day the Marlin Defendants completed the Transaction.

The MOU entered into by the Parties provided for confirmatory discovery, which was subsequently completed. Lead Counsel reviewed thousands of pages of documents that included, *inter alia*, e-mails, correspondence, financial presentations, financial diligence materials, and Board minutes regarding the Transaction produced by Defendants. On January 30 and January 31, 2014, Lead Counsel took in San Francisco the depositions of Ryan Limaye (a representative of Tellabs' financial advisor, Goldman Sachs), and Vincent H. Tobkin (Chairman of the Tellabs Board), respectively, and on and February 12, 2014, Lead Counsel took in Chicago the deposition of Daniel Kelly (Chief Executive Officer ("CEO") of Tellabs). Further, and after thorough discovery, Lambert and his counsel also confirmed, with the assistance of a highly respected financial expert, that the Tender Offer price fell within a range of what could be considered fair.

On March 21, 2014, the Parties memorialized their settlement agreement (the "March 21 Agreement"). ECF No. 67.

### D. THE *ENGLEHART ACTION* AND AMENDMENT OF THE SETTLEMENT

On March 20, 2014, plaintiffs Robert Englehart, Jorge Rodriguez, and the Judith Kane-Rodriguez 2012 Family Trust filed a putative stockholder class action complaint styled *Englehart, et al. v. Tellabs, Inc., et al.*, Case No. 1:14-cv-1990 (N.D. Ill.) (the "*Englehart Action*"). The *Englehart Action* was subsequently assigned to Judge Darrah. The *Englehart Action* alleged claims arising out of the Transaction and Tender Offer similar to those brought in

this Action. Prior to filing the *Englehart Action*, plaintiffs in the *Englehart Action* had litigated their claims in Illinois State Court.

On March 24, 2013, plaintiffs in the *Englehart Action* filed a motion to transfer the *Englehart Action* to Judge Guzman, consolidate the *Englehart Action* with this Action, and to stay this Action pending appointment of a lead plaintiff pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §78u-4, *et seq.* ECF No. 68.

After review of the *Englehart Action*, Lambert and the Defendants agreed to amend the March 21 Agreement and provide for certification of the proposed class under Federal Rules of Civil Procedure 23(a) and 23(b)(3), thereby improving the settlement by providing members of the proposed class with the right to opt-out of the proposed settlement.

On April 1, 2014, the Court requested additional submissions concerning the motion by the plaintiffs in the *Englehart Action* to transfer, consolidate, and stay. ECF No. 74. On April 18, 2014, Lead Plaintiff, Defendants, and the plaintiffs in the *Englehart Action* filed supplemental briefs. ECF Nos. 76-78. Also on April 18, 2014, the Parties informed the Court of the amended Settlement.

On April 25, 2014, the Court denied the motion of the plaintiffs in the *Englehart Action* to transfer, consolidate, and stay. ECF No. 79. The Court also noted that it would address Lambert's motion for preliminary approval of the Settlement after lead plaintiff and lead counsel issues were resolved and after notice pursuant to the PSLRA was issued by Lambert. *Id.* Pursuant to the Court's order, on May 14, 2014, Lambert's counsel issued via PR Newswire a notice of the filing of the class action against Tellabs. ECF No. 87-3.

On July 14, 2014, Lambert and plaintiffs in the *Englehart Action* separately moved to be appointed lead plaintiff. ECF Nos. 83, 86. On September 3, 2014, after reviewing the deposition

transcripts and documents produced by Defendants in this Action, and after retaining their own financial advisor to consider whether the Transaction price was fair, the plaintiffs in the *Englehart Action* withdrew their bid to be considered for lead plaintiff after agreeing to support Lambert's application for his appointment as lead plaintiff. ECF No. 101. On September 8, 2014, the Court granted that motion to withdraw. ECF No. 103.

On November 20, 2014, a second amended settlement agreement (the "Settlement Agreement") was submitted to the Court. The Settlement Agreement was executed by counsel for plaintiff Lambert, counsel for plaintiffs in the *Englehart Action*, counsel for Tellabs and the Individual Defendants, and counsel for the Marlin Defendants. Pursuant to the Settlement Agreement, on November 24, 2014, plaintiff in the *Englehart Action* moved to stay that action pending final approval of this Action. This motion was grated on December 2, 2014.

### E. PRELIMINARY APPROVAL OF THE SETTLEMENT AND CERTIFICATION OF THE CLASS

On November 21, 2014, Lambert moved for Preliminary Approval of the Settlement, Approval of Form and Method of Notice, and For Entry of an Order Setting a Settlement Hearing and Other Dates. ECF No. 109. On December 9, 2014, the Court held a hearing on Lambert's motion. During the hearing, the Court questioned the Parties concerning whether the Action was now moot and whether the Court had subject matter jurisdiction to approve the Settlement. After conclusion of the hearing, the Court entered an order requesting supplemental briefing "addressing: (1) why the case is not moot, thus depriving the Court of subject matter jurisdiction; (2) what benefit the proposed class members will receive that they otherwise would not by certifying a class at this stage of the litigation; and (3) any other issues the parties believe should be addressed based on the discussion in open court." ECF No. 112. On January 9, 2015,

Lambert filed his supplemental brief in response to the Court's December 9, 2014 Order. ECF No. 113.

On March 5, 2015, the Court granted in part, and denied in part, Lambert's motion for preliminary approval. ECF No. 115. In its written order, the Court "conclude[d] that this case is not moot and that the proposed settlement benefits [C]lass members." ECF No. 115 at 3. The Court concluded that that the Action was not moot because active claims remained because "Plaintiff's claim for damages is still unresolved and can go forward" and that the Amendment "[did] not render Plaintiff's disclosure-related claims moot because they addressed only seven of the eleven omissions Plaintiff alleged in [his] complaint." ECF No. 115 at 4-5. The Court further concluded that the Supplemental Disclosures in the Amendment provided benefit to the Class, that the Settlement was costless to Class members because of the ability to opt-out (a benefit not usually present in settlements of similar cases), and that the benefit to the Class members was not reduced by the payment of attorneys' fees and costs. ECF No. 115 at 6-7. However, the Court identified certain deficiencies with the proposed form of notice to Class members, and the procedures and deadlines for objecting and opting out of the Settlement. The Court directed the parties to file a renewed motion for preliminary approval to address these concerns. ECF No. 115 at 4-5, 7-10.

On April 14, 2015, Lambert filed a Renewed Motion for Preliminary Approval of Form and Method of Notice and for Entry of an Order Setting a Settlement Hearing and Other Dates. ECF No. 118. On April 20, 2015, Lambert filed corrected exhibits to his renewed motion. ECF Nos. 120-21.

On April 22, 2015, the Court granted Lambert's renewed motion. ECF No. 123. In its minute order, the Court stated that "[t]he Court is satisfied that Plaintiff's renewed motion for

preliminary approval adequately addresses the notice deficiencies raised in the Court's March 5, 2015 Order." *Id.*

On May 5, 2015, the Court issued its written "Preliminary Approval Order," in which it "approve[d], for settlement purposes only, certification of [this Action] as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure[.]" ECF No. 124 at 2. The Preliminary Approval Order certified the following class (the "Settlement Class" or "Class"):

> All record holders and beneficial owners of any share(s) of Tellabs stock who have held any such share(s) at any time during the period beginning on and including October 18, 2013, through and including December 2, 2013, including any and all of their respective successors-in-interest, successors, predecessors-in-interest, predecessors, representatives, trustees, executors, administrators, estates, heirs, assigns and transferees, immediate and remote, and any person or entity acting for or on behalf of, or claiming under, any of them, and each of them, together with their predecessors-in-interest, predecessors, successors-in-interest, successors, and assigns, but excluding the Defendants.

*Id.* The Court also found that "for the sole purpose of settlement and without an adjudication on the merits, that all requirements pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) are met for certification of the Settlement Class." *Id.* The Court certified Lambert as Class Representative pursuant to Federal Rule of Civil Procedure 23 and appointed Lambert as Lead Plaintiff and Faruqi & Faruqi LLP as Lead Counsel pursuant to the PSLRA. *Id.*

The Preliminary Approval Order approved forms of mailed notice to members of the Proposed Class, and scheduled the notice to be mailed on or before May 19, 2015. *Id.* at 3-4. The mailing of the Notice of Pendency of Class Action, Proposed Settlement of Class Action and Settlement Hearing (the "Notice") took place in accordance with the Preliminary Approval Order. Counsel for Defendants has represented that 32,014 Notice packets have been mailed to date to known Class members and broker nominees. Pursuant to the Preliminary Approval Order, on or before August 24, 2015, Defendants will file with the Court proof of mailing of the Notice to the Class. *Id.* at 4.

In addition, the Court scheduled the final hearing on the Settlement (the "Settlement Hearing") for September 3, 2015; set an opt-out and objection deadline of August 13, 2015, and an objection deadline of August 13, 2015; and set a schedule for the Parties to file briefs and other papers in support of final approval of the Settlement. *Id.* at 3-7.

F.    **THE SETTLEMENT**

After extensive negotiations, the Parties to the Action reached an agreement in principle and entered into the MOU signed on November 24, 2013, which was subject to the filing and dissemination of the Supplemental Disclosures in the Amendment and confirmatory discovery. The Amendment provided material information for Tellabs stockholders to decide whether to tender or not their shares in support of the Transaction as well as whether to seek appraisal rights. In particular, the Amendment included the following Supplemental Disclosures, which are indicated in underlined text. Any information deleted through the Amendment is indicated in strikethrough text:

(1)    In Goldman Sachs's Illustrative Present Value of Future Share Price Analysis, additional information regarding the basis for the earnings per share multiples and discount rate used by Goldman Sachs for this analysis:

> *Illustrative Present Value of Future Share Price Analysis.* Goldman Sachs performed an illustrative analysis of the implied present value of the future price per Share, which is designed to provide an indication of the present value of a theoretical future value of a company's equity as a function of such company's estimated future earnings and its assumed price to future earnings per Share multiple. For this analysis, Goldman Sachs used the Forecasts for each of the calendar years 2015 through 2017. Goldman Sachs first calculated the implied values per Share as of December 31 for each of the calendar years 2014 through 2016, by applying illustrative price to one-year forward earnings per Share multiples of 12.0x to 18.0x, <u>which were derived by Goldman Sachs utilizing its professional judgment and experience, taking into account current and historical trading data and the current P/E multiples for the Company and the selected companies (as defined below),</u> to earnings per Share estimates for each of the calendar years 2015 through 2017<s>, and</s>. <u>These theoretical future values of the Company's equity on a per Share basis were</u> then discounted <s>these theoretical</s>

11

~~future values of the Company's equity on a per Share basis~~ to present values to June 30, 2013, using an illustrative discount rate of 12.7% ~~reflecting estimates of the Company's cost of equity and taking into account~~ <u>derived by application of the Capital Asset Pricing Model, which takes into account certain company-specific metrics, including the company's target capital structure and historical beta, as well as certain financial metrics for the United States financial markets generally and adding</u> a size premium.

Goldman Sachs then calculated the implied values per Share as of December 31 for each of the calendar years 2014 through 2016, by applying illustrative price to one-year forward cash adjusted earnings per Share multiples of 8.0x to 14.0x<u>, which were derived by Goldman Sachs utilizing its professional judgment and experience, taking into account current and historical trading data and the current cash adjusted P/E multiples for the Company and selected companies,</u> to cash adjusted earnings per Share estimates for each of the calendar years 2015 through 2017~~, and~~<u>.  These theoretical future values of the Company's equity on a per Share basis were</u> then discounted ~~these theoretical future values of the Company's equity on a per Share basis~~ to present values to June 30, 2013, using an illustrative discount rate of 12.7% ~~reflecting estimates of the Company's cost of equity and taking into account~~ <u>derived by application of the Capital Asset Pricing Model, which takes into account certain company-specific metrics, including the company's target capital structure and historical beta, as well as certain financial metrics for the United States financial markets generally and</u> a size premium. Cash adjusted earnings per Share was calculated for this purpose by subtracting tax-adjusted interest income earned per Share from unadjusted earnings per Share, and implied values per Share were then calculated using cash adjusted earnings per Share multiplied by cash adjusted earnings per Share multiples and adding the applicable net cash balance from the Forecasts.

(2)     In Goldman Sachs's Illustrative Discounted Cash Flow Analysis, additional information regarding how Goldman Sachs treated certain factors, including the discount rate, amount of tax carryforwards, and components of unlevered free cash flows, when conducting this analysis:

*Illustrative Discounted Cash Flow Analysis*. Goldman Sachs performed an illustrative discounted cash flow analysis on the Company using the Forecasts, the Company's cash balance and basic Share count as of June 28, 2013, and ~~an assumed~~ <u>incorporating the</u> present value <u>(using a discount rate of 10.2%)</u> of the Company's tax carryforwards of <u>approximately $36 million (approximately</u> $0.10 per ~~Share~~ <u>share).  In addition, stock based compensation expense was treated as a cash expense for purposes of determining unlevered free cash flow.</u>  Goldman Sachs calculated implied prices per Share using illustrative terminal values in the year 2017 based on perpetuity growth rates ranging from (2.0)% to 2.0%<u>, estimated by Goldman Sachs utilizing its professional judgment and experience,</u>

taking into account the Forecasts and market expectations regarding long-term real growth of gross domestic product and inflation, to terminal year projected free cash flow and illustrative discount rates ranging from 16.6% to 20.6%. This analysis resulted in a range of implied present values per Share of $1.74 to $1.79.

(3)     In Goldman Sachs's Selected Companies Analysis, the results of such analysis,

including the multiples observed and implied values for each of the comparable companies:

*Selected Companies Analysis.* Goldman Sachs reviewed and compared certain financial information for the Company to corresponding financial information, ratios and public market multiples for the following publicly traded corporations in the technology industry, separated into the Mid-Cap group (companies with market capitalizations of less than $10 billion), the Large-Cap group (companies with market capitalizations of $10 billion or more) and the Historically Declining Revenue group (collectively referred to as the "selected companies"). The following table presents the results of Goldman Sachs' analysis:

Mid-Cap Group

• ADTRAN Inc.

• ADVA International Inc.

• Alcatel-Lucent USA Inc.

• Calix, Inc.

• Ciena Corp.

• Harmonic Inc.

• Infinera Corp.

• Sonus Networks Inc.

Large-Cap Group

• Cisco Systems, Inc.

• Ericsson

• Juniper Networks Inc.

• Motorola Solutions, Inc.

Historically Declining Revenue Group

• Alcatel-Lucent

13

• ~~Blackberry (Blackberry market data and projections as of September 22, 2013, one day prior to the announcement of the sale of the company to a consortium of investors)~~

• ~~Nokia (Nokia market data and projections as of September 1, 2013, one day prior to announcement of the sale of the Devices & Services Business to Microsoft)~~

| Company | Enterprise Value as a multiple of | | | | Equity Value as a multiple of | | | |
|---|---|---|---|---|---|---|---|---|
| | CY2013E Revenue | CY2014E Revenue | CY2013E EBITDA | CY2014E EBITDA | CY2013E EPS | CY2014E EPS | CY2013E Cash Adjusted EPS | CY2014E Cash Adjusted EPS |
| **Large Cap** | | | | | | | | |
| Cisco | 1.85x | 1.76x | 6.0x | 5.6x | 11.1x | 10.5x | 6.7x | 6.3x |
| Ericsson | 1.02x | 0.98x | 8.6x | 7.2x | 19.4x | 14.7x | 15.0x | 11.3x |
| Juniper Networks | 1.79x | 1.69x | 7.9x | 6.8x | 17.4x | 15.5x | 11.6x | 10.3x |
| Motorola Solutions | 1.80x | 1.73x | 9.1x | 8.4x | 13.7x | 15.2x | 11.0x | 12.2x |
| **Median** | **1.80x** | **1.71x** | **8.2x** | **7.0x** | **15.6x** | **14.9x** | **11.3x** | **10.8x** |
| **Mid-Cap** | | | | | | | | |
| ADTRAN | 1.59x | 1.41x | 16.5x | 11.3x | 35.9x | 27.6x | 24.9x | 18.9x |
| ADVA | 0.61x | 0.56x | 5.2x | 4.4x | 32.2x | 21.0x | 22.1x | 14.2x |
| Alcatel-Lucent | 0.55x | 0.54x | 9.4x | 6.6x | NM | NM | NM | 19.4x |
| Calix | 1.43x | 1.26x | 16.2x | 13.1x | 25.6x | 16.6x | 23.1x | 14.9x |
| Ciena | 1.84x | 1.66x | 19.5x | 15.0x | 38.9x | 24.8x | 34.5x | 21.8x |
| Harmonic | 1.43x | 1.33x | 13.2x | 10.9x | 46.0x | 24.5x | 38.2x | 20.0x |
| Infinera | 2.21x | 2.01x | NM | 17.6x | NM | 46.5x | NM | 37.2x |
| Sonus Networks | 2.54x | 2.40x | NM | NA | 173.5x | 69.4x | NA | 51.9x |
| **Median** | **1.51x** | **1.37x** | **14.7x** | **11.3x** | **37.4x** | **24.8** | **24.9x** | **19.7x** |
| **Historically Declining Revenue** | | | | | | | | |
| Alcatel-Lucent | 0.55x | 0.54x | 9.4x | 6.6x | NM | NM | NM | 19.4x |
| Blackberry | 0.14x | 0.17x | 1.5x | 1.4x | NM | NM | NM | NM |
| Nokia | 0.31x | 0.31x | 5.0x | 4.0x | NM | 22.5x | NM | 2.5x |
| **Median** | **0.31x** | **0.31x** | **5.0x** | **4.0x** | **NM** | **22.5x** | **NM** | **10.9x** |

Note that Blackberry market data and projections are as of September 22, 2013, one day prior to the announcement of the sale of the company to a consortium of investors. Nokia market data and projections are as of September 1, 2013, one day prior to announcement of the sale of the Devices & Services Business to Microsoft.

(4) In Goldman Sachs's Selected Companies Analysis, additional information about Goldman Sachs's basis for choosing the selected companies and the multiples observed for each of the selected transactions:

> Although none of the selected companies is directly comparable to the Company, the selected companies ~~included~~ were chosen because they are publicly traded companies in the communications technology industry with operations and product profiles that for purposes of analysis may be considered similar to certain ~~operations~~ of the Company's operations and product profiles.

(5) In the Background of the Merger section, additional information regarding the basis for the Tellabs Board's March 27, 2013 decision to suspend discussions with third parties regarding a potential sale of the entire company for the time being:

> The Board held a special telephonic Board meeting on March 27, 2013 at which representatives of Goldman Sachs and Sidley Austin LLP, the Company's outside legal advisors ("Sidley Austin"), were present. During the meeting, representatives of Goldman Sachs led a discussion regarding a preliminary financial analysis with respect to the Company, a process to be followed for exploring the Company's strategic alternatives and a proposed timeline for such a process. After discussion regarding the Company's outlook and the attendant uncertainties, the Board determined that it desired additional information regarding the Company's financial and business outlook in order to assist the Board in considering various strategic options. For this reason, the Board decided to suspend the Company's discussions with third parties regarding a potential sale of the entire Company for the time being~~; however~~. However, the Board did authorize management to continue to permit Party A to conduct due diligence with respect to the data business and to contact other parties that might be interested in acquiring the Company's data business. The Board also requested that management work with Goldman Sachs to prepare an update to the Company's financial and business outlook to assist the Board in considering various strategic options and to present such update at the next Board meeting.

(6) In the Background of the Merger section, additional information regarding the basis for the Tellabs Board's April 30, 2013 decision to begin a more formal non-public process of identifying and contacting certain parties that would be the most likely to be interested in acquiring Tellabs:

The Board held a regularly scheduled in-person Board meeting on April 30, 2013 at which representatives of Goldman Sachs and Sidley Austin were present. During the meeting, representatives of Goldman Sachs continued to review with the Board the strategic alternatives previously presented to the Board, including both strategic transactions and operational and financial strategies as a standalone Company. In addition, the Goldman Sachs representatives reviewed with the Board information regarding the Company, including information relating to the Company's past financial and share price performance and operational benchmarking compared to other industry participants. Management reviewed with the Board and representatives of Goldman Sachs the Company's business plan, as well as preliminary financial projections for the Company, and representatives of Goldman Sachs presented to the Board a preliminary financial analysis with respect to the Company. At the meeting, representatives of Sidley Austin discussed with the Board its fiduciary duties in the context of considering the Company's strategic alternatives, including a potential sale of the Company. Representatives of Goldman Sachs discussed with the Board process alternatives the Board could pursue in exploring a possible sale of the Company, including conducting a focused, non-public process for determining third-party interest in an acquisition of the Company. The Board discussed the strategic alternatives presented and then authorized the Company to formally engage Goldman Sachs as its financial advisor in connection with a potential sale of the Company ~~and directed Goldman Sachs, working with management, to begin~~. The Board also decided that, although there had been communications with various parties regarding a potential sale of the entire Company, the Company would be more likely to maximize stockholder value in connection with a potential sale of the entire Company if the Company were to conduct a more formal, non-public process of identifying and contacting the strategic and financial sponsor parties that would be the most likely to be interested in acquiring the Company (other than those as to which there were any material competitive concerns), and the Board directed Goldman Sachs, working with management, to begin such a process. The Board chose to engage Goldman Sachs given, among other things, Goldman Sachs' reputation, knowledge of the Company and the industry, and experience with transactions similar to those contemplated by the Board.

(7)     In the Background of the Merger section, additional details regarding the refined

base case projections that Tellabs provided to Marlin on October 3, 2013:

On October 3, 2013, at an in-person meeting at which representatives of Marlin, the Company and Goldman Sachs were present, Company management provided Marlin with an update on the business, including estimated third quarter 2013 results and an estimated revenue forecast for 2013. The same day, the Company also provided Marlin with the

Company's refined base case projections, projections, which Company management had prepared on its own initiative to reflect refined assumptions regarding certain cash flow items.

The Parties also agreed to improve the Settlement by providing members of the proposed Class with the right to opt out of the proposed Settlement as memorialized in the Stipulation of Settlement. Plaintiffs in the *Englehart Action*, after reviewing the confirmatory discovery taken in this Action and after retaining their own financial expert consultant, also agreed to join and support the Settlement.

Only after all terms in the Stipulation of Settlement were agreed upon in principle by the Parties, Lead Plaintiff and Defendants reached an agreement wherein Lead Plaintiff, joined by the plaintiffs in the *Englehart Action*, intend to petition the Court for an award of fees in an amount not to exceed $700,000 and expenses not to exceed $50,000 in connection with the Settlement (the "Fee and Expense Application"), and Defendants agree not to oppose the Fee and Expense Application.

## III.   ARGUMENT

### A.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE UNDER THE APPLICABLE LEGAL STANDARDS AND SHOULD BE APPROVED

The Seventh Circuit has endorsed the settling of litigation as an overriding public interest, particularly in class actions. *See Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."). In fact, "settlement should be facilitated at as early a stage of the litigation as possible." 6A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 1522, at 225-26 (citing Fed. R. Civ. P. 16(c) 1983 Advisory Committee Notes).

Rule 23 of the Federal Rules of Civil Procedure requires judicial approval for any compromise of claims brought on a class basis. Approval of a class action settlement is

committed to "the sound discretion of the district courts to appraise the reasonableness of particular class-action settlements on a case-by-case basis, in light of the relevant circumstances." *Evans v. Jeff D.*, 475 U.S. 717, 742 (1986), *overruled on other grounds by* 42 U.S.C. § 2000e (1988). As stated by the court in *In re MicroStrategy, Inc. Securities Litigation*, 148 F. Supp. 2d 654, 663 (E.D. Va. 2001), "there is a strong initial presumption that the compromise is fair and reasonable" (internal quotation marks omitted).

A proposed class action settlement should be approved if the Court, after allowing absent class members an opportunity to be heard, finds that the settlement is "'fair, reasonable, and adequate.'" *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 958 (N.D. Ill. 2011) (quoting Fed. R. Civ. P. 23(e)); *Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 855 F. Supp. 825, 827 (E.D.N.C. 1994). In making this determination at the final approval stage, courts in this Circuit consider the following factors:

(1)     the strength of plaintiffs' case compared to the terms of the proposed settlement;

(2)     the likely complexity, length, and expense of continued litigation;

(3)     the amount of opposition to settlement among affected parties;

(4)     the opinion of competent counsel; and

(5)     the stage of the proceedings and the amount of discovery completed.

*Isby*, 75 F.3d at 1199. Courts "do not focus on individual components of the settlements, but rather view them in their entirety in evaluating their fairness" and courts view the facts "in the light most favorable to the settlement." *Id.* (quoting *Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*, 616 F.2d 305, 315 (7th Cir. 1980) (internal quotation marks omitted)). In addition, courts "should not substitute their own judgment as to optimal settlement terms for the judgment

of the litigants and their counsel." *Armstrong*, 616 F.2d at 315, *overruled on other grounds by*

*Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998).

Application of these factors here confirms that the Settlement is fair, reasonable, and

adequate, and should be finally approved.

1.     The Strength of Lead Plaintiff's Case Compared to the Terms of the
       Proposed Settlement Supports Final Approval

"The most important factor relevant to the fairness of a class action settlement is the first

one listed:  the strength of the plaintiffs' case on the merits balanced against the amount offered

in the settlement." *Synfuel Techs., Inc. v. DHL Express (USA), Inc*., 463 F.3d 646, 653 (7th Cir.

2006) (internal quotation marks omitted).  Nevertheless, "[b]ecause the essence of settlement is

compromise, courts should not reject a settlement solely because it does not provide a complete

victory to the plaintiffs." *In re AT&T Mobility Wireless Data Servs. Sales Litig*., 270 F.R.D. 330,

347 (N.D. Ill. 2010) (citations omitted) (internal quotation marks omitted).

a)     *The Settlement Provides a Substantial Benefit to the Class*

The proposed Settlement, which provided for the inclusion of Supplemental Disclosures

in the Amendment concerning certain subject areas raised by Lead Plaintiff and his counsel, has

clearly been beneficial to the Class.  Through these substantive and improved disclosures in the

Amendment, Tellabs stockholders received additional information necessary to make a fully-

informed decision about whether to approve the Transaction.  Moreover, Lead Plaintiff also

obtained the right for Class members to opt out of the Settlement.  As a result, Class members

who believe the benefits conferred were not sufficient to justify the Settlement can retain the

benefits of the increased disclosure, yet opt out of the Settlement, and seek relief on their own.

These Supplemental Disclosures are the preferred remedy under both state and federal

law.  It is well settled under the law of Delaware, where Tellabs was incorporated, that curative

disclosures confer a substantial benefit on public stockholders. *See, e.g., In re Talley Indus., Inc. S'holders Litig.*, No. 15961, 1998 Del. Ch. LEXIS 53, at *46 (Del. Ch. Apr. 13, 1998) ("[T]he timely disclosure of the information in the supplement was presumably of greater value to the class than any potential award of damages based on the failure to disclose the same information, as such information is of the greatest utility when it is available in a timely manner to inform the stockholders' decision making process."). Supplemental Disclosures also fulfill the purpose of the Williams Act, which is "to encourage an accurate disclosure of information relevant to a tender offer." *Atchley v. Qonaar Corp.*, 704 F.2d 355, 359 (7th Cir. 1983) (internal quotation marks omitted); *see also Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477-78 (1977) (the fundamental objective of federal securities law is full disclosure).

The Supplemental Disclosures here constituted essential information with which Tellabs stockholders could evaluate the fairness of the Transaction, the accuracy of the disclosures, and reliability of the financial advisor's valuation analyses and opinion contained therein. The Supplemental Disclosures were also of particular importance to stockholders who had to determine whether or not to seek appraisal as an alternative to tendering their shares. *See McMullin v. Beran*, 765 A.2d 910, 917 (Del. 2000); *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1172 (Del. 2000).

The Supplemental Disclosures provided Tellabs stockholders with crucial information regarding each of the three valuation analyses Goldman Sachs employed to independently value Tellabs' stock. Affidavit M. Travis Keath, CFA, CPA/ABV in Support of Motion for Final Approval of Proposed Settlement ("Keath Aff."), ¶¶ 8-16, Monteverde Decl., Ex. C. This is particularly noteworthy, since a sizable minority of TLAB's shareholders – h.olders of 9% or

more than 32 million shares – declined to tender their shares, despite the unanimous approval of the Board. *Id.* at ¶ 11.

The first Supplemental Disclosure provided additional information regarding the basis for the earnings per share multiples and discount rate used by Goldman Sachs for its Illustrative Present Value of Future Share Price Analysis.

The second Supplemental Disclosure provided additional information regarding how Goldman Sachs treated certain factors when conducting its Illustrative Discounted Cash Flow Analysis ("DCF"), including the specific amount of tax carryforwards used and how stock-based compensation was treated in the analysis. Since stock-based compensation is not a cash expense, the treatment of stock-based compensation varies between analysts, and therefore the supplemental clarification had a direct impact on Goldman's DCF analysis. Keath Aff. ¶ 16 and n.4.

Notably, the third Supplemental Disclosure provided detailed pricing information regarding the 14 publicly traded companies used by Goldman in its Selected Companies Analysis, which also influenced its Illustrative Present Value of Future Share Price Analysis. *Id.* at ¶¶ 12-15. This additional information was not only material, but crucial to stockholders' analysis of Goldman Sachs' valuation. For example, this Supplemental Disclosure revealed that the inclusion of the Large-Cap companies (with capitalization 100 times greater than TLAB) cut against the Transaction because it skewed Goldman Sachs' Selected Companies Analysis and Illustrative Present Value of Future Share Price Analysis, since these Large-Cap companies provided the lowest summary statistics of the three peer groups with respect to both the Price-to-earnings ("P/E") multiples and cash-adjusted P/E multiples. *Id.* at ¶¶ 12(a), 13. In contrast, the more comparable Mid-Cap companies reported a one-year forward earnings per share median

multiple of 24.8x, rather than the 12.0x-18.0x multiple employed by Goldman Sachs by the inclusion of the Large-Cap companies as peers in the fairness opinion. *Id.* at ¶¶ 12(a)-(b), 14(a). Indeed, the most comparable companies, ADTRAN Inc. and Ciena Corp., reported multiples of 27.6x and 24.8x respectively. Similarly, the Supplemental Disclosures revealed that Alcatel-Lucent, the only company in the Historically Declining Revenue peer group that, like Tellabs, focuses on optical network equipment, reported the highest multiples of any of the three companies in this peer group and most were above the high ends of the ranges of multiples Goldman Sachs selected for use in its Illustrative Present Value of Future Share Price Analysis. *Id.* at ¶¶ 12(a), 14(b).

In sum, the Supplemental Disclosures with respect to Goldman's fairness opinion not only provided material additional information to Tellabs stockholders, but also exposed analytical shortcomings related to Goldman's Selected Companies Analysis and Illustrative Present Value of Future Share Price Analysis, which constitute two of the three discrete financial analyses prepared by Goldman independently valuing Tellabs. With respect to the other, the Illustrative Discounted Cash Flow Analysis, the fourth Supplemental Disclosure provided important clarity on Goldman's choice to treat stock-based compensation as a cash expense in its calculation of free cash flow. *Id.* at ¶ 17.

All of these disclosures illuminated the key inputs and range of ultimate values generated by Goldman Sachs' analyses, which constituted material information allowing investors to understand, and check, the analyses conducted by the Tellabs' financial advisor. Importantly, the Supplemental Disclosures provided further information about the analyses performed by Goldman Sachs, which would certainly aid a stockholder's decision on whether or not to tender shares in the Tender Offer. *See In re Countrywide Corp. S'holders Litig.*, No. 3464-VCN, 2009

Del. Ch. LEXIS 44, at *9, *53 (Del. Ch. Mar. 31, 2009) (curative disclosure pursuant to settlement of class action, which, among other things, "provided greater detail about the assumptions underlying the fairness opinions relied upon by the Countrywide board in evaluating the merger" and led to a "vote by better informed shareholders;" court noted that "[s]imply because no monetary consideration resulted from the settlement does not render it unfair."); *Cf. In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-03 (Del. Ch. 2007) (disclosures concerning merger were "materially incomplete" absent disclosure of all projections used by financial advisor in preparing its discounted cash flow analysis as part of its fairness opinion and disclosure of valuation methods, and "key inputs and range of ultimate values generated by those analyses" underpinning fairness opinion; in light of irreparable harm stockholders faced absent these additional disclosures, court preliminarily enjoined merger vote).

The fifth Supplemental Disclosure provided additional information regarding the basis for the Tellabs Board's March 27, 2013 decision to temporarily suspend discussions with third parties regarding a potential sale of the entire company. The sixth Supplemental Disclosure provided additional information regarding the basis for the Tellabs Board's April 30, 2013 decision to begin a more formal non-public process of identifying and contacting certain parties that would be the most likely to be interested in acquiring Tellabs. The seventh Supplemental Disclosure provided additional details regarding the refined base case projections that Tellabs provided to Marlin on October 3, 2013. These disclosures illuminated the process through which the Board arrived at the Transaction, and hence provided meaningful information on why the Transaction was recommended by the Board to Tellabs stockholders. *See In re Chips & Techs., Inc. S'holders Litig.*, No. 15832, 1998 Del. Ch. LEXIS 109, at *6 (Del. Ch. June 24, 1998) (supplemental disclosure which more fully described analysis employed by advisory firm

retained by defendants, and which explained reasons challenged transaction was recommended, while not necessarily material "as a matter of law," were "substantial and helpful to an understanding of the decision to authorize the transaction with Intel and to recommend it to the stockholders", thereby justifying an award of $667,500 in fees and expenses to plaintiffs' counsel).

Given the benefit provided to the Class of material disclosures and the ability to opt-out of the Settlement, the complexities of this Action, and the continued risks if the Parties were to proceed to trial (detailed in the next section below), the Settlement represents a laudable result. This Court has already concluded that "the proposed settlement benefits [C]lass members," that the supplemental disclosures in the Amendment provided some benefit to the Class, that the Settlement was costless to Class members because of the ability to opt-out (a benefit not usually present in settlements of similar cases), and that the benefit to the Class members was not reduced by the payment of attorneys' fees and costs. ECF No. 115 at 3, 6-7. Lead Plaintiff respectfully submits that this Court affirm its prior statement and find, again, that the Settlement benefits the Class. *See, e.g., In re Wm. Wrigley Jr. Co. S'holders Litig.*, No. 3750-VCL, 2009 Del. Ch. LEXIS 12, at *18-19 (Del. Ch. Jan. 22, 2009) (benefits conveyed to stockholders in settlement that, among other things, supplemented proxy disclosures regarding merger were sufficient to support approval of the settlement, even in the absence of any monetary benefit; court observed that "Delaware Courts have often approved settlements of merger class litigation that entail only non-monetary relief.");

> b)  *There is Great Uncertainty as to Lead Plaintiff's Ability to Prove the Remaining Part of His Case*

In analyzing the strength of the case, a court should "begin by quantifying the net expected value of continued litigation to the class, discounted to the present value using a

reasonable interest rate." *AT&T Mobility*, 270 F.R.D. at 346-47 (citation omitted) (internal quotations omitted). A court should also consider "the various risks and costs that accompany continuation of the litigation." *Id.* at 347 (internal quotation marks omitted).

Here, although Lead Plaintiff believed in his claims when he commenced this Action, Lead Plaintiff is cognizant of the multitude of hurdles he would have to overcome if he were to pursue his claims through trial.

First, Lead Plaintiff has conferred with a respected financial expert who has concluded that the price paid by Tellabs was within the range of fairness. Given the conclusion of this expert, Lead Counsel has concluded that it would face a difficult up-hill battle in a claim for money damages due to an unfair Transaction price.

Second, if Lead Plaintiff were to proceed on his claims, defeat Defendants' motion to dismiss, obtain class certification, and defeat Defendants' expected motion for summary judgment, there is great risk of losing a trial on the merits. Concerning the Section 14(e) and 20(a) claims, Lead Plaintiff would have had to prove that the alleged misstatements were material and were made with scienter. *Peregrine Options, Inc. v. Farley, Inc.*, No. 90 C 285, 1993 U.S. Dist. LEXIS 16479, at *27 (N.D. Ill. Nov. 17, 1993). Scienter is especially difficult to prove under the relevant securities laws. And, even if Lead Plaintiff did prevail at trial, any judgment could be reversed on appeal. The Settlement provided relief to the Class by publishing additional material information concerning the Transaction and the Tender Offer in the Amendment, which further informed their decision on whether or not to tender their shares.

Third, as this Court has recognized, injunctive relief to provide for pre-closing disclosure is typically the preferred method for remedying disclosure violations under Section 14(e) of the Securities Exchange Act. *See* ECF No. 115 at 4; *Panter v. Marshall Field & Co.*, 646 F.2d 271,

287 (7th Cir. 1981). In this matter, the Transaction has already closed, and therefore injunctive relief is not available. While Lead Plaintiff can pursue post-closing claims for money damages for Section 14(e) violations, the significant risks of further litigation and trial listed above apply with equal, if not greater, force due to the prerequisite of proving reliance to obtain post-closing damages for these claims. "To state a claim for damages under § 14(e), a plaintiff must allege that he or she relied on misstatements to his or her detriment. Thus, courts have only allowed compensatory damages under § 14(e) where the plaintiff has relied on an alleged misstatement." *Jacob M. Scheiner IRA v. Midas, Inc.*, No. 12 C 02653, 2013 U.S. Dist. LEXIS 11520, at \*14-15 (N.D. Ill. Jan. 29, 2013) (citation omitted). "[T]hough injunctive relief [under § 14(e)] may be justified, a damage remedy is inappropriate when there can be no exact proof and measure of damages, and when the causal connection between the alleged wrong and plaintiff's loss is not determinable." *Neuman v. Elec. Specialty Co.*, No. 68 C 1817, 1969 U.S. Dist. LEXIS 13005, at \*8 (N.D. Ill. Dec. 31, 1969). Any post-closing damages for violations for Section 14(e) would further be reduced due to the fact that seven of Lead Plaintiff's eleven alleged material omissions were remedied in the Amendment.

The substantial hurdles Lead Plaintiff faces are supremely evidenced by what has occurred in parallel actions by stockholders who also challenged the Transaction. According to Cornerstone Research's Review of 2013 mergers and acquisitions litigation, the acquisition of Tellabs through the Tender Offer was the second most challenged (*i.e.* litigated) deal of 2013. In fact, sixteen (16) separate lawsuits were filed in response to the Transaction announcement due to stockholder unhappiness with the Transaction. However, all of the remaining cases have been voluntarily discontinued, except for this Action and the plaintiffs in the *Englehart Action*, where after reviewing the discovery in this action, now affirmatively support the Settlement. The

26

evaporation of these many litigations speaks volumes as to the hurdles Lead Plaintiff faced in continuing the action after having already accomplished the goal of providing full disclosure for Tellabs stockholders.

        2.     <u>Continued Litigation of this Complex Action Would Consume Considerable Time and Expense</u>

Litigation would likely be lengthy and expensive if this Action were to proceed. Although the Parties engaged in extensive discovery efforts, significant litigation and motion practice would still need to occur – including Defendants' expected renewal of their motion to dismiss, Lead Plaintiff's motion for class certification, and likely motions for summary judgment. Further, the Parties would most likely engage in additional factual and expert discovery. It would be more than a year before the case went to trial, and both Parties would expend great time and expense – assuming Lead Plaintiff prevailed on the motions to dismiss (far from a sure thing). Further, should Lead Plaintiff navigate all the aforementioned hurdles, any judgment in favor of Class members could be further delayed by the appellate process. Instead of facing the uncertainty of a potential award in their favor years from now, the Settlement allowed Lead Plaintiff and the Class to receive immediate and certain relief through the disclosure of the additional material information in the Amendment. *See, e.g., Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011) ("Settlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation.").

        3.     <u>Class Members Have Responded Positively to the Settlement, Supporting Final Approval</u>

Class members' response to the Settlement has been overwhelmingly positive. The Notice informed Class members of the Settlement Hearing to consider, *inter alia*, final approval of the Settlement, approval of the Settlement Class, and the request for an award of attorneys' fees and reimbursement of costs and expenses. The Notice also informed Class members of the

opportunity to request exclusion from the Class and to object to the terms of the Class. Pursuant to the Preliminary Approval Order, the deadline to request exclusion from or object to the Settlement is August 13, 2015.

As of the date of filing of this Memorandum of Law[5], only five Class Members have objected to the Settlement. *See* Monteverde Decl., Ex. D. The first objection by Frank Taranto states only "[m]isinformation breach of Duties to Tellabs shareholder (Me)," and does not identify any deficiency or unfairness in the Settlement or the Notice. *Id.* This objector does not intend to appear at the Settlement Hearing.

The second objection by Eldor Wilfahrt, who purportedly owned just 100 shares of Tellabs stock, far less than Lambert, Englehart, and Rodriguez, states: "[I was] <u>Never</u> informed as to any details [and] reasons why I would be forced to sell my shares in Tellabs. Take it or leave it approach. Disgusting." This objection does not identify any deficiency or unfairness in the Settlement or the Notice. Rather, the objection seems to enhance the crux of the Settlement, *i.e.,* remedying disclosure deficiencies.

The third objection by Carl Fabiszak states that the "Settlement [is] too low." This objection represents the sole comment by Tellabs stockholders on the sufficiency of the Settlement. This objector does not intend to appear at the Settlement Hearing. Initially, it must be pointed out that Mr. Fabiszak did not think enough of his legal claim to pursue it by opting out (although it is possible that his Tellabs holdings were *de minimus*). More importantly, however, is the fact that Lead Counsel has considered this objection, and in light of the conclusion of its respected financial expert that the price paid by Tellabs was within the range of fairness, does not believe that this objection is meritorious.

---

[5]    On August 24, 2015, Lead Plaintiff will file a final tally of all objections and opt-outs to the Settlement pursuant to the Preliminary Approval Order.

The fourth and fifth objections by Anton Ledway and Harold James Shutt are blank and thus silent on the bases for their objections. Both have indicated that they do not intend to appear at the Settlement Hearing.

Although the reaction of a class to a settlement should be considered, "the existence of objections does not mean that the settlement is unfair." *In re Telectronics Pacing Sys., Inc., Accufix Atrial "J" Leads Prods. Liab. Litig.*, 137 F. Supp. 2d 985, 1018 (S.D. Ohio 2001); *see, e.g.*, *Bailey v. AK Steel Corp.*, No. 1:06-CV-468, 2008 U.S. Dist. LEXIS 16704, at *12 (S.D. Ohio Feb. 21, 2008). The overwhelming majority of stockholders support the Settlement and have not objected, which weighs in favor of approving the Settlement. *Rome v. Archer*, 197 A.2d 49, 58 (Del. 1964) (approving settlement agreement which was ratified by a very large majority of the shareholders); *Isby*, 75 F.3d at 1200 (affirming final approval of settlement where 13% of the class submitted written objections); *In re Sw. Airlines Voucher Litig.*, No. 11 C 8176, 2013 U.S. Dist. LEXIS 120735, at *21 (N.D. Ill. Aug. 26, 2013) (finding that the "low level of opposition" amounting to 0.01% of the class "supports the reasonableness of the settlement").

In addition, a number of Tellabs stockholders have availed themselves of the Opt-Out rights in the Settlement and sought to Opt-Out from the Settlement. In total, 6 Class members have requested to opt-out of the Settlement. These Class members have represented that they held in the aggregate 31,507 shares in Tellabs representing approximately 0.00009% of the outstanding number of Tellabs shares as of December 2, 2013.

4.     The Experience and Views of Lead Counsel Favor Final Approval

Lead Counsel strongly endorses this Settlement and believes that it represents a reasonable result for Class members. This opinion is entitled to great weight, particularly because: (1) Lead Counsel has significant experience in securities and other complex class action litigation (particularly in similar merger class action cases), and has negotiated hundreds of other

29

substantial class action settlements throughout the country; (2) Lead Counsel is "well informed as to the operative facts" and "considerable risks" of the Action, *see Reade-Alvarez v. Eltman, Eltman, & Cooper, P.C.*, 237 F.R.D. 26, 34 (E.D.N.Y. 2006); (3) Lead Counsel engaged in extensive discovery and confirmed, with the assistance of a highly respected financial expert, that the Tender Offer price was fair; and (4) the Settlement was reached at arm's-length through negotiations by experienced counsel. *See In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000) (placing "significant weight on the unanimously strong endorsement of these settlements" by "well-respected attorneys").

5.     <u>The Stage of the Proceedings and Confirmatory Discovery Completed</u>

The MOU was reached only after extensive negotiations, and the final Settlement agreement was subject to the filing of the supplemental disclosures in the Amendment and significant additional confirmatory discovery that supported the reasonableness of the Settlement. The confirmatory discovery included taking the depositions of a representative of Tellabs' financial advisor, Tellabs' Chairman of the Board, and Tellabs' CEO; reviewing thousands of pages of documents that included, *inter alia*, e-mails, correspondence, financial presentations, financial diligence and Board minutes regarding the Transaction; and confirming, with the assistance of a highly respected financial expert, that the Tender Offer price was fair.

Accordingly, the final terms of Settlement were agreed to only after Lead Counsel participated in arm's-length negotiations and thoroughly vetted the claims. Thus, this factor favors final approval.

**B.     THE COURT SHOULD APPROVE LEAD PLAINTIFF'S REASONABLE REQUEST FOR ATTORNEYS' FEES AND EXPENSES**

Pursuant to the Stipulation of Settlement, and following arm's-length negotiations between the Parties, Defendants agreed not to oppose an application by Lead Plaintiff for

attorneys' fees in an amount not to exceed $700,000 and expenses in an amount not to exceed $50,000 (the "Fee and Expense Award"). As indicated above, this amount is separate from the benefit already conferred on the Class, does not impact the Class in any way, and was negotiated at arm's-length with Defendants ***only after*** agreement was reached by the Parties concerning all other terms.

Rule 23(h) expressly authorizes the Court to "award reasonable attorney's fees and nontaxable costs . . . by the parties' agreement." Fed. R. Civ. P. 23(h). In this Circuit, courts calculate an appropriate attorney's fee in class actions by two methods: (1) the percentage of the benefit method; and (2) the lodestar method. *See, e.g., Butler v. Am. Cable & Tel., LLC*, No. 09 CV 5336, slip op. at 9-11 (N.D. Ill. Jan. 23, 2012) (Final Approval Order) (using the percentage method), Monteverde Decl., Ex. E; *Florin v. Nationsbank of Ga., N.A.*, 60 F.3d 1245, 1247 (7th Cir. 1995) (using the loadstar method). The determination of which method is appropriate in any given case will depend upon the particular circumstances of the case. *Cook v. Niedert*, 142 F.3d 1004, 1010 (7th Cir. 1998); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 719 (7th Cir. 2001). Based on this Circuit's precedent, the lodestar method will be used in cases where non-monetary benefits are obtained for the class. *See Langendorf v. Conseco Senior Health Ins. Co.*, No. 08-cv-3914, 2009 U.S. Dist. LEXIS 131289, at *30 (N.D. Ill. Nov. 18, 2009) (citing *Charles v. Goodyear Tire & Rubber Co.*, 976 F. Supp. 321, 324-25 (D.N.J. 1997) (using lodestar method where the settlement provided for "equitable relief to address the alleged deceptive practices averred in plaintiffs' complaint"), and *In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821 (3d Cir. 1995) (noting that a "court may select the lodestar method in some non-statutory fee cases where it can calculate the relevant parameters (hours expended and hourly rate) more easily than it can determine a suitable percentage to award")).

Under the lodestar method, the Court first ascertains the "reasonable number of hours expended by the attorneys." *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 974 (7th Cir. 1991) ("'Reasonable' implies that the judge may reduce the hours if the number requested appears excessive compared to other cases or in light of the work."). Next, the Court "should determine the reasonable hourly rate allowable for each attorney or class of attorneys involved in the case." *Id.* "These rates should be within narrow bands of rates charged by attorneys of similar experience, competence and specialty." *Id.* Thus, attorneys' fees may include hourly billing for paralegals and law clerks, given that the prevailing practice in the community is to bill their time separately at market rates. *Missouri v. Jenkins*, 491 U.S. 274, 286-87 (1989). "Multiplying the hours reasonably expended by the reasonable hourly rates produces the lodestar." *Harman*, 945 F.2d at 974.

The resulting lodestar is only the first step in determining a reasonable fee. Indeed, in cases like this one, courts often adjust the lodestar upward by applying a lodestar multiplier where, for example, the case involved a contingency fee arrangement and counsel "'had no sure source of compensation for their services.'" *City of Greenville v. Syngenta Crop Prot., Inc.*, No. 3:10-cv-00188-JPG-PMF, 2012 U.S. Dist. LEXIS 151819, at *21-22 (S.D. Ill. Oct. 23, 2012) (awarding multiplier to compensate the attorneys for the risk of nonpayment if the litigation were unsuccessful). "Multipliers anywhere between one and four…, have been approved." *Harman*, 945 F.2d at 976 (citation omitted).

To determine the reasonableness of the sought-after fee, courts will consider the following factors: (1) the value of the services on an hourly basis; (2) the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (3) the fee customarily charged in the locality for similar legal services; (4) the results obtained; (5) the

experience, reputation and ability of the lawyers performing the services; and (6) whether the fee is fixed or contingent. *In re Pub. Serv. Co. Sec. Litig. of Ind. Sec. Litig.*, 125 F.R.D. 480, 483 (S.D. Ind. 1988).

### 1. The Value of Services Provided on an Hourly Basis

Collectively, Lite DePalma Greenberg LLC, Faruqi & Faruqi LLP, and counsel in the *Engelhart Action* (collectively, "Plaintiffs' Counsel") expended approximately 1,763.05 hours of attorney and paralegal time prosecuting the Action on behalf of the Class.[6] A summary of Plaintiffs' Counsel's attorney and paralegal time is attached to the Monteverde Declaration as Exhibits F-J.

The work reflected was necessary, performed without duplication to the extent possible, and led to a successful result via the Settlement. As indicated, the regular hourly rates of Plaintiffs' Counsel multiplied by the number of hours expended results in a total lodestar of $1,046,147.25 *See generally Harman*, 945 F.2d at 974 (discussing lodestar calculation). Thus, Plaintiffs' Counsel's fee request represents a negative lodestar multiple of 0.68 which underscores the reasonableness of the requested fee.[7] Plaintiffs' Counsel's Fee and Expense

---

[6]    The time submitted also includes the time of plaintiffs' counsel in the *Englehart Action* who contributed to the benefits of the Settlement both directly (by causing the right of Class members to opt-out) and indirectly (by having certain of the disclosure claims they asserted mooted by the Settlement).

[7]    This is in accord with case law from other courts, and Lead Counsel respectfully submit that the multiplier here would be considered reasonable in almost any jurisdiction in this country. *See Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 517 (6th Cir. 1993) (holding that the trial court did not abuse its discretion in awarding a multiplier of 2); *Weiss v. Mercedes-Benz of N. Am., Inc.*, 899 F. Supp. 1297 (D.N.J. 1995) (multiplier of 9.3); *In re Beverly Hills Fire Litig.*, 639 F. Supp. 915 (E.D. Ky. 1986) (multiplier of 5); *In re Boston & Maine Corp. v. Sheehan, Phinney, Bass & Green, PA.*, 778 F.2d 890 (1st Cir. 1985) (multiplier of 6); *Conley v. Sears, Roebuck & Co.*, 222 B.R. 181 (D. Mass. 1998) (multiplier of 8.9 in a derivative action); *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 549 (S.D. Fla. 1988) ("Most lodestar multiples awarded in cases like this are between 3 and 4"); *Fournier v. PFS Invs., Inc.*, 997 F. Supp. 828 (E.D. Mich. 1997) (recommending multiplier of 2); *In re Ikon Office Solutions, Inc. Sec. Litig.*,

Award request also includes a request for payment of costs and expenses of $50,000, which in reality totaled $64,892.02 and which are capped at $50,000.

2.  The Novelty and Difficulty of the Questions Involved, and the Skill
    Requisite to Perform the Legal Service Properly

The claims asserted here involved complex factual and legal issues involving the application and interpretation of relevant corporate and fiduciary duty laws and the relevant federal securities laws, which, in turn, had a direct impact and required knowledge of complex valuation issues in a fast-moving merger context, which Plaintiffs' Counsel were necessarily required to analyze and evaluate throughout the course of the Action. Plaintiffs' Counsel conducted an extensive factual investigation and analyses of Tellabs' SEC filings and nonpublic financial information, as well as other public statements made by the Company through and by the Individual Defendants, together with news and analyst reports. Moreover, because of the inherent speed of merger-related litigation (and particularly with tender offers), Plaintiffs' Counsel were required to complete all of this legal, factual, and financial investigation and pursue their claims for injunctive relief in an extremely compressed time frame.

Plaintiffs' Counsel had to evaluate the value of the proffered additional disclosures in light of the information being obtained through on-going discovery. Only after considering all available information did Plaintiffs and their counsel conclude that the additional disclosures set forth in the amended Schedule 14D-9 provide ample consideration for the Parties to settle and release the claims in this lawsuit, and provided an excellent result given the litigation risk in such complex merger-related litigation. The complexity of the Action supports the Court's approval of the Fee and Expense Award.

---

194 F.R.D. 166 (E.D. Pa. 2000) (approving multiplier of 2.7 in a derivative action); *In re Fine Host Corp. Sec. Litig.*, No. MDL 1241, 2000 U.S. Dist. LEXIS 19367 (D. Conn. Nov. 8, 2000) (approving multiplier of 2.6).

3.     The Fee Customarily Charged in the Locality for Similar Legal Services

The rates charged by Plaintiffs' counsel are commensurate with the rates customarily charged by attorneys who actively litigate the complex and specialized practice area of shareholder actions.[8] Further, attorneys who prosecute litigation of the magnitude of this case with a national scope (as distinguished from a case primarily dealing with the law of a specific locality) are evaluated by the courts in this Circuit based upon the national rates charged by attorneys practicing in the field nationwide. *See, e.g., Wilfong v. Rent-A-Center, Inc.*, No. 00-680-DRH, 2002 U.S. Dist. LEXIS 28016, at *20 (S.D. Ill. Oc. 4, 2002). The only requirement is that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation. *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). A rate determined in this way is normally deemed to be reasonable, and is referred to—for convenience—as the prevailing market rate. *Id.*

Such rates necessarily reflect the reputation, experience, care, and successful record of Plaintiffs' Counsel. "[T]he 'requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation,'" and, therefore, the rates are presumptively reasonable. *Powell v. Comm'r of Internal Revenue*, 891 F.2d 1167, 1173 (5th Cir. 1990) (quoting *Blum*, 465 U.S. at 895-96 n.11); *see also Major v. Treen*, 700 F. Supp. 1422, 1434 (E.D. La. 1988) ("As the Supreme Court decisions have also made clear, experienced and expert attorneys who exhibit a high degree of skill have the right to have those factors calculated into the hourly rates.") (citing *Pa. v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546 (1986)).

---

[8]     *See National Law Journal 2015 Billing Survey* (Jan. 5, 2015) (reporting average partner billing rates between $715.00 and $1,055.00 per hour; and average associate billing rates between $290.00 and $678.00 per hour) (Monteverde Decl., Ex. K). The requested fee of $700,000 would represent an average hourly rate of approximately $397.00.

Here, Plaintiffs' Counsel has used hourly rates that are reasonable for their respective locations and for the level of skill, expertise, and reputation of each of the lawyers involved.

4.    The Results Obtained for the Class

The Settlement unquestionably conferred benefits on the Class in the form of additional, meaningful disclosures provided to the Company's stockholders in advance of the expiration of the Tender Offer.  These disclosures, which Plaintiffs' Counsel obtained through its vigorous advocacy on behalf of the Class, furnished stockholders with critical information regarding the sales process leading up to the Transaction and the financial analyses conducted by Goldman Sachs in support of its fairness opinion.  This information enabled Tellabs' stockholders to evaluate the Transaction in the context of the process undertaken by the Board to sell the Company and also to understand and assess Goldman Sachs's financial analyses concerning the adequacy of the Tender Offer price.  The right to opt-out of the Settlement, obtained as a result of the *Englehart Action*, provides further benefit to the Class.  Further, as this Court recognized, the right to opt-out makes the settlement "potentially costless" to Class members and is not a benefit provided in similar cases.  *See* ECF No. 115 at 6-7.

Moreover, while every case is unique and should be judged on its own merits, the requested Fee and Expense Award of $750,000 is well within the range of awards in similar merger or "deal" cases where the settlement consisted mainly, if not solely, of supplemental disclosures in company filings.  For example, other recent fee awards in merger-related actions alleging inadequate disclosures support the agreed-upon Fee and Expense Award requested here. *See Plumbers Local #65 Pension Fund v. Nicor Inc.*, No. 10-CH-52627, slip op. at 4 (Cook Cnty. Ill. Cir. Ct. Dec. 7, 2011) (Final J. and Order of Dismissal with Prejudice) (awarding fees and expenses of $675,000 for additional disclosures), Monteverde Decl., Ex. L; *Stein v. Pactiv Corp.*, No. 10-CH-35455, slip op. at 4 (Cook Cnty. Ill. Cir. Ct. Apr. 26, 2011) (Final J. and Order of

Dismissal with Prejudice) (awarding fees and expenses of $860,000 for additional disclosures), Monteverde Decl., Ex. M; *IBEW Local 164 Pension Fund v. Hewitt Assocs., Inc.*, No. 10 CH 31612, slip op. at 3-4 (Cook Cnty. Ill. Cir. Ct. Feb. 15, 2011) (Final J. and Order of Dismissal with Prejudice) (awarding fees and expenses of $850,000 for additional disclosures), Monteverde Decl., Ex. N; *In re ICX Techs., Inc. S'holder Class Action*, Consol. C.A. No. 1:10-cv-941, slip op. at 6 (E.D. Va. Jul. 8, 2011) (Order and Final J.) (awarding $925,000 in fees and expenses for additional disclosures and fifteen day extension of appraisal rights), Monteverde Decl., Ex. O; *Nichting v. DPL, Inc.*, No. 3:11-cv-141, slip op. (S.D. Ohio Feb. 24, 2012) (Order and Final J.) ($700,000 for disclosure-only settlement), Monteverde Decl., Ex. P; *In re Schering-Plough/Merck Merger Litig.*, No. 09-CV-1099 (DMC), 2010 U.S. Dist. LEXIS 29121 (D.N.J. Mar. 25, 2010) ($3.5 million for disclosure-only settlement); *Cnty. of N.Y. Emps. Ret. Plan v. Merrill Lynch*, C.A. No. 4066-VCN, slip op. at 6 (Del. Ch. Aug. 31, 2009) (Order and Final J.) ($950,000 for disclosure-only settlement), Monteverde Decl., Ex. Q; *Henkel v. Battista*, C.A. No. 3419-VCN, 2008 Del. Ch. LEXIS 292, at *8 (Del. Ch. Dec. 16, 2008) (awarding $1.1 million in fees and expenses for additional disclosures); *In re The Trizetto Grp., Inc. S'holders Litig.*, C.A. No. 3694-VCN, slip op. at 5 (Del. Ch. Dec. 4, 2008) (Final Order and J.) ($950,000 for disclosures and proportional voting provision agreement), Monteverde Decl., Ex. R.

Therefore, the non-economic benefit conferred on Tellabs' stockholders merits approval of the Fee and Expense Award. Indeed, the additional disclosures included in an amended Schedule 14D-9 in advance of the expiration of the Tender Offer, which Plaintiffs alleged had been omitted in the original Schedule 14D-9, have already been provided to each member of the Class, and the fees and expense payments that are now being sought will not diminish the benefit received by Class members at all. Rather, by agreement, the payment will come entirely from

Defendants. Thus, as this Court recognized, as distinguished from a traditional common fund case where the fee and expense payment, as awarded by the court, comes from the common fund before distribution of the settlement proceeds to class members thus diminishing the return to them from the fund, the Fee and Expense Award requested here will not diminish, in any way, what the Class members have already received in the form of the Transaction consideration and by way of the supplemental disclosures. *See* ECF No. 115 at 7 ("Thus, unlike in most class action settlements, class members' benefit is not reduced in any way as a result of the payment of attorney's fees and costs.").

5.    <u>The Experience, Reputation and Ability of the Lawyers Performing the Services</u>

It took considerable skill to achieve the Settlement. To successfully pursue the Action, Plaintiffs' Counsel had to possess expertise in the corporate law governing the fiduciary duties of officers and directors, the relevant federal securities laws, as well as the knowledge to distill and analyze facts giving rise to proof of an affirmative case from thousands of pages of documents. The ability of Plaintiffs' Counsel allowed them to advance claims and theories of liability to pursue the Action, obtain the information they needed to analyze the strength and weaknesses of these claims and bring Defendants to the negotiating table, all to the benefit of Tellabs stockholders with the expiration of the Tender Offer fast approaching. Through their efforts, Plaintiffs' Counsel provided the Company's stockholders with previously undisclosed material information.

The efforts of Plaintiffs' Counsel were not conducted in a vacuum. Aligned against them were some of the most prominent defense counsel in the country, equally knowledgeable of Delaware law and federal law and fully capable of capitalizing on any misstep or weakness, who could draw upon the exceptional resources of their well-regarded regional and national law

38

firms. The skills and abilities of defense counsel are factors that may be considered in evaluating a fee request. *See*, *e.g.*, *In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*, 248 F.R.D. 483, 504 (E.D. Mich. 2008). Consequently, based on the foregoing, this factor weighs in favor of approving the Fee and Expense Award.

6.   <u>The Contingent Nature of the Fee</u>

Plaintiffs' Counsel accepted this case on a contingent fee basis and, therefore, they have received no compensation during the course of this Action, although they incurred expenses in prosecuting the claims for the benefit of the Class. This factor should be considered in evaluating the reasonableness of the Fee and Expense Award. *See*, *e.g.*, *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 565 (7th Cir. 1994); *Gaskill v. Gordon*, 160 F.3d 361, 363 (7th Cir. 1998); *In re Prudential-Bache Energy Income Partnerships Sec. Litig.*, MDL No. 888, 1994 U.S. Dist. LEXIS 6621, at *16 (E.D. La. May 18, 1994) ("Counsel's contingent fee risk is an important factor in determining the fee award. Success is never guaranteed and counsel faced serious risks since both trial and judicial review are unpredictable. Counsel advanced all of the costs of litigation, a not insubstantial amount, and bore the additional risk of unsuccessful prosecution."). Because of the contingent nature of the representation in the Action, any award of fees and expenses to Plaintiffs' Counsel has always been at risk and completely contingent on the result achieved (as well as on the exercise of this Court's discretion in making any award). Moreover, the appearance of Plaintiffs' Counsel in this case precluded them from engaging in other lucrative work.[9]

---

[9] Delaware courts, which more frequently face litigation such as this, fully recognize the significance of a contingency fee arrangement when considering fee awards. *See, e.g., Chrysler Corp. v. Dann*, 223 A.2d 384, 389 (Del. 1966); *Seinfeld v. Coker*, 847 A.2d 330, 333-34 (Del. Ch. 2000); *Franklin Balance Sheet Inv. Fund v. Crowley*, C.A. No. 888-VCP, 2007 Del. Ch. LEXIS 133, at *38-39 (Del. Ch. Aug. 30, 2007) ("Fee awards should encourage future meritorious lawsuits by compensating the plaintiff's attorneys for their lost opportunity cost

These factors fully support the Court's approval of the Fee and Expense Award.[10]

## IV.   <u>CONCLUSION</u>

Lead Plaintiff respectfully requests that the Court enter final judgment approving the proposed Settlement and granting the requested attorney's fees and reimbursement of litigation costs and expenses.

Dated: July 23, 2015                                 Respectfully submitted,

                                               By: <u>*/s/ Katrina Carroll*</u>
                                               LITE DEPALMA GREENBERG, LLC
                                               Katrina Carroll, Esq.
                                               Kyle A. Shamberg, Esq.
                                               One South Dearborn
                                               Suite 2100
                                               Chicago, IL 60603

---

(typically their hourly rate), the risks associated with the litigation, and a premium."); *In re Vitalink Commc'ns Corp. S'holders Litig.*, No. 12085, 1991 Del. Ch. LEXIS 195, at *51 (Del. Ch. Nov. 8, 1991) ("[i]n all fairness, the contingent nature of [counsel's] fee agreement demands a higher fee for [counsel's] work"); *In re Plains Res. Inc. S'holders Litig.*, No. 071-N, 2005 Del. Ch. LEXIS 12, at *22 (Del. Ch. Feb. 4, 2005) ("[T]he plaintiffs' counsel were all retained on a contingent fee basis, and stood to gain nothing unless the litigation was successful. It is consistent with the public policy of Delaware to reward this risk-taking in the interests of shareholders."). In *Globis Capital Partners v. Safenet*, No. 2772-VCS (Del. Ch. Dec. 20, 2007) (Tr. of Settlement Hr'g) (Monteverde Decl., Ex. S), the court awarded a fee of $1.2 million, which equated to approximately $1,500 per hour, in a disclosure-only settlement, reasoning: "you need to reward people who took real risk and hit a home run ... [W]hen you look at this particular situation, it's clear that the plaintiffs really did achieve substantial disclosure." *Id.* at 34, 44, 49.

[10]     Other courts have resorted to the factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974):

> (1) The time and labor required . . . ; (2) The novelty and difficulty of the questions . . . ; (3) The skill requisite to perform the legal service properly . . . ; (4) The preclusion of other employment by the attorney due to acceptance of the case . . . ; (5) The customary fee [for similar work in the community] . . . ; (6) Whether the fee is fixed or contingent . . . ; (7) Time limitations imposed by the client or the circumstances . . . ; (8) The amount involved and the results obtained . . . ; (9) The experience, reputation, and ability of the attorneys . . . ; (10) The "undesirability" of the case; (11) The nature and length of the professional relationship with the client . . . ; [and] (12) Awards in similar cases.

A consideration of these factors also supports Plaintiffs' Fee and Expense Award.

Tel: 312-212-4383
Fax: 312-212-5919
Email: kcarroll@litedepalma.com
       kshamberg@litedepalma.com
*Liaison Counsel for Court-Appointed Class Representative and Lead Plaintiff Kerry Lambert and the Class*

FARUQI & FARUQI, LLP
Juan E. Monteverde, Esq.
369 Lexington Avenue, 10th Floor
New York, New York 10017
Tel: 212-983-9330
Fax: 212-983-9331
Email: jmonteverde@faruqilaw.com

*Court-Appointed Lead Counsel and Counsel for Court-Appointed Class Representative and Lead Plaintiff Kerry Lambert and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that, on July 23, 2015, Lead Plaintiff Kerry Lambert's Memorandum of

Law In Support of His Motion For Final Approval of Proposed Settlement and an Award of

Attorneys' Fees, was filed with the Clerk of Court using the CM/ECF system, which will then

send a notification of such filing to all counsel of record.

Dated: July 23, 2015

By: */s/ Katrina Carroll*
LITE DEPALMA GREENBERG, LLC
Katrina Carroll, Esq.
Kyle A. Shamberg, Esq.
One South Dearborn
Suite 2100
Chicago, IL 60603
Tel: 312-212-4383
Fax: 312-212-5919
Email: kcarroll@litedepalma.com
kshamberg@litedepalma.com
*Liaison Counsel for Court-Appointed Class*
*Representative and Lead Plaintiff Kerry*
*Lambert and the Class*