# EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KERRY LAMBERT, On Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> TELLABS, INC., VINCENT H. TOBKIN, BO HEDFORS, FRANK IANNA, VINCENT D. KELLY, MICHAEL E. LAVIN, STEPHANIE PACE MARSHALL, ALEX MASHINSKY, GREGORY J. ROSSMANN, DENNIS F. STRIGL, JAN H. SUWINSKI, MIKEL H. WILLIAMS, MARLIN EQUITY PARTNERS, BLACKHAWK HOLDING VEHICLE, LLC, and BLACKHAWK MERGER SUB INC., <br><br> Defendants. | Case No. 1:13-cv-07945 <br><br> <u>CLASS ACTION</u> <br><br> Hon. Ronald A. Guzman |

**AFFIDAVIT OF M. TRAVIS KEATH, CFA, CPA/ABV IN SUPPORT OF
MOTION FOR FINAL APPROVAL OF PROPOSED SETTLEMENT**

M. Travis Keath, being duly sworn, deposes and says:

1. I am submitting this Affidavit in support of settlement in the above-captioned action (the "Action").

2. I am over the age of 18, of sound mind and fully competent to testify about the matters contained in this Affidavit. I hold the Chartered Financial Analyst designation, am a Certified Public Accountant licensed in the state of Texas and hold the Accredited in Business Valuation designation conferred by the American Institute of Certified Public Accountants. I am a financial analyst by profession, specializing in matters pertaining to business and securities valuation and capital markets. A copy of my resume, which

1

outlines my professional experience and expertise, appears in Attachment A to this Affidavit. I have been qualified or accepted as an expert on the operations of the securities markets, damages, financial valuation and related corporate finance matters in numerous federal and state courts nationwide since 1996. I have provided many depositions and submitted numerous declarations and affidavits on matters in these subject areas as well. My opinions have never been excluded from any case on the basis of a challenge of their admissibility.

3. I have been retained by plaintiff's counsel to render independent financial advice and assistance in connection with the Action, and to provide expert testimony, as needed, relevant to transaction terms, valuation and disclosure issues.

4. Tellabs, Inc. ("TLAB" or the "Company") was acquired by Marlin Equity Partners ("Marlin") for $891 million in cash (the "Transaction Consideration") in a transaction completed on December 4, 2013 (the "Transaction"). The purchase price of $2.45 per share, which was announced on October 21, 2013, represented a mere 4.3% premium to TLAB's closing price on the previous trading day.

5. TLAB, incorporated in Illinois in 1975, designed equipment and services to communications-services providers worldwide. The Company's products and services enabled customers to deliver voice, data and video services to business and residential end-users. TLAB's customers were primarily communication services providers, distributors, original equipment manufacturers, system integrators and government agencies. The Company operated in four segments: Optical, Data, Access and Services.

      a) The Optical segment (TLAB's largest operating segment) included solutions that enabled service providers to manage network bandwidth by adding capacity when and where needed to support metro networks, mobile services, business services for enterprises, and triple-play voice, video and data services for residential consumers.

    b) The Data segment products included next-generation packet-switched products that enabled carriers to deliver mobile voice and Internet services and wireline business services to their customers.

    c) The Access segment products enabled service providers to deliver bundled voice, video and high-speed Internet/data services over the "last mile" of copper or fiber networks. Access products also enabled optical local area networking using gigabit passive optical network technology.

    d) The Services segment delivered deployment, training, support and professional services to TLAB's customers.

6. The Transaction was effected through a tender offer to purchase the outstanding shares of TLAB for $2.45 in cash (the "Offer"), which commenced November 1, 2103 and expired December 2, 2013. The Transaction was completed on December 4, 2013.

7. It is my understanding that a settlement was reached with respect to the Action, and that this settlement provided for (among other things) certain supplemental disclosures (the "Supplemental Disclosures") to be made to TLAB's shareholders. These Supplemental Disclosures were made in the Company's Form SC 14D9/A filed November 25, 2013 in order to remedy certain shortcomings in the disclosures contained in the Company's Form SC 14D9 (the "Original Proxy") filed November 1, 2013. Such disclosure shortcomings, in my opinion, were collectively material and limited the ability of TLAB's shareholders to make an informed decision regarding the Offer.

8. As detailed in the Original Proxy, Goldman Sachs & Co. ("Goldman") prepared fairness opinion (the "Goldman Opinion") presented on October 18, 2013 to the Company's board of directors (the "Board"). The Goldman Opinion contained five discrete financial analyses with respect to TLAB. Three of these analyses sought to independently value TLAB's shares, and two were merely diagnostic, as discussed below:

a) *Historical Stock Trading Analysis.* A diagnostic analysis, in the sense that, rather than seeking to independently determine TLAB's value, this analysis merely accepted the Offer as a given amount and examined the transaction premia implied by comparison to various measures of TLAB's historical trading prices (e.g., the previous trading day's closing price, the one-month volume-weighted average closing price, etc.).

b) *Illustrative Present Value of Future Share Price Analysis.* A valuation analysis seeking to independently determine TLAB's value based on the respective present values of a range of assumed future trading prices for TLAB's common shares.

c) *Illustrative Present Value of Future Share Price Analysis.* A valuation analysis seeking to independently determine TLAB's value based on TLAB's projected free cash flows and terminal values discounted to present value, assuming a range of assumed discount rates and a range of perpetuity growth rates.

d) *Selected Companies Analysis.* A valuation analysis seeking to independently determine TLAB's value based on a comparison of certain financial information for the Company to corresponding financial information, ratios and public market multiples for selected publicly traded corporations deemed by Goldman to be comparable to TLAB.

e) *Analysis at Various Prices.* Another diagnostic analysis seeking not to independently determine TLAB's value but merely examining the pricing multiples of various financial metrics (revenue and EBITDA, in this instance) resulting from the value of TLAB implied by the Offer.

9. Some of the information contained in the Original Proxy had been presented in such a way as to appear to support the conclusion reached by Goldman in the Goldman Opinion. Still, there were some reasons to doubt the soundness of some of the assumptions underlying the *Illustrative Discounted Cash Flow Analysis* prepared as part of the Goldman Opinion and to question whether the valuation analyses on the whole served as an adequate basis upon which to assess the fairness of the Offer. For example:

   a) The low range of perpetuity growth rates of between (2.0)% and 2.0% used in the *Illustrative Discounted Cash Flow Analysis*. The entire range selected by Goldman was lower than the then-prevailing 2.7% expected rate of long-term inflation,[1] thus reflecting the pessimistic assumption that TLAB's best expected outcome is to experience chronic decay in real (i.e., inflation-adjusted) terms at a rate of a 0.7% decline (and as much as a 4.7% decline) per year into perpetuity, with no prospect of long-term growth.

   b) The unusually high range of discount rates of between 16.6% and 20.6% used in the *Illustrative Discounted Cash Flow Analysis*, which range was much higher than then-prevailing discount rates for companies in TLAB's industry.

   c) The conspicuous absence of any analysis of comparable precedent transactions, a staple in valuation analyses underlying fairness opinions.

10. The Supplemental Disclosures brought to light problems with certain other analyses ostensibly supporting the Goldman's Opinion, further chipping away at the foundation of Goldman's belief that the Offer was fair, from a financial point of view, to the

---

[1] Based on the difference between the 3.7% yield on 30-year nominal Treasury bonds and the 1.0% yield on 30-year inflation-indexed Treasury bonds prevailing on October 18, 2013, the date of the Goldman Opinion.

Company's shareholders. It is reasonable to believe that the Supplemental Disclosures likely served to cast further doubt on the conclusion of fairness reached by Goldman.

11. A sizable minority of TLAB's shareholders declined to tender their shares. According to Bloomberg, 9% of TLAB's approximately 356 million outstanding shares were not tendered pursuant to the Offer despite the unanimous approval of the Board. The Board's approval, in turn, was based in part on the Goldman Opinion.

12. Some of the Supplemental Disclosures pertained to detailed pricing information regarding the 14 publicly traded companies used by Goldman in its *Selected Companies Analysis*. Furthermore, the Supplemental Disclosures indicated that these observed pricing multiples also influenced Goldman's *Illustrative Present Value of Future Share Price Analysis*. Specifically:

   a) The Supplemental Disclosures included the objective criteria by which the peer companies were selected and categorized. This brought into focus the lack of comparability of the Company to the Large-Cap peer group, in particular, which was important in light of the facts that (i) the Large-Cap peer group had the lowest summary statistics of the three peer groups with respect to Price-to-earnings ("P/E") multiples and cash-adjusted P/E multiples, and (ii) P/E multiples and cash-adjusted P/E multiples were considered by Goldman not only in its *Selected Companies Analysis*, but also as two of the bases of the future share prices of TLAB assumed by Goldman in its *Illustrative Present Value of Future Share Price Analysis*.

   b) The Supplemental Disclosures included detailed pricing multiples from which shareholders can make observations based on a company-by-company comparison, which is a significant improvement over using the nebulous summary statistics that represented the Original Proxy's only quantitative disclosure regarding observed pricing multiples of

6

>> TLAB's publicly traded peer companies. This is important because comparative valuation analyses require qualitative judgments regarding differences that bear on the various companies' respective values. It is widely acknowledged that mathematical analysis (such as simply determining the mean, median or other summary statistics of the pricing multiples of a group of peers) is not in itself a meaningful method of using comparable company data.
>
> c) The Supplemental Disclosures reveal that the Original Proxy inexplicably failed to mention Goldman's examination of Cash-Adjusted P/E multiples[2] of the peer companies. While such information is important in its own right, its importance in this instance is enhanced by the facts that (i) Cash-Adjusted P/E multiples were used as one of the bases for Goldman's *Illustrative Present Value of Future Share Price Analysis*, and (ii) the large majority of the company-by-company detail of Cash-Adjusted P/E multiples undermines – and in fact are much higher than – the range of such multiples Goldman selected for its *Illustrative Present Value of Future Share Price Analysis*.

13. With respect to paragraph 12.a) above, the Company's market capitalization (at less than $900 million) was a single-digit fraction of the newly disclosed $10 billion *lower* end of the range of Goldman's Large-Cap Group (in fact, it was less than 0.7% of Cisco's then-current $125.9 billion market capitalization). This readily apparent lack of comparability left TLAB's shareholders to focus their attention on the Mid-Cap Group and the Historically Declining Revenue Group.

---

[2] Cash-Adjusted P/E, as used by Goldman in this analysis, is calculated by deducting a company's cash per share from its share price to arrive at the numerator of the ratio, and calculating the denominator by deducting tax-effected interest income per share from earnings per share.

14. With respect to the Supplemental Disclosures related to detailed pricing multiples referred to above in paragraph 12.b):

   a) Of Goldman's Mid-Cap peer group, ADTRAN Inc. and Ciena Corp. are the most comparable as evidenced by the fact that these were the only two companies from the group that were also selected for inclusion by TLAB's compensation committee in the Communications Equipment Peer Group used in the benchmarking study referred to in the Company's Form SC DEF14A (p. 23) filed March 28, 2013. Importantly, all but two of the 16 pricing multiples for ADTRAN and Ciena were at or above the Mid-Cap peer group median figures. The Mid-Cap peer group medians were, in turn, all significantly higher than any of the ranges of pricing multiples selected by Goldman in its *Illustrative Present Value of Future Share Price Analysis.* For example, Goldman selected a range of one-year forward earnings per share multiples of 12.0x-18.0x, which range appears unduly pessimistic compared to ADTRAN's observed multiple of 27.6x, Ciena's observed multiple of 24.8x, or the Mid-Cap peer group median figure of 24.8x.

   b) Of Goldman's Historically Declining Revenue peer group, Alcatel-Lucent is the most comparable peer company, as it is the only one of the three companies that shares TLAB's focus on optical network equipment (BlackBerry Limited and Nokia Corp both specialize in mobile communications[3]). Without the Supplemental Disclosures, the Original Proxy failed to bring to the attention of TLAB's shareholders the facts that all of Alcatel-Lucent's multiples were the highest of any of the three companies in the peer group and most were above the high

---

[3] Nokia had in fact exited TLAB's primary business altogether, having previously sold its optical networks business to Marlin.

8

ends of the ranges of multiples Goldman selected for use in its *Illustrative Present Value of Future Share Price Analysis*.

15. With respect to paragraphs 12.b) and 12.c) above, of the 12 P/E multiples and cash-adjusted P/E multiples for companies in the Historically Declining Revenue category, nine were deemed by Goldman to be "NM" (not meaningful). Of the multiples Goldman did calculate (Nokia's 22.5x Equity Value to CY2014E EPS, and Equity Value to CY2014E Cash-Adjusted EPS multiples of 2.5x for Nokia and 19.4x for Alcatel-Lucent) *two out of three* revealed that the ranges of P/E multiples and Cash-Adjusted P/E multiples selected by Goldman in its *Illustrative Present Value of Future Share Price Analysis* were too low. Moreover, the only other multiple shown, Nokia's 2.5x Cash-Adjusted P/E multiple, is a clear outlier and too low to be meaningful.

16. With respect to the Goldman's *Illustrative Discounted Cash Flow Analysis*, the Supplemental Disclosures clarify that Goldman treated stock-based compensation as a cash expense for purposes of calculating free cash flow.[4] The only mention of stock-based compensation in the Original Proxy in the context of information used in Goldman's analysis was a vague reference to "refined" assumptions pertaining to stock-based compensation and other cash flow items. This reference did not indicate whether or not stock-based compensation was deducted from the unlevered free cash flow calculation.

17. As detailed herein, the Supplemental Disclosures not only provided material additional information to TLAB's shareholders, but in this instance also exposed analytical shortcomings related to Goldman's *Selected Companies Analysis* and *Illustrative*

---

[4] Because stock-based compensation expense is not, technically speaking, a cash expense, many analysts choose not to deduct it in the calculation of free cash flow. This treatment necessitates an adjustment to the subject company's share count in order to account for the dilutive effect of this form of compensation. Alternatively, some analysts (including Goldman in this instance) deduct stock-based compensation expense from free cash flow as an alternative means of estimating the dilutive effect, rather than making the dilution adjustment to the share count. Arguments can be (and are) made in favor of either way of treating stock-based compensation expense in the calculation of free cash flow, but shareholders need to be made aware of the treatment in order to understand how to interpret the free cash flow information presented, as well as the results derived under the discounted cash flow valuation method.

9

*Present Value of Future Share Price Analysis*, which constitute two of the three discrete financial analyses prepared by Goldman seeking to independently value TLAB prepared as part of the Goldman Opinion. With respect to the other, the *Illustrative Discounted Cash Flow Analysis*, the Supplemental Disclosures provided important clarity on Goldman's choice to treat stock-based compensation as a cash expense in its calculation of free cash flow.

18. Although the Board made its recommendation to shareholders to tender their shares, the final decision rested with the shareholders themselves. Sufficient disclosures were therefore necessary to enable shareholders to reach their own conclusions regarding whether to follow the Board's recommendation or to withhold their tender. It is my opinion that the disclosure modifications achieved by plaintiff and its counsel provided important information to better enable shareholders to make an informed decision with respect to the contemplated Transaction.

_____            _July 22, 2015_____
M. Travis Keath, CFA, CPA/ABV             Date

Sworn to on this 22 day of July, 2015
Irving, Texas

CHERYL LYNN ROBNETT
Notary Public, State of Texas
My Commission Expires
January 10, 2017

_____
Notary

# ATTACHMENT A

# M. Travis Keath, CFA, CPA/ABV

### Professional Experience

Travis Keath is a Principal with VALUE Incorporated, a premier firm in the application of valuation and economic theory. Mr. Keath has conducted valuation and financial restructuring analyses for law firms, lending institutions and clients ranging in size from small, closely held businesses to Fortune 500 companies and government agencies. He has served companies spanning a broad range of industries, including agribusiness, construction, consumer services, distribution, energy, financial institutions, health care, high-tech, hospitality, manufacturing, media, mining, professional services, restaurants, retail, telecommunications, textile, transportation and others.

The scope of Mr. Keath's work includes acquisition and financing memoranda, fairness opinions, submissions to the Securities and Exchange Commission, and valuation studies for restructuring, quantification of economic damages for commercial litigation and arbitration, acquisition/disposition of business interests or assets, tax-related issues, due diligence and preferred stock, debt instruments and loan portfolios, derivative securities, inventories, patents and unpatented technology, trademarks, customer lists, licensing agreements, software, and other assets and financial interests.

Before joining VALUE, Mr. Keath was employed in the consulting practices of a national financial valuation firm as well as two large accounting and consulting firms. Complementing his consulting experience, Mr. Keath served as the Chief Financial Officer of a software development company, with responsibility for capital raising, budgeting, implementation of the company's SAP accounting system, financial/tax reporting, and corporate risk management.

Mr. Keath has testified as an expert witness in numerous venues including federal and state district court, U.S. Tax Court, and before arbitration panels of both the National Association of Securities Dealers and the American Arbitration Association. In addition, he has assisted with valuation issues in mediations and informal negotiations between parties in dispute.

### Formal Education

Master of Science in Finance - 1989
    Texas A&M University, College Station
Bachelor of Business Administration in Finance - 1988
    Texas A&M University, College Station

### Accreditations and Designations

Chartered Financial Analyst (CFA)
Certified Public Accountant (CPA)
Accredited in Business Valuation (ABV)
Instructor, DSFA Chartered Financial Analyst Examination Review Course, 1995-2012

**ATTACHMENT A**

### Organizations and Professional Associations (Past and Present)

Member, American Institute of Certified Public Accountants
Member, Texas Society of Certified Public Accountants (TSCPA)
Committee Member, TSCPA Business Valuations, Forensic &
     Litigation Services Committee
Member, American Bankruptcy Institute (ABI)
Committee Member, ABI Financial Advisors Committee
Member, Turnaround Management Association (TMA) Dallas Chapter
Board Member, TMA Dallas Chapter
Member, CFA Institute
Member, Dallas Society of Financial Analysts (DSFA)
Treasurer, DSFA
Board Member, DSFA

### Honors and Awards

Phi Kappa Phi (Honors Scholastic Society)
Beta Gamma Sigma (Business Scholastic Honors Society)
Texas A&M Distinguished Student Award – 1986, 1987, 1988
Who's Who in Finance and Industry
Who's Who in America
Who's Who in the South and Southwest

### Publications

"Bankruptcy: If You Thought It Was Hard Before, Wait Until You See What's In Store" – *Value Advisory*, Winter 2003.

"Who Bears the Burden of Better Accounting?" – *Value Advisory*, Spring 2002.

"Exit Strategies: Avoiding the Pitfalls," (with Matthew Morris, CFA)

"Analysis and Valuation of Distressed Equity Securities" (with Scott D. Hakala, Ph.D.) - *Valuation Strategies*, September/October 1999.

"Analysis and Valuation of Distressed Equity Securities" (with Scott D. Hakala, Ph.D.) – Chapter 13F, *Financial Valuation: Businesses and Business Interests* 1999 Update.

"Mergers and Acquisitions: Planning and Finance" – Chapter 11, *Corporate Controller's Manual*, 1999-2 Update.

"Mergers and Acquisitions: Offensive and Defensive Strategies" – Chapter 13, *Corporate Controller's Manual*, 1999-2 Update.

"Discounts for Built-In Capital Gains Tax Liabilities of Asset-Holding C-Corporations" – Position Paper, Unpublished – February 1997

# ATTACHMENT A

## Selected Lectures and Appearances

"Current Topics in Valuation" –IRS Estate and Gift Tax Group, Continuing Professional Education – Fort Worth, Texas – August 2002.

"Going Public Workshop" – Entrepreneurship Institute: President's Forum of Dallas – April 1999

"Valuation Battlegrounds and Issues in Bankruptcy" – Continuing Legal Education Seminar; Jenkens & Gilchrist; Dallas, Texas – February 1999.

"Valuation and Bankruptcy Issues" – Continuing Legal Education Seminar, Charter Law Affiliates; Dallas, Texas – October 1998.

"Intellectual Property Valuation" – IRS Engineers Group, Continuing Professional Education - Dallas, Texas - September 1998.

"Estate and Gift Tax Valuation Issues" - IRS Estate & Gift Tax Division, Continuing Professional Education - Kansas City, Missouri - August 1998.

"How Daubert and Other Evidentiary Standards Impact the Qualification of Expert Witnesses in Commercial Cases" – Texas A&M University Law Center 7th Annual Advanced Civil Trial Law Conference – College Station, Texas – March 1998.

"Due Diligence – A Micro Perspective" - Accounting and Financial Television Network, December 1996.

"Due Diligence – A Macro Perspective" - Accounting and Financial Television Network, November 1996.

"Business Valuation Symposium: Living on the Edge" – Illinois CPA Society & Foundation; Chicago, Illinois – May 1996.