# EXHIBIT S

EFiled: Jan 7 2008 1:44PM EST
Transaction ID 17922257
Case No. 2772-VCS

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GLOBIS CAPITAL PARTNERS, LP,          :
                                      :
                   Plaintiff,         :
                                      :
          vs.                         :    Civil Action
                                      :    No. 2772-VCS
SAFENET, INC., et al.,                :
                                      :
                   Defendants.        :

                         - - -

                    Chancery Courtroom No. 12A
                    New Castle County Courthouse
                    Wilmington, Delaware
                    Thursday, December 20, 2007
                    10:35 a.m.

                         - - -

BEFORE:   HON. LEO E. STRINE, JR., Vice Chancellor.


                         - - -




                    SETTLEMENT HEARING



                         - - -

_____

               CHANCERY COURT REPORTERS
           500 North King Street - Suite 11400
             Wilmington, Delaware 19801-3759
                      (302) 255-0525

2

1   APPEARANCES:

2           JOSEPH A. ROSENTHAL, ESQ.
            CARMELLA P. KEENER, ESQ.
3           Rosenthal, Monhait & Goddess
                    -and-
4           U. SETH OTTENSOSER, ESQ.
            of the New York Bar
5           Bernstein Liebhard & Lifshitz, LLP
              for the Plaintiff
6
            JON E. ABRAMCZYK, ESQ.
7           Morris, Nichols, Arsht & Tunnell
                    -and-
8           CHARLES E. BACHMAN, ESQ.
            of the New York Bar
9           O'Melveny & Myers LLP
              for Vector Stealth Holdings II, L.L.C.
10            and Vector Defendants

11          ROBERT K. PAYSON, ESQ.
            Potter, Anderson & Corroon
12                  -and-
            KENNETH B. FORREST, ESQ.
13          GRAHAM W. MELI, ESQ.
            of the New York Bar
14          Wachtell, Lipton, Rosen & Katz
              for Defendants SafeNet, Inc., Thomas A.
15            Brooks, Andrew E. Clark, Shelley A. Harrison,
              Ira A. Hunt, Jr., Arthur L. Money, Walter
16            W. Straub, Bruce R. Thaw, Lois Joyeusaz and
              John Joyeusaz, as Personal Representatives
17            of the Estate of John Carter Beese, Jr.

18                          -  -  -

19

20

21

22

23

24

3

1              THE COURT:  Good morning,

2     Mr. Abramczyk.

3              MR. ABRAMCZYK:  Good morning, Your

4     Honor.  If we could begin with introductions this

5     morning, it's my pleasure to introduce Charles

6     Bachman, from the O'Melveny & Myers firm, who may be

7     familiar with the Court.  He has been admitted pro hac

8     in this proceeding and will be making the presentation

9     on behalf of defendants today.  I think Mr. Payson has

10    introductions today, as well.

11             THE COURT:  Good morning, Mr. Payson.

12             MR. PAYSON:  Good morning, Your Honor.

13    We represent SafeNet and the individual defendants,

14    although I take it now that Mr. Bachman's client has

15    taken over SafeNet, he will be making any presentation

16    necessary for the corporation.

17             THE COURT:  Your clients don't want to

18    contribute to any fee award in the holiday spirit?

19             MR. PAYSON:  No.

20             THE COURT:  Corporate America is

21    hurting.  If individuals can step up, it's --

22             MR. PAYSON:  With me at counsel table

23    are Mr. Kenneth Forrest and Mr. Graham Meli.

24    Mr. Forrest has been admitted pro hac vice and will be

4

1  making any presentation that may be necessary.

2                    THE COURT:  Good morning, everyone.

3  Good morning, Mr. Rosenthal.

4                    MR. ROSENTHAL:  Good morning, Your

5  Honor.  This is the time fixed to hear the proposed

6  settlement and request for attorneys' fees and

7  expenses.  Just a few housekeeping matters, since we

8  do have a settlement to present, even though I think

9  the focal point of the hearing will probably be the

10 application for attorneys' fees.

11                    The affidavit of mailing of notice of

12 these proceedings has been filed with the Register in

13 Chancery.  No objections have been filed, other than,

14 of course, the objection by the Vector defendants to

15 plaintiffs' fee application.  It's a bit past the hour

16 when the hearing was to commence, and the only people

17 in the courtroom are court personnel and counsel for

18 the parties.

19                    THE COURT:  They have vehement

20 objections.  They are very upset about this, and I

21 care about their views immensely.  They are valued

22 employees, and I don't expect you to take their

23 objections seriously.

24                    MR. ROSENTHAL:  I haven't consulted

5

1    with them yet, Your Honor.

2                    THE COURT:  Actually, they are so

3    livid that they can barely voice their objections.

4    They can't even articulate them in words.  It's

5    ineffable, but it's palpable.

6                    MR. ROSENTHAL:  I can see one of

7    them -- both of them are taking them down in writing,

8    perhaps to curb their zeal.

9                    In any event, sitting at counsel table

10   are Mr. Ottensoser, who has already been admitted pro

11   hac vice --

12                    MR. OTTENSOSER:  Good morning, Your

13   Honor.

14                    MR. ROSENTHAL:  -- and my partner,

15   Ms. Keener.  With Your Honor's permission,

16   Mr. Ottensoser will make a brief presentation on

17   behalf of the plaintiff.

18                    THE COURT:  Sure.

19                    MR. OTTENSOSER:  Good morning, Your

20   Honor.  Seth Ottensoser, Bernstein Liebhard, on behalf

21   of plaintiff.  We are here for the settlement of the

22   SafeNet shareholder litigation and plaintiffs'

23   counsels' application for fees and expenses.

24                    By way of background, this action was

6

1    initiated after a tender offer was announced, that

2    Vector would buy SafeNet for $28.75 per share in cash.

3    Plaintiff, who is a -- was a shareholder of SafeNet at

4    the time, filed a complaint.  We filed an amended

5    complaint.  We moved for expedited discovery.  One of

6    our main arguments at the time we moved for expedited

7    discovery was that there was a bare bones or naked

8    fairness opinion issued by both of SafeNet's

9    investment bankers.

10                THE COURT:  That is actually illegal

11   in Alabama, I believe.  Couldn't be distributed there.

12   But you are saying this was the -- as I recall it,

13   touring through the memory thing -- and I actually

14   reread the whole transcript.  This was the case where

15   the original 14D-9 actually didn't even really purport

16   to describe what the bankers did at all.  Right?

17                MR. OTTENSOSER:  Right.  It actually

18   did a little worse than that, because there were

19   sections in the D-9 that said based on a comparable

20   companies analysis that Merrill Lynch did, this was

21   fair; based on a DCF they did, this was fair.  But

22   then there was no summary at all of those analyses.

23                THE COURT:  They just attached a

24   fairness opinion, the one-sentence fairness opinion,

7

1 plus the four paragraphs of liability disclosures that

2 go with it.  Right?

3                MR. OTTENSOSER:  And how much they

4 were being paid.  So, you know, we saw this.  We

5 thought this was highly unusual.  We moved for

6 expedited discovery.  Most of the depositions we took

7 -- well, let's put it this way.  Two of the

8 depositions we took were of the investment bankers,

9 because we wanted to understand the fairness opinions

10 and their nondisclosure.  We also took two depositions

11 of the -- of two of the directors, to understand the

12 stock option backdating and the sales process.

13                Ultimately, we submitted a brief to

14 the Court which we thought was thorough and specific

15 in terms of the issues raised, and the next day, the

16 defendants issued an amended 14D-9, 16 pages, which we

17 supplied to the Court, which went through each

18 analysis and explained what they did.

19                Now, we could have packed up our bags

20 at that point, said, "We won.  We are going home.  We

21 got a fee.  This is great."  We didn't do that,

22 because I'm not that type of lawyer.  I need to pursue

23 what is there.

24                THE COURT:  You are a pain in the

8

1   butt.

2               MR. OTTENSOSER:  I like to think I'm a

3   nice pain in the butt.

4               THE COURT:  I'm kidding.  No, I mean,

5   it's admirable, but you are right.  A lot of people --

6   I remember, I think, in the hearing remarking to you

7   that it was a more relaxed day for you than for most

8   plaintiffs' lawyers, just because you had some stuff,

9   arguably, in the pocket already, a fairly big thing.

10              MR. OTTENSOSER:  I think what you said

11  was I should be doing an end-zone dance.  But at that

12  point, I wanted the two-point conversion, also.  I

13  wasn't only happy with the settlement.  I spent the

14  week -- we had a week's time between the D-9 being

15  issued and the defendants' brief coming in and our

16  reply being due.  I anticipated --

17              THE COURT:  Remind me again when the

18  D-9 came in.

19              MR. OTTENSOSER:  We filed our brief, I

20  believe, March 27th.

21              THE COURT:  Then they filed the D-9

22  after your brief.

23              MR. OTTENSOSER:  Tuesday, yeah.  Their

24  brief was going to come in on Friday.  We had until

9

1  Saturday or Sunday to put in a reply.  I knew I
2  couldn't sit there and just wait, because I figured
3  their arguments would be our claims are moot because
4  there is an amended D-9.  So what I did, I
5  painstakingly went through the disclosure, the amended
6  D-9, compared it to the bankers' books, compared it to
7  the testimony we got from the bankers, and saw there
8  were big problems.
9           We argued this for three hours on
10  April 2nd, at the hearing, and what I remember, there
11  were two lawyers from Wachtell, Lipton up here at the
12  same time, trying to explain why it was wrong or why
13  we weren't right.  But that being told, there still
14  were problems.
15           There was the use of certain multiples
16  without disclosing the full ranges.  There was a
17  Merrill Lynch analysis where in the bankers' book they
18  said there were four companies that were directly
19  comparable which gave much higher prices.  So we
20  argued.  And I thought we did fairly well that day.
21  And the thing that was unique about this case, which I
22  had never done before, was after the hearing, you
23  called everyone into your conference room and said,
24  "Look, this is a hard week.  It's Good Friday.  It's

10

1   this.  It's that.  I think that if you go ahead,

2   defendants, and issue these two bankers' books as an

3   8-K, this case can be settled, and I don't have to

4   work on an injunction opinion this week," obviously

5   not indicating to us that you would or wouldn't grant

6   one, but that an opinion would have to be issued.

7              The defendants took several hours that

8   day, and it was the day that Passover was beginning

9   that night, so slowly, lawyers from New York started

10  filtering back to New York.  I tried to stay as late

11  as I could.  Lots of approvals were needed.  They had

12  to call the investment banks, call the clients.

13  Ultimately, they agreed.  The bankers; books were

14  disseminated.  We were happy with the settlement,

15  because we thought it alleviated issues.

16             THE COURT:  That raises one issue,

17  though.  You did, obviously -- you filed Revlon

18  claims.  They didn't pan out for you.  And I assume,

19  ultimately, the deal was approved.

20             MR. OTTENSOSER:  Yes, it was.

21             THE COURT:  Why -- I have no doubt

22  that there is consideration for the settlement.  Full

23  disclosure of the bankers' books is meaningful.  I

24  reread the transcript.  I'm better positioned than

11

1  those -- than I usually am to approve a settlement,

2  because I was able to go back and reread the

3  transcript, and I remember the questions about,

4  particularly, the comparables analysis, and the choice

5  of -- the judgmental choice by the bankers of the

6  multiples, which I don't think it was perfectly

7  congruent with the company's trading multiple, but it

8  seemed to be awful close to it in almost every

9  measure, and not have a lot of relationship to the

10  comparables that they chose.  I remember that issue.

11  I remember the difficulty.

12                I think the question is you asked for

13  a fee of a million two.  Your friends obviously focus

14  on two points:  One, it's just disclosure.  And I will

15  deal with them.  I think that they are -- they slight,

16  a little bit, the unusual predicament that their

17  investment bankers and their own tactical choice about

18  the original disclosures put them in.  The other is

19  that because a lot of the hours you put in were

20  related to the Revlon claims, there should be, you --

21  that needs to be taken into account.

22                How do you deal with that?  Why

23  $1.2 million if you didn't hit on the Revlon claims

24  and if the stockholders essentially approved the deal,

12

1  anyway?

2           MR. OTTENSOSER:  Okay.  I think these

3  questions are all connected, actually.  First of all,

4  I think it's undisputed that most of the briefs in the

5  case, the argument and the like, was spent on

6  disclosure, rather than Revlon.  Revlon really was the

7  tail wagging the dog.  In our reply brief, 26 pages,

8  two pages were on Revlon.  At the oral argument, maybe

9  five minutes was on Revlon.

10           THE COURT:  How about in the opening

11  brief?

12           MR. OTTENSOSER:  Opening brief?  Much

13  less than -- I mean half or a third.  I think we have

14  the actual page amounts.  We put it in the reply

15  brief.  But it's clear that most of the opening brief

16  --

17           THE COURT:  But a lot of the discovery

18  was on Revlon, was it not?

19           MR. OTTENSOSER:  I think a lot of the

20  discovery -- let's put it this way:  There were four

21  depositions.  The two investment banker depositions,

22  in my view, because I took those, were directed

23  towards the investment banking analyses, understanding

24  those analyses and the nondisclosure of those

13

1    opinions.

2              THE COURT:  Wasn't some of that also

3    on Revlon, about who -- one of the bankers was the

4    sell-side adviser.  Right?

5              MR. OTTENSOSER:  No.  The two bankers

6    both were -- the two bankers were both SafeNet

7    bankers.

8              THE COURT:  Right.  But one of them

9    was actually the sell-side adviser, who was the

10   strategic adviser during the process.  The other was

11   the confirmatory fairness opinion.  Right?

12             MR. OTTENSOSER:  Right.

13             THE COURT:  I'm assuming the one who

14   actually was involved in the process, that you asked

15   questions about the shopping process, about the

16   opportunity for people to bid, things that would go to

17   a Revlon claim.

18             MR. OTTENSOSER:  But that was also

19   related to our disclosure claim, because they claimed

20   in the proxy -- or in the tender offer materials that

21   no one cared that they were involved in an option

22   backdating situation, and no one cared that they were

23   -- they didn't have restatements.  And we showed --

24   and they did a supplemental disclosure in the amended

14

1   D-9 -- that people were indeed very interested in

2   those issues, and that was a big part of the due

3   diligence.

4               So I had to ask about that, because

5   that related to the disclosures that we were alleging

6   in our amended complaint, in the opening brief, and

7   that was ultimately corrected in the D-9.  So we got

8   disclosures that dealt with the Revlon issue and the

9   issue, in particular, that I was worried about, which

10  was how much did people care about the backdating and

11  the restatements, and how that impacted the sales

12  process.  So to me, that is a disclosure issue that

13  was addressed by the D-9.

14              But more than that, as a lawyer, I'm

15  not going to leave stones that are obvious unturned.

16  I'm going to look under the rock, see if there is a

17  worm there, or a salamander, whatever the term is.  We

18  alleged that this was on the heels of option

19  backdating.

20              THE COURT:  What if it was a delicious

21  truffle?

22              MR. OTTENSOSER:  I might eat it,

23  although I would consult my field book first, to see

24  if it was poisonous or not.

15

1          But, you know, this being the unique

2  case, where the sale was on the heels of option

3  backdating restatement, we had evidence that we threw

4  into our brief and showed Your Honor, that various

5  directors who were involved in the sales process had

6  their options backdated.  We weren't on a wild goose

7  chase here.  Ultimately, I think the evidence would

8  bear out that perhaps a sale at this time was better

9  for the company.  I know the CFO was ultimately

10  indicted after this.  That probably wouldn't have done

11  that well for the company.  But you know, again, we

12  have to do this work, and here, it was a minority of

13  the work that we did.

14          I went back and looked at my time

15  records, because the defendants complained I didn't

16  give it to them, even though they didn't ask for them.

17  We gave a summary of our time.  I don't segregate, in

18  my time, "worked on brief on backdating issues, worked

19  on the brief on the disclosure issue."  I worked on

20  the injunction brief.  I prepared for the deposition.

21  I reviewed documents.  I think the record here bears

22  out that the time spent was very little on the Revlon

23  and much more on the disclosure.

24          And, you know, I looked at the

16

1    Gilmartin case.  I know we cite that heavily.  That

2    was a case where the Prickett firm launched an attack

3    on a tender offer.  The work was done in three weeks

4    worth of time.  They did a scattershot approach.  They

5    had Revlon, disclosure.  Ultimately, the judge said,

6    "You have to issue one disclosure," which dealt with

7    two pages of the combined plaintiffs' briefs.  In that

8    case, the plaintiffs were granted $750,000, which is,

9    granted, less than we are applying for here, but the

10   Court took into account -- I believe it was Jack

11   Jacobs, Vice Chancellor Jacobs -- that they had to do

12   it in a very quick time.  They had to look at

13   everything.  Ultimately, they used the man hours they

14   had to get where they had to go.

15              We didn't have other firms helping us

16   here.  It was my firm, assisted, thank God, by the

17   Rosenthal firm, who always play a good role in these

18   cases.  We have people taking depositions, people

19   writing the briefs.  We had people looking at the

20   documents.  We had to do everything in a very quick

21   time period.  I looked at the briefs again, the

22   opening briefs and reply briefs on the injunction.  I

23   think they are fantastic briefs.  They are very

24   detailed.  They get to the point.  They explain what

17

1   the problem is.

2                    Under these circumstances, I don't

3   think that we should be penalized, that we spent some

4   time on the Revlon claim that didn't pan out in the

5   end.  We make an argument in our brief -- I don't know

6   how persuasive it is, but that the defendants now want

7   a release of Revlon claims.  But we couldn't give a

8   release of the Revlon claims --

9                    THE COURT:  Without investigating.

10                   MR. OTTENSOSER:  -- if we wouldn't

11  have looked at it.  I can't stand up here and say,

12  "Your Honor, I'm releasing it, but I know nothing

13  about it."  My integrity doesn't allow it.

14                   I think we did a good job.  It's clear

15  from the papers that disclosure was the main point

16  here, and Revlon was a small point.  I can't segregate

17  out my hours, but again, based on Gilmartin and other

18  cases we cited, we don't think we should be penalized

19  for that.  We think the amount we applied for here is

20  fair, given the unique disclosures.

21                   I have been in lots of cases before

22  Your Honor and other judges in this court where you

23  fix a sentence here in the proxy, fix a sentence

24  there.  "Oh, they used the word 'record.'  They didn't

18

1    mean to use the word 'record.'"  Here, it's 100 pages

2    of disclosures.  I mean, I printed it out.  We gave it

3    to Your Honor.  This is all due to us.  If we never

4    moved for an injunction, they never would have issued

5    the initial D-9.  If we didn't go past that point,

6    they never would have issued these 85 pages.

7                    And it's not like we are saying that

8    stuff is not important or marginally important.  The

9    cases the defendants cite are cases where disclosures

10   were crappy.  They are crappy disclosures.  And you

11   know, I wouldn't stand up here on those cases and say,

12   "Give me 1.2 million plus my expenses."  I wouldn't

13   have the nerve to do that.  But in this case, where I

14   have all these disclosures, for the defendants to come

15   in and say, "You should get $108,000 for that" -- we

16   spent almost 800 hours on this case, all of which I

17   think was well spent -- frankly, is an insult, to me.

18   Might not be to the Court, but to me, it is.

19                    THE COURT:  I think it was intended a

20   as such, actually.

21                    MR. OTTENSOSER:  Right.  I've kept my

22   cool here in all this.  But this case isn't like any

23   other case.  It's also on the heels of an injunction.

24   We took this case far.  We didn't settle the day after

19

1  they came to us and said, "Oh, we wanted to

2  supplement.  Take it."  I don't do that.

3            So all that being told, I think we are

4  entitled to what we applied for.  We have substantial

5  expenses, of $60,000.  We have outlined those for the

6  Court, transcripts, filing fees, some research and our

7  expert, who did not only put on the Revlon claims.  He

8  explained in his report and rebuttal report why the

9  disclosures were inappropriate and wrong, both

10  initially in the D-9 and in the amended D-9.

11            So based on all that and then,

12  obviously, the other factors, standing of counsel --

13  not going to toot my own horn, but the defendants had

14  very good lawyers here, Wachtell, Lipton, O'Melveny &

15  Myers, the Delaware firms, throwing everything they

16  had at us, when we had three-and-a-half weeks to

17  litigate this.  Public policy considerations,

18  contingent nature, all the like, I believe supports

19  the fee we are seeking today in this court.

20            THE COURT:  Thank you.

21            MR. OTTENSOSER:  On a related note, I

22  do support the settlement.  I believe class

23  certification is appropriate.  We put in our client

24  affidavit.  We put in all the other supporting papers.

20

1  And I would request the class be certified, as well.

2                    THE COURT:  Is the 1.2 million all in,

3  or you want that plus expenses?

4                    MR. OTTENSOSER:  It's 1.2 million,

5  plus we put in expenses for $60,239.29.

6                    THE COURT:  Thank you.

7                    MR. OTTENSOSER:  Thank you.

8                    THE COURT:  Mr. Bachman.

9                    MR. BACHMAN:  Thank you, Your Honor.

10  Mr. Ottensoser, both in his papers and this morning, I

11  think has set forth the arguments in favor of

12  certifying the class and approving the settlement.  We

13  support those, have nothing to add, unless the Court

14  has questions of us about it.  I would move, then, to

15  the attorneys' fee issue.

16                    THE COURT:  Sure.

17                    MR. BACHMAN:  Your Honor, defendants

18  did not, contrary to plaintiffs' claim, belittle the

19  disclosures that settled this action.  Nor do we

20  demean them.

21                    THE COURT:  But I have to say, you --

22  your position is that the fee awarded should be

23  $108,000.  I have seen -- I'm sorry, but you know, I'm

24  a weathered veteran of looking at these kinds of

21

1  things.  And certainly, the Delaware firms involved,

2  and I would think O'Melveny and certainly the

3  Wachtell, Lipton firm, have settled cases and agreed

4  to pay fees of 300, $500,000 for disclosures which --

5  I mean, I have been in situations where I cut the fees

6  that folks like you all have agreed to, because it

7  struck me as they were exceedingly insubstantial, and

8  that they might -- might just pass muster to get past

9  a settlement, but that is about all.

10              Here, I mean, if you have got a

11  complaint, why don't you take it to your two bankers.

12  Not only did you have to pay one banker; you had to

13  pay two bankers, who then had you put out an initial

14  set of disclosures which by current standards was

15  pretty woefully bare bones.  I mean, I don't really

16  get it.  I mean, it reminds me of Chancellor Allen in

17  the Gonsalves case, where he was inclined to say, "If

18  we are really in a situation where people have just

19  fundamentally irrational positions or irreconcilable

20  issues, I am going to go with one that is closer to

21  the mark."

22              You all come in and propose $108,000

23  when that 14D-9 -- frankly, there was probably more

24  information in the amendment than there was in the

22

1  original one.

2               MR. BACHMAN:  Let me --

3               THE COURT:  That was after their

4  opening brief and before your answer.  Right?

5               MR. BACHMAN:  That's correct, Your

6  Honor.  We are not contesting causation on --

7               THE COURT:  I understand that.  But

8  then you are attributing the value of that -- you are

9  saying that they deserve $108,000.  I mean, that

10 doesn't even take into account the bankers' books.

11 Just the amended 14D-9, I don't see how you can stand

12 before me and look at the cases you have cited on fee

13 awards and say that the disclosure that the plaintiffs

14 in this case got was anywhere comparable, like, to

15 Gilmartin.  If I took the substantiality of the

16 disclosure in Gilmartin, and I did a mathematical

17 ratio of the fee awarded by former Vice Chancellor

18 Jacobs, now Justice Jacobs, you could be looking at a

19 fee of $8 million, or something.

20              MR. BACHMAN:  Your Honor, without

21 focusing, just for the moment, on the numbers, we

22 think that the approach that this Court has adopted in

23 prior therapeutic disclosure cases is the right

24 approach.  In Dunkin' Donuts and in Citrix, where the

23

1   Court held where the benefit created is not

2   quantifiable, as in a disclosure case, that the

3   quantum meruit approach should be followed, where a

4   slight premium to hours times customary noncontingent

5   rate is the correct approach.  That is what we did in

6   our presentation, Your Honor, is follow the guidance

7   of this Court in both Citrix Systems and

8   Dunkin' Donuts.

9               Whether it's 108,000 or 200,000, I can

10  represent to Your Honor that if the numbers that we

11  have been talking about had been in the range that you

12  mentioned, I don't think we would have been here

13  today.  But 1.2 million, Your Honor, is a number that

14  has never been entered in a therapeutic disclosure

15  case, ever in this Court's history.  And the

16  disclosures in Citrix, in Dunkin' Donuts were -- and

17  in Augenbaum just last year, Your Honor, were very

18  substantial disclosures.  In Augenbaum versus Forman,

19  the Court awarded $225,000 for fees and expenses, not

20  materially different than 168,000 for fees and

21  expenses here.  There the Court held the supplemental

22  disclosures included useful information but pointed

23  out that it did not reveal fiduciary misconduct or

24  call into question the fundamental fairness of the

24

1  final deal struck.  And that is precisely the

2  situation here.

3              THE COURT:  Wait a minute.  The

4  comparable analysis of the bankers actually -- if you

5  took the comparables seriously, did give people reason

6  to think that the deal wasn't so good.

7              MR. BACHMAN:  But ultimately, when

8  that information was provided to all the shareholders

9  and they had the time to consider them, over

10  90 percent of the shareholders voted, and voted in

11  favor of the transaction.  So they did not find --

12              THE COURT:  They didn't find it a

13  reason to vote against the transaction, but is that

14  the legal test?  Because if it is, frankly, you --

15  this is a situation where you don't want me to give

16  any credit to the plaintiffs for investigating the

17  Revlon claims.  You act as if there is an entirely

18  neat separation between the investigation of the

19  disclosure claims and Revlon claims, but I'm supposed

20  to support the release.  One of the things I could do

21  is support an amended settlement where I struck the

22  release as to those claims.  I don't think you would

23  like that.

24              And you know, I understand that you

25

1  get rewarded for what you achieve, but what you seek

2  to do is essentially ignore the effort, and any

3  premium they get is essentially a premium to half or

4  less of their hours.  Right?

5         MR. BACHMAN:  Correct.  And if I can

6  address that piece of it, Your Honor?

7         THE COURT:  What kind of incentive

8  would it put in place for people, the next time they

9  do the 14D-9, to just continue to do this stuff?  I

10  don't know what the bankers' position was on

11  disclosure from the get-go, but it must have been

12  exceedingly odd.

13         MR. BACHMAN:  Well, I was not privy to

14  those discussions, Your Honor, so I can't answer your

15  question.  I will tell you that with regard to the

16  Revlon claims -- if the disclosure claims here were

17  material, and the information that was -- additional

18  disclosures that were made in response to those

19  claims, I think just the opposite is true of the

20  Revlon claims.  Even in Mr. Ottensoser's brief he

21  acknowledges that their Revlon claim was based on a

22  novel theory, that there was a fiduciary duty on the

23  part of the board to remain independent, a theory that

24  has never been successfully advanced in this Court.

26

1          We firmly believe that if the case had

2     been prosecuted on the Revlon-only theory, plaintiffs

3     would not have been successful.  The case would have

4     not gone forward, and there would have been no fee

5     application or fee award in this case, if it had just

6     been a Revlon claim.  And contrary, I think, to some

7     of the representations made this morning, we went

8     through and did a line-by-line analysis of the

9     deposition testimony, of the document requests and the

10    documents produced.  And by far and away, in excess of

11    75 percent of the effort in discovery was directed to

12    the Revlon claims.

13          If you look at the document requests,

14    if you look at the documents that were produced, if

15    you look at the questions that were asked during

16    depositions, and the answers given, on a line-by-line

17    basis, that's what you come up with.  And because we

18    don't have time records -- I understand it's his

19    privilege not to submit time records in connection

20    with his application.  But when you do that, you leave

21    the Court and the defendants with what we know.

22          What do we know?  We know that in the

23    aggregate, less than four boxes of documents were

24    produced in this case.  We know that less than 15

27

1   hours, total, in deposition time occurred in this

2   case.  We know that 75 percent of that effort was

3   directed toward the Revlon claims.

4                   THE COURT:  How about the briefing?

5                   MR. BACHMAN:  Over half of the

6   original preliminary injunction brief filed by the

7   plaintiff in this action was dedicated to the Revlon

8   claim.  Half, if -- again, if you go line by line,

9   page by page, half to disclosure.

10                  THE COURT:  Are you claiming that as

11  an overall matter they put in too many hours?  Then I

12  would be interested to know what the defense put in.

13                  MR. BACHMAN:  No, Your Honor, we have

14  not raised that point.  As I think about the number of

15  documents, the deposition time, you know, I don't know

16  how you get there, but we have not raised that point.

17  But what we have raised is that well over half of that

18  time was dedicated to what plaintiff admits was a

19  novel Revlon claim, one that had never been advanced

20  before, but one which even the original 14D-9

21  disclosed to be without merit, such that by the point

22  we get to the reply brief and to the hearing before

23  Your Honor, it occupied a minuscule portion of counsel

24  and the Court's time.  And when you have that, we

28

1   don't believe that counsel is entitled to be awarded

2   fees on a novel claim that, in the end, even they

3   concluded -- and as they said in the papers, they

4   concluded had sufficiently small prospect for success

5   that they did not seek any --

6                    THE COURT:  Is it your position in the

7   quantum meruit that when the Court is looking at

8   quantum meruit, that you can't at all give weight to

9   the substantiality of the benefit achieved, simply

10  because it's not quantifiable?  I thought the idea

11  there was that you can't give some sort of percentage

12  of the recovery.  I mean, the idea, for example, that

13  in determining what premium to give I can't consider

14  how substantial the disclosure was that the plaintiffs

15  achieved seems to me to be silly and unprincipled,

16  because there can be cases, frankly, from a

17  defendant's perspective, where what you would want me

18  to do was approve the settlement, because of how weak

19  the plaintiffs' claims were, that they were barely

20  vibrant, and getting virtually anything in exchange

21  for them supported the settlement, but because what

22  they achieved was so insubstantial, they should get a

23  $25,000 fee.

24                    I remember doing a disclosure case,

29

1   and I cut the person's -- I forget whether it was

2   25,000 or $12,500.  It was some trifle.  I cited an

3   old decision by Chancellor Allen, saying, basically,

4   it would punish the defendants not to approve the

5   settlement, and that anything the plaintiffs got, you

6   know, supported the release, but that you are going to

7   get a fee that reflects that.  It was some trifle that

8   I gave.

9           MR. BACHMAN:  I thought -- the concept

10  of quantum meruit is flexible.  But as I look at

11  Chancellor Chandler's opinion in LASERS against Citrix

12  in 2001, there he conducted a survey of all

13  therapeutic disclosure settlements over the past three

14  years, and there he found that on average the award

15  was 273,586.

16          THE COURT:  Right.  And I am pretty

17  familiar with the going rate.  And what I'm saying to

18  you is you are arguing to me that even though the

19  actual disclosures in this case I think are inarguably

20  10 to 15 times more substantial and more material and

21  more informative than the disclosures at issue in

22  those cases, that the fee should be, in your view,

23  less than half the average that was awarded.  That is

24  your position?

1          MR. BACHMAN:  What we have tried to do

2     in our brief was follow the guidance of this Court in

3     these cases.

4          THE COURT:  I'm just saying, you view,

5     on a quantum meruit basis, that basically, what the

6     plaintiffs achieved here, even though it was

7     substantively, frankly, way out of the ordinary and

8     more substantial -- that they should get $108,000.

9     Now, you cited to me a painstaking survey.  And the

10    average even in that survey -- and I bet you if we

11    looked at the disclosures in there, we could probably

12    bundle 10 to 15 of them together and they wouldn't add

13    up to what was disclosed here in the amended 14D-9,

14    much less in the bankers' book.

15         MR. BACHMAN:  Your Honor, whether it's

16    173,000 or $273,000, if that is what we were talking

17    about, we wouldn't be here today.

18         THE COURT:  That is not the point.

19    That was Chancellor Allen's point in Gonsalves, which

20    is when -- maybe they were being unreasonable.  I

21    don't know what you tempted them with.  But then what

22    you come in with is -- I don't even get it.  No one

23    would ever bring a case, if you were a plaintiffs'

24    lawyer, if you were in a situation like this, and you

31

1  could get the defendants to do what you all did, and

2  all you got was $108,000.  And if part of the point is

3  to reward people for the risk they take in the cases

4  they don't get compensated in -- I mean, I have been

5  pretty aggressive about cutting fees when I don't

6  think there is any kind of merit to a case, or not

7  granting an injunction in the first place, but, you

8  know, you guys ought to be fighting with your bankers.

9            MR. BACHMAN:  I understand that, Your

10  Honor, but --

11            THE COURT:  I don't know what clawback

12  you have against them.  You paid two bankers here, and

13  they got you into a mess you probably never should

14  have been in.

15            MR. BACHMAN:  My experience with

16  investment bankers, Your Honor, does not suggest there

17  is much in the way of clawback.

18            THE COURT:  No, it doesn't.  But it

19  suggests maybe the next time people negotiate with

20  their bankers, part of the issue with the bankers is

21  if you are going to be an adviser and you are going to

22  be a grown-up, then you are going to participate like

23  a grown-up in the securities markets of this country,

24  and not put your clients in a stupid situation, where

32

1  you put out -- I mean, I'm surprised -- I'm not even

2  sure we get out of the SEC under the current

3  environment, having been down there this autumn with a

4  couple defense-side lawyers to talk about the whole

5  disclosure issue.  I'm not sure you --

6                   MR. BACHMAN:  I will tell you, Your

7  Honor, that while we are not contesting causation with

8  respect to the amended 14D-9, what we -- what --

9  thoughts about what the SEC might expect in the way of

10  the amended 14D-9 were materially informative as to

11  what appeared in that first amendment.  I don't

12  represent the investment banks.  My experience with

13  them was the concept of negotiation is --

14                   THE COURT:  Agonizing.

15                   MR. BACHMAN:  You know, it's what we

16  live with.

17                   THE COURT:  Okay.

18                   MR. BACHMAN:  But let me just -- to

19  the 10 to 15 times, I direct your attention again to

20  the In Re Golden State Bancorp. case.  In there, you

21  got a new fairness opinion.  You got an undated set of

22  financials disclosed.  You had financial information

23  from what was formerly a privately purchaser.  There,

24  the award was $500,000, but you had over a thousand

33

1    attorney hours, over a four-month period.

2                    So Your Honor correctly challenges me

3    on the $100,000 fee.  And what I would say to that,

4    Your Honor, is that is an advocacy position, which I

5    view as no more or less advocacy position than

6    $1.2 million, given the range of fees that this Court

7    has customarily awarded in disclosure cases.  We

8    believe it's that range that should guide this Court

9    in terms of the fee to be awarded here.  And do I

10   expect that this Court would enter 108,000 -- $163,000

11   fee award here?  No.  I don't.  Nor do I expect that

12   the Court would enter a fee of $1.2 million.  Rather,

13   the Court would be guided by the cases that -- the

14   matters that Chancellor Chandler reviewed and the fact

15   that there has never been a reported decision in

16   excess of 330,000.

17                   With respect to the Gilmartin case,

18   Your Honor, again, I point out that that case is now

19   over ten years old, and I do believe the thinking in

20   this Court and the jurisprudence --

21                   THE COURT:  That cuts both ways for

22   you, though.

23                   MR. BACHMAN:  There is inflation.  But

24   I think the Court's thinking about disclosure-only

34

1    cases has undergone some change over that period.

2                    THE COURT:  I know.  But the policy

3    issue also is, frankly, for those of us on the Court

4    -- I include myself in that -- who have been willing

5    to reduce requests for fees when insubstantial gains

6    are achieved, there comes almost a special obligation

7    to also recognize when something substantial was

8    achieved, and the risk that was taken.  That is why I

9    don't believe -- I have said this before.  I don't

10   believe in upward caps, the idea that the more you

11   get -- that that should penalize you when you get a

12   fee request.

13                    I have awarded fees in excess of

14   $10 million on a few occasions, three or four.  I

15   didn't do any kind of reduction precisely because, you

16   know, if you are going to cut fees when modest

17   benefits -- very modest benefits are achieved, you

18   need to reward people who took real risk and hit a

19   home run.  I don't get -- that is what I'm having

20   trouble with, is with the policy.  How do I even start

21   approving your settlements?  I mean, one of the ways

22   to go about this is to just have you all litigate

23   things.  And I'm not sure where that is always good,

24   either, if you -- you see what I'm saying?

1          MR. BACHMAN:  I understand.

2          THE COURT:  If you push too hard on

3    the notion that it really wasn't much achieved and

4    there really shouldn't be much of a reward, then you

5    get to say maybe there shouldn't really be much of a

6    release, either.

7          MR. BACHMAN:  I'm not saying that

8    there wasn't much achieved or there shouldn't be much

9    of an award.  What I'm saying is the award should be

10   within the range of rewards that this Court has

11   historically entered, even in cases when you have

12   substantial disclosures.

13         THE COURT:  Which is the case where

14   you think there was the most substantially comparable

15   disclosure to this?  I'm not aware of anywhere it's

16   been quite as thorough going.

17         MR. BACHMAN:  I think where you

18   actually go out and get a new fairness opinion, that

19   the parties go out and get a new, updated fairness

20   opinion, with new information, as directed --

21         THE COURT:  I'm not even sure that is

22   a disclosure issue.  Is it?  That strikes me as a more

23   substantive --

24         MR. BACHMAN:  Even more so, then, Your

36

1    Honor.

2                    THE COURT:  What was the fee award?

3    Which case is that?

4                    MR. BACHMAN:  That is Golden State

5    Bancorp., Your Honor.  And the fee there was $500,000

6    for a three-to-four-month effort, involving over a

7    thousand hours of attorney time.  Part of that

8    recognizes, as appropriately so, the contingent nature

9    of the case.  But here, the contingency lasted less

10   than a month, as opposed to in the Golden State

11   Bancorp. case, which was nearly four months.  There

12   have been very -- there have been substantial

13   disclosure cases in this jurisdiction, and none have

14   involved a fee anywhere approaching $1.2 million.

15                   That is our argument, Your Honor.

16                   THE COURT:  Thank you, Mr. Bachman.

17   Mr. Ottensoser, anything to add?

18                   MR. OTTENSOSER:  Yeah.  Just a couple

19   of little things.  I have been litigating cases in the

20   Chancery Court here, as Your Honor knows, for -- I

21   mean, I guess I'm a young guy, but a fairly long

22   period of time.  I was in Golden State.  That was my

23   case.  There was no injunction hearing in that case.

24   There was no injunction briefing in that case.  There

37

1    had to be an amended -- or a new fairness opinion.

2    The fairness opinion was issued months and months and

3    months before the deal was closed.

4                    Here, the bankers' books were days

5    before the tender offer started.  The tender offer was

6    two weeks later.  So to have an updated fairness

7    opinion wouldn't make much sense.  On the other hand,

8    what we did by giving the bankers' books, so the

9    shareholders could see what the bankers really did

10   contemporaneously, and how we thought that negatively

11   impacted the price and the process -- was something

12   that we gave the shareholders.

13                   We went through an injunction.  We

14   were on the eve of having a decision.  Under those

15   circumstances, we are more like the Gilmartin case,

16   even though the disclosures there were nothing like

17   ours, where the courts recognize if you take up the

18   cudgels, and you go the distance, and you argue an

19   injunction, and you get relief post-injunction, that

20   is valued much higher than any, as we use the word --

21   scientific word -- crappy disclosures we might get.

22                   I have been in this Court before.  I

23   have been on the receiving end of lowered fees; albeit

24   not 25,000, but lowered fees.  And the Court said if

38

1   you get information that would indicate to support a

2   deal, that is not worth a lot, in my book.  In our

3   view, the information we got -- although the

4   information caused the shareholders not to change

5   their votes, or the like, we thought it was

6   information that showed the deal wasn't as great as

7   they were portraying in the bankers' book.

8              The test for materiality, the Zirn

9   case, is just a total mix of information.  You might

10  find it helpful.  It's not outcome determinative.

11  That is basic Supreme Court Hornbook law under TSC

12  versus Northway.

13             Let's cite some of the other cases

14  that you have in your briefs.  Again, I was in a lot

15  of these cases.  I didn't apply for 1.2 million in

16  those cases.  I applied for 300,000 or 400,000,

17  whatever the price may be.  From my perspective, 1.26

18  is not an advocacy number.  That's a number that I

19  believe I'm entitled to because of the hours we put in

20  the case and, more than that, the substantial

21  settlement that we achieved.

22             Now, my friend on the defense side

23  says he doesn't know what was going through the

24  investment bankers' minds.  If he was at the

39

1    deposition -- I'm not sure if he was -- he would know

2    I asked that question to the investment bankers: Why

3    did you not include these in the proxy -- or the D-9?

4    The answer was: "We don't think we have to put that

5    optional information into these tender offers."

6            So let's not talk about what we got

7    into in the depositions, what was in the briefs, and

8    what was Revlon or wasn't, because I asked these

9    questions, and I got answers to these questions. We

10    cited this testimony in our brief. Again, it all

11    related to the claims we had. And I don't know how

12    many documents we got or what our document requests

13    said, but at the end of the day, the arguments and the

14    briefing clearly relied on the disclosure claims, and

15    you know, I just support my fee for where we are, and

16    that is all I have to say.

17            Thank you, Your Honor.

18            THE COURT: I have the usual trio of

19    obligations to discharge. I think the easiest two are

20    usually whether to approve the settlement and to

21    certify the class. And that is no exception here. I

22    am going to approve the settlement. I think the

23    plaintiffs, they thoroughly -- they took a hit on the

24    Revlon claims. They looked into them. But ultimately

40

1  what they really had were solid disclosure claims.

2  The release of the Revlon claims in exchange for the

3  disclosure of the banker books was a fair and

4  reasonable thing to do in light of the circumstances.

5  And there was substantial information that bore on the

6  fairness of the deal that the stockholders received as

7  a result of this settlement.  So I approve the

8  settlement.

9          Class certification in these cases,

10  this -- corporate cases like this are quintessentially

11  appropriate for class action treatment, because

12  everyone in the class is equally affected.  The only

13  variation is the extent to which they own the shares.

14  That is not a relevant legal variation.  So the order,

15  I believe, proffered order, recites all the requisite

16  findings, and they are fully justified.

17          The difficult issue, I suppose, if

18  it's difficult, is the fee.  I don't find it

19  particularly difficult.  I'm not a person who buys

20  into the idea that you can make the process of

21  awarding fees into some sort of mathematical formula.

22  The Federal Courts tried to do that with the lodestar

23  for years.  It never really amounted to as much

24  mathematical rigor as it promised.  I do think it's

41

1 important, and we use these things. We used effort to

2 get -- you want -- the reason why, to get an eyeball

3 of the effort -- I don't expect, absent -- I think if

4 the defendants want, going in -- if they want the

5 hours on the plaintiffs' side broken down, they should

6 ask. And as long as I get an affidavit from the

7 attorney indicating the overall effort, that is

8 generally -- and I think Vice Chancellor Lamb said as

9 much in previous cases -- it's generally fine for us.

10 If defendants really want that sort of information, I

11 think they can get it, as long as they remember the

12 goose-and-gander rule. For -- the healthy application

13 of the goose-and-gander rule in that situation I think

14 will probably cut down on the number of defense

15 requests for plaintiffs' hours and expenses, given

16 that, you know, defendants often will spend a fair

17 amount of time themselves, arguably more redundantly

18 at times.

19 I'm not troubled by, and I accept as a

20 good faith representation, the range of hours that

21 Mr. Ottensoser indicated were spent. I also accept

22 the notion of the defendants, that a substantial --

23 I'm not going to get into this sort of tipping point

24 between whether it's a majority or 75 or 25 percent

42

1    was spent on Revlon versus disclosure.  There is no

2    doubt that the plaintiff spent a substantial number of

3    hours on developing Revlon claims that didn't pan out.

4    That is also claims that they then entered into a

5    settlement with defendants to release.  To some

6    extent, the defendants need plaintiffs to investigate

7    those claims, because the plaintiffs can only in good

8    faith release them.

9                I do not, however, reward those hours

10   in the sense of giving -- saying that they created any

11   sort of benefit that ought to cause me to up what is

12   given to the plaintiffs.  But I also don't penalize

13   the plaintiffs, in the sense that I do think it's part

14   of the overall effort I have had to take into account

15   in determining whether I'm giving anyone a windfall.

16               I don't know that the plaintiffs could

17   responsibly have avoided this.  This is a policy

18   matter that I do think affects corporate directors and

19   corporations, remember.  A few of us raised the issue

20   with the defense bar in a few cases, with the question

21   of whether, when disclosure-only complaints were being

22   made -- whether we were going to release Revlon

23   claims.  I remember there being a kind of almost --

24   there was a palpable -- I mean, you could feel it.  If

43

1   you are a human -- we all have -- we have these kind

2   of feelings.  You could feel, throughout the defense

3   community, the radiated concern about that notion.

4   Right?  "What do you mean we can't settle all claims

5   if somebody just brings a disclosure claim?"

6                You know, I think -- so if that is

7   right, and if you want to -- if, say, the Revlon

8   claims don't pan out, and the disclosure comes due,

9   and you want a global release, there has to be some

10  acknowledgment of that in the fee compensation

11  process, for the fact that the plaintiffs actually

12  gave it a try.  In reality, in terms of the benefit to

13  the defendants of a settlement like this, if it's

14  collaterally attacked, it's quite useful to have had

15  plaintiffs who were vigorous than to have plaintiffs

16  who didn't do their job.  If there was ever a

17  collateral attack on this settlement, you would have a

18  much better record because Mr. Ottensoser and his

19  clients actually tried to make what they could of that

20  claim.

21                What I'm saying is I don't measure,

22  when I'm looking at awarding a fee -- in determining

23  the size of the fee, I'm certainly not going to say,

24  "They put in a huge amount of hours on claims that

44

1    didn't pan out, and therefore -- and I should reward

2    that."  I'm going to take into account the fact that

3    they hit and hoped -- they hit and hoped they would

4    get something on the Revlon claim, and they didn't,

5    but I'm not going to penalize them.  I also think it's

6    very difficult in a fast-moving injunction setting to

7    be sitting around categorizing where you spend your

8    hours.

9                In my view, the fact that it's not

10   quantifiable, the benefit here, does not mean that the

11   substantiality of the benefit obtained is not

12   relevant.  I think the same policy considerations that

13   the Supreme Court has said matter in a case where the

14   benefit is quantifiable also matter when it's not, and

15   that you need to consider what was achieved, and you

16   also need to consider the risks that were taken, and

17   the fact that in many other cases plaintiffs don't get

18   anything.

19               And taking it all into account, I'm

20   going to award essentially an all-in fee of

21   $1.2 million.  I tend to do all-in because that I

22   think in some ways the costs should be taken into

23   account.  If you quantify it by the hours, it's about

24   $1,500 an hour.  It's a lot of money, but I think a

45

1    lot of risk -- you know, the $1,500 an hour doesn't

2    take into account the expenses, which will have to

3    come out of the 1.2 million.

4                 That is substantially what the

5    plaintiffs requested.  I don't have any problem with

6    that, and I don't have any problem reconciling it with

7    average studies of average disclosures.  This was not

8    an average case.  The corporation here chose to go to

9    its stockholders with extremely bare-bone,

10   noninformative disclosures, took a calculated risk and

11   lost.  You can look at it as this is the third

12   bankers' fee, perhaps caused by the first two bankers.

13   But the amended 14D-9 alone, I believe, if you stack

14   it up against the disclosures in the surveyed cases,

15   would put them all to shame.

16                 Now, I'm not saying that

17   Mr. Ottensoser and his colleagues didn't, you know,

18   jump for joy when they recognized how bare bones this

19   is.  Of course, they did.  But that is part of the

20   enforcement mechanism, because the next time, if

21   somebody didn't jump on this, that would be the

22   pattern.  In most of the other cases, when it's 200,

23   $300,000 awarded, there was a trifling -- I'm not

24   saying trifling.  It could be some important, very

46

1    discrete kind of disclosure.  Here, there had to be

2    rather thoroughgoing disclosure, because of the

3    initial state of what was presented to the

4    stockholders.  And then, of course, the settlement

5    itself, which was entered into after full briefing and

6    after a hearing -- and I acknowledge, in some ways, at

7    my suggestion -- also resulted in very substantial and

8    informative disclosures to stockholders.  And part of

9    that is --

10             I don't gainsay the difficulty in

11   describing what bankers did -- do.  It's a very

12   difficult thing.  I was just up at the New York City

13   Bar Association's M&A committee.  We spent like

14   two-and-a-half hours obsessing -- they did, actually.

15   It seemed to be the most interesting topic that they

16   could ever have addressed in their lives, was the

17   question of how do you disclose bankers' opinions?

18   What is the balance?  And it's not easy to do.

19             But in this case, frankly, the amended

20   14D-9 raised some questions that probably didn't need

21   to be raised, partly, again, because bankers often

22   don't -- they don't have to write appraisal decisions

23   like we do, and have to explain.  They don't have to

24   write exams for Wharton professors.  They go in a

47

1    room, and they pick a multiple that has no

2    relationship to a median or mean, and then they don't

3    explain it except to say it's based on their years of

4    experience.  And then -- but they put all the

5    comparables in the book to show how rigorous they were

6    and that they were following a process of using

7    comparables.

8                    Well, if you know anything about

9    valuation, if you actually come up with your four

10   comparables, and you come up with a median or a mean

11   out of them, and you totally ignore the median or

12   mean, you are not going to pass your test at Wharton

13   in corporate finance, or at HBS or at Stanford, unless

14   you explain why you deviated from the median and mean

15   of the comparables you have chosen.  If all you have

16   done is pick the company's own trading multiple, and

17   you have rejected any real use of the data provided by

18   your comparables, you have concluded that they are not

19   comparable, or you have just concluded that you

20   generally believe in the efficient capital market's

21   hypothesis and the comparable methods of valuation is

22   inapplicable here.

23                    If you have chosen the trading

24   multiple of the company because it happens to make the

48

1  deal look fair, you can't make a disclosure claim out
2  of that if you are a plaintiff, because the banker is
3  not going to admit that that is why it was done.  But
4  it's informative for somebody looking at this, if
5  bankers are going to choose to do these methods of
6  valuation, to know what was the comparables they
7  chose, what was the information that it generates, and
8  what was the multiple chosen by the banker, so that if
9  there is some dose of skepticism out there in the
10 stockholder electorate about these things, they can
11 use their own judgment, from the objective disclosure,
12 about the way the analyses were done.
13             One of the things I talked about with
14 the city bar association is whether it's in some ways
15 easier to simply more routinely disclose banker books
16 than trying to get into all of this narrative
17 disclosure.  I also had a case very recently where I
18 did not grant an injunction even though the disclosure
19 about the bankers' opinion was literally false,
20 because neither the plaintiffs' lawyers, nor the
21 defendants, nor the people that wrote the disclosure
22 actually understood the bankers' analysis.  And once
23 it was properly understood, if it had been properly
24 disclosed, it made the deal look ten times fairer than

49

1    it actually was, and that wasn't a basis to enjoin a

2    transaction, even though the disclosure was literally

3    false.  And I'm probably going on too long, but we

4    have a lot of cases like this.

5              Bankers also do analyses, and they put

6    them in books, and they don't take the analyses

7    seriously.  The better banks don't do this, but some

8    of them, by gosh, if they have created a template for

9    a type of analysis, they will have a junior banker run

10   it.  It's going to be in the book, to make the book

11   longer.  The fact that nobody really understood it, or

12   took the time to make it a seriously good analysis,

13   doesn't mean it's not in the book.  And sometimes

14   these books are too long.  If they create 20 pages --

15   people could say it about my opinions:  "If you just

16   did 15 to 20 good pages, Strine, you wouldn't have to

17   do 50 questionable ones."  So I will acknowledge the

18   glass-house nature of what I'm saying.  It's a

19   difficult thing for people to do.

20             But, you know, when you look at this

21   particular situation, it's clear that the plaintiffs

22   really did achieve substantial disclosure.  And I'm

23   not -- and I think that the magnitude of what they

24   achieved, and the risks that they took, and the fact

50

1    that they did actually do it in an expedited time

2    frame merits the award of a premium.

3              I think if you compare these cases

4    where the average disclosure was 300,000, it's very

5    easy to justify a fee award of four times that here,

6    because the disclosures were far more than four times

7    more informative, on average, than the disclosures

8    that supported the settlements in those cases.  I

9    think if you compare it to Gilmartin -- I don't think

10   the defendants would actually want me to go back and

11   look at what was achieved in Gilmartin and do a -- you

12   know, a -- peg my fee to what was achieved in

13   Gilmartin, and the rate of inflation since then, and

14   then size the fee based on that, and the change in

15   time value of money.  I don't think the defendants

16   want me to do it.

17             So as a person who has rather

18   regularly sliced fees when something insubstantial was

19   achieved, I feel fully confident that an award of

20   $1.2 million in fees, inclusive of the expenses, is a

21   fair and reasonable one in this case.  What I would

22   ask the plaintiffs to do through -- if they have an

23   updated thing, I can save them the LexisNexis thing.

24   If not, I can enter it through the miracle of

51

1  LexisNexis.  It's a holiday miracle.  There is

2  actually a show about it, I believe, that LexisNexis

3  puts out.

4                MR. ROSENTHAL:  Your Honor, I have

5  here the order and final judgment in the form that was

6  attached as an exhibit to the stipulation of

7  settlement.  I have taken the liberty of putting in

8  the dates, and I think Your Honor will have to do a

9  bit of editing on the fee part, strike out "plus

10  expenses."

11                THE COURT:  Okay.  Let me see.  Can

12  you show it to Mr. Bachman?

13                MR. BACHMAN:  I think there was a typo

14  in there.

15                THE COURT:  If you guys want to

16  scrivener it a bit and just send it over by computer,

17  we can do that, too.

18                MR. PAYSON:  We lost a thousand years.

19  It's 1007.

20                THE COURT:  That is -- how quaint?

21  1007.  That predates the Magna Carta and concepts of

22  -- English concepts of equity.  I think the defendants

23  would like -- the problem is it would void your

24  release, too.  You would have to waive the fee award.

52

1                    Mr. Rosenthal, what were the filing

2      fees in the 1007?

3                    MR. ROSENTHAL:  I think that you were

4      drawn and quartered.

5                    THE COURT:  You and Mr. Sparks were

6      tangling over things back then.

7                    MR. ROSENTHAL:  I think he was just in

8      short pants and I was little older.

9                    THE COURT:  So we corrected the year.

10     Okay, a thousand years.  Thank you, all.  Have a happy

11     holiday season.

12                    (Recess at 11:35 a.m.)

13                         – – –

14

15

16

17

18

19

20

21

22

23

24

53

1                                CERTIFICATE

2              I, WILLIAM J. DAWSON, Official Court Reporter

3      of the Chancery Court, State of Delaware, do hereby

4      certify that the foregoing pages numbered 3 through 52

5      contain a true and correct transcription of the

6      proceedings as stenographically reported by me at the

7      hearing in the above cause before the Vice Chancellor

8      of the State of Delaware, on the date therein

9      indicated.

10             IN WITNESS WHEREOF I have hereunto set my hand

11     at Wilmington, this 7th day of January, 2008.

12

13

14                      /s/William J. Dawson
                       Official Court Reporter
15                      of the Chancery Court
                         State of Delaware
16

17
       Certification Number: 187-PS
18     Expiration:  Permanent

19

20

21

22

23

24